UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
23-CR-160 (10)( NEB/JFD)

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **DEFENDANT'S** |
| v. | ) | **MEMORANDUM IN SUPPORT** |
| | ) | **OF HIS MOTIONS** |
| Trevaun Robinson, a.k.a. | ) | |
| Tricky Tre, | ) | |
| | ) | |
| Defendant. | ) | |

_____

This Court's Docket Entry 1220 sets the following order for Mr. Robinson's memorandum:   His motion for Disclosure of Brady Materials, Docket Entry 961; His motion to Strike Surplusage, Docket Entry 964; his Motion to Suppress Evidence of Searches and Seizures, Docket Entry 965; his Motion to Suppress Evidence of Statements, Docket Entry 966; and finally, his Motion to Dismiss the Second Superceding Indictment, Docket Entry 962.

**Motion for Disclosure of Brady Materials, Docket Entry 961.**

The Court suggested that Mr. Robinson had taken "the most expansive view of a prosecutor's <u>Brady</u> obligations," Motions Transcript at p. 12.   Our motion was not boilerplate.   "[W]hat we're looking for is the evidence that the DOJ has that provides our claim.   Namely, that the RICO statute is used for discriminatory

effect by targeting black gangs to the exclusion of white gangs who are similarly situated."  Id. at p. 15.

Our related claim was the linkage between the DOJ report finding racial bias with the Minneapolis Police Department and this case.   This Court suggested that if the defense could "show that to me, you'll get your ruling."   Motions T. at p. 21.

Brady requires disclosure, upon request, of evidence favorable to the defendant on the questions of guilt and punishment.   Brady v. Maryland, 373 U.S. 83, 87 (1963).   Brady isn't just about impeaching evidence and its required disclosure, and the reversal that will result if it isn't.   E.g., Reutter v. Solem, 888 F.2d 578, 581-82 (8th Cir. 1989); United States v. Foster, 824 F.2d 491, 495 (8th Cir. 1988).

Favorable evidence is also evidence that confirms the defendant's defense. For example, if the defendant claims alibi, and the government has corroborating evidence, it must be disclosed.   Dennis v. Sec'y, Pa. Dep't of Corr., 834 F.3d 263, 286-88 (3rd Cir. 2016).   Or for the defendant's proposed entrapment.   United States v. Ford, 550 F.3d 975, 982-83 (10th Cir. 2008).   Or a defendants minimal role in the conspiracy.   United States v. Barraza Cazares, 465 F.3d 327, 333-34 (8th Cir. 2006).   If the defense is a third party perpetrator matching the defendant's description, Brady requires the Government timely disclosure of that person,

United States v. Olson, 697 F.2d 273, 275-76 (8th Cir. 1983)(finding error in the DOJ's refusal to timely disclose Brady information with respect to the defense of mistaken eye-witness identification; Judge Rosenbaum reversed); Clemmons v. Delo, 124 F.3d 944, 952 (8th Cir. 1997)(finding Brady violated where government failed to disclose memo written by key prosecution witness accusing third party of committing crime).

We have raised a defense of selective prosecution as defined by the Supreme Court in United States v. Armstrong, 517 U.S. 456 (1996).   To place our Brady requests in context, the first step is to recognize that the defense exists, and that there is "some" basis for it.   The next step is an answer to the question of whether the Department of Justice, in all its offices, has data that supports our defense.

On the latter question, the Government's memorandum obfuscates.   The Government's Brady response does not address our specific requests, and instead spends nineteen pages addressing motions brought by defendants Hamilton, Knight, Banks, and D. Johnson.   Memorandum at pp. 62-81.

Armstrong holds that our selective prosecution claim as "not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the change for reasons forbidden by the Constitution."   Id. at 463.   The DOJ's "'broad discretion' to enforce the National criminal laws," Id.

3

at 464 (quoting <u>Wayte v. United States</u>, 470 U.S. 598, 607 (1985)), Memorandum at p. 5, has never been beyond judicial review.    That discretion is "subject to constitutional constraints," <u>United States v. Batchelder</u>, 442 U.S. 114, 125 (1979), as opposed to the United States' mere claim that if probable cause exists to charge, that office may charge whatever crime.    Memorandum at p. 6.

The Government is constrained, however, and there is a place for the District Court to review our claim.    That constraint is "imposed by the equal protection component of the Due Process Clause of the Fifth Amendment."    <u>Armstrong</u>, 417 U.S. at 464 (citing <u>Bolling v. Sharpe</u>, 347 U.S. 497, 500 (1954)). "[T]he decision whether to prosecute may not be based on 'an unjustifiable standard such as race, religion, or other arbitrary classification.'"    <u>Id.</u> (quoting <u>Oyler v. Boles</u>, 368 U.S. 448, 456 (1962)).

Yes, as the Government points out, Memorandum at p. 14, we have a burden to "produce <u>some</u> evidence that similarly situated defendants of other races could have been prosecuted, but were not," consistent with the Supreme Court's "equal protection case law."    <u>Armstrong</u>, 417 U.S. at 469 (citations omitted; emphasis added).    The word "some" is not defined.    Rather, the Supreme Court opined: "We think the required threshold – a credible showing of different treatment of similarly situated persons – adequately balances the Government's interest in

4

vigorous prosecution and the defendant's interest in avoiding selective prosecutions." Id. at 470.

Some evidence does exist. For starters, we read new Lucy Litt's recent article, written during the Government's investigation here, RICO: Rethinking Interpretations of Criminal Organizations, Berkeley Journal of Criminal law, 26:2 (2022). She tried to secure the data, and discovered the DOJ "does not share information with the public about the alleged gangs it prosecutes." Id. at 81. The Government does not dispute that posit. Ms. Litt does not have a Brady motion at her disposal. There is no due process involved in writing a law review article.

Nonetheless Ms. Litt found that "Black and Brown men from low-income communities are the primary suspects who are later convicted and harshly sentenced through federal RICO prosecutions." Id. at 83. The Government has chosen not to dispute that premise either, countering with an ipse dixit "full stop" denial. Memorandum at p. 12. But we have the benefit of Ms. Litt's research (which the government can't dispute because it has blocked the data of RICO prosecutions), that from 2015-2019, the federal RICO prosecutions charged an over-representation of Black defendants. Of those defendants under the age of 25, 85% were black. Id. at 150.

The Court questioned whether an earlier law review article reaching the same conclusions might be dated since it came out "20 years ago."    Motions Transcript at p 17.    The article by Professor Jordan Blair Woods was published in 2012, <u>Systemic Racial Bias and RICO's Application to Criminal and Prison Gangs</u>, 17:304-357, Michigan Journal of Race and Law (2012).    He found that a "strong majority (approximately 86%) of the prosecuted gangs was affiliated with one or more racial minority groups (Black, Latino, or Asian)."    <u>Id</u>. at 306-307.    Of the 160 DOJ prosecutions he studied, 83% of the defendants were from a minority group, with Latino and Black comprising of 77.5%.    <u>Id</u>. at 329, Table 1.    The Government doesn't dispute Professor Wood's findings.

Claims of racial bias in the federal courts system are not unique to this motion.    A leading study published by M. M. Rehavi and Sonja B. Starr, <u>Racial Disparity in Federal Criminal Sentences</u>, J. Pol. Econ. 122: 1320, 1337, 1343 (2014), found that across many offense types, Black arrestees received 10% higher sentences than white defendants, the disparity explained by initial charging decisions and the prosecution's choice to include a mandatory minimum.

The Minnesota Supreme Court's <u>State v. Russell</u>, 477 N.W.2d 886 (Minn. 1991) acknowledged early defense equal protection claims with respect to crack/cocaine disparities in penalty, with crack used predominantly in the Black

6

community.    It took decades for Congress to acknowledge that similarly situated

defendants, using a drug with the same chemical composition, received disparate

sentences.    See United Stated v. Spears, 555 U.S. 840, 844 (2009)(discussing the

irrational 100:1 cocaine/crack ratio); 21 U.S.C. 841(b)(1)(A)(reflecting the

amended ratio).

   And then we have the DOJ's "Investigation of the City of Minneapolis and

the Minneapolis Police Department," dated June 16, 2023.    Which finds that the

MPD "unlawfully discriminates against Black and Native American people in its

enforcement activities."    Id. at p. 1.    The report relies on interviews with MPD

officials of all ranks.    Id. at p. 7.    The report also references the afflicted North

Minneapolis Black population.    Id. at 3.    It is not a coincidence that the location

of this case is Lyndale Avenue North and Broadway, where you can find Winner's

Gas Station and Merwin Liquors.

   Our Brady motion was not filed to be an improper "discovery device."

Memorandum at p. 63 (quoting United States v. Bowie, 618 F.3d 802, 818 (8th Cir.

2010)).    We are not requesting evidence that is already available to us.

Memorandum at p. 65 (citing United States v. Jones, 34 F.3d 596, 600 (8th Cir.

1994)).    What our Motion does is track the DOJ findings, and requests the

underlying data so that we might prove our defense that there is a racial animus in

the investigation of the Black community, in the MPD's "enforcement activities," and in the use of RICO to unfairly accentuate punishment for crimes that have, in large part, already been prosecuted in state court by the same police department.

Footnote 4, at page 13 of its Memorandum, the Government does not dispute the DOJ findings of civil rights violations, police misconduct, and the failure of police leaders, once aware of the violations, to stop the practice.

Instead the Government makes the hollow claim that since these particular lawyers do not possess the DOJ's "Report materials," the prosecution team "would not be the appropriate party from whom to seek disclosures of this type." Memorandum at p. 13, n. 4. The Government's <u>Brady</u> obligation is to learn of and disclose exculpatory or impeachment evidence known, even if the data is outside its offices on the Sixth Floor. <u>Kyles v. Whitley</u>, 514 U.S. 419, 437 (1995).

The Government's Memorandum fails to address our key <u>Brady</u> request, which, once provided, will definitively prove our selective prosecution claim. Number 30: "Finally, we request DOJ case statistics, breaking down RICO prosecutions by the race of the defendants. Specifically, for the [last] twenty years, we also request a listing of RICO prosecutions brought against Black urban gangs and RICO prosecutions brought against gangs involving whites and Hispanics and the composition of the defendants' race in each case." Robinson

8

Brady motion at p. 27.

The Government has promised that when "additional evidence required to be disclosed comes to the government's attention, it will be turned over promptly." Memorandum at p. 62.    To supplement our Motion to Dismiss, we need that Brady information right now.

This Court has ample authority to order the DOJ provide data concerning the ethnicity of RICO defendants, and the dispositions of their cases.    In, for example, United States v. Correa-Gomez, 160 F.Supp.2d 748, 750 (E.D. Ky. 2001), aff'd 328 F.3d 297 (6th Cir. 2003), the DOJ was ordered to produce records from the INS that would support Defendant's Armstrong claim that charges concerning employment of illegal aliens were selective.    After a review of the government's disclosures, which were resisted, and yet proved INS engaged is discrimination in enforcement between white and Hispanic employers, the government's selective prosecution was proven, and the Indictment dismissed.    Id. at 754.    We seek the same remedies – production of favorable evidence, then evaluation of the Armstrong standard.

**Motion to Strike Surplusage, Docket Entry 964.**

Where the questioned language is needless, inflammatory and prejudicial, e.g., United States v. Michel-Galaviz, 415 F.3d 946, 948 (8th Cir. 2005)(the

standard), Rule 7(d), Fed.R.Crim.P. permits our request for a significant deletion consistent, of course, with this Court's discretion.    United States v. Figueroa, 900 F.2d 1211, 1218 (8th Cir. 1990), cert. denied, 496 U.S. 942 (1990).    The Government writes as if discretion is a meaningless exercise in this case; nicknames, and detailed gang descriptions must be included, no matter the implications.    Government's Memorandum at pp. 50-51.

But each defendant is treated individually.    The joint trial is a conglomeration of separate trials, or so the theory goes.    That's the jury instruction anyway, given for decades now.    See e.g. Sec. 11.07, Devitt and B Blackmar, Federal Jury Practice and Instructions (3rd ed. 1977; Supp. 1988); Sec. 12.13, O'Mally, Grenig, et al., Federal Jury Practice and Instructions (5th ed. 2000); Sec. 5.06A-1, Eighth Circuit Model Instructions (2022) (noting the defendant's role in a conspiracy must be separately evaluated).

There is no claim Mr. Robinson murdered for the benefit of the alleged Enterprise.    Superceding Indictment at pp. 9 and 12, para. 15, para 52, page 18, paras. 60 and 64, page 19, para. 72, page 20, para. 77.    The Indictment's language is cold, at e.g., Overt Act 64 ("S.T. fired at Victim H, who also had a firearm, and Victim H shot and killed S.T."); Overt Act 72 ("D. Johnson, Hamilton, Pruitt and W. Johnson traveled to the Skyline Market and shot and killed Victim J, whom

they mistakenly believed was a rival Lows gang member").

The Government claims the "violent acts" are "interconnected" and relevant to proving the "existence of a criminal enterprise as defined by the RICO statute." Memorandum at p. 52.   Not with respect to Mr. Robinson.   He didn't shoot, and these allegations are inflammatory and prejudicial to him, again key factors to be considered.   Dranow v. United States, 3076 F.2d 545, 558 (8th Cir. 1982); United States v. DeRosier, 501 F.3d 888, 897-98 (8th Cir. 2007).

At the beginning and end of a federal case, the charges are read to the jury. This process serves as yet another opening statement and final argument without the Government having to make one.   An Indictment is sufficient if it states an offense and elements thereof, Rule 7(c)(1), Fed.R.Crim.P.; United States v. Redzic, 627 F.3d 683, 689 (8th Cir. 2010), providing adequate notice to Mr. Robinson. Hamling v. United States, 418 U.S. 87, 117-118 (1974); United States v. Beasley, 688 F.3d 523, 533 (8th Cir. 2012).   We have notice of his charges without the endless overt acts which do not pertain to him.

We are likewise concerned with Mr. Robinson's purported alias, "Tricky Tre."   Mr. Robinson is Mr. Robinson.   The Government contends nicknames are relevant for, among other reasons, identity.   Memorandum at p. 50 (citing United States v. Delpit, 94 F.3d 1134, 1146 (8th Cir. 1996)).   There will be no trial issue

as to his identity.

The Government's fallback claim is that the cooperating witnesses know Mr. Robinson by Tricky Tre only.    Memorandum at p. 51.    They also know his face and can easily be made to call him by his rightful name.

"Tricky Tre" infers sneakiness, a trick, a deceit, a slinky character.

At the motions hearing, this Court asked for "discovery in the form of police reports," where it is said that "Mr. Trevaun Robinson is referred to as "Trevaun Robinson" and not by a nickname, okay?"    Motions Transcript at p. 29.

Bates 48552 describes an arrest, on the felony warrant discussed below, of TREVAUN LEEDELL EUGENE ROBINSON."    He is identified as "Trevaun ROBINSON" in Bates 48557.    There is a reference to (aka TRICKY) in Bates 48577.

For his arrest with Shanami Shakur General-Thomas, also discussed below, he is identified as "Trevaun Leedell Eugene Robinson."    Bates 411514.    As the driver of the General-Thomas car, he is referenced by his last name, "Robinson." Bates 41528.

A narrowing of an indictment's scope, to bar its prejudicial impact, is a permitted use of Rule 7(d).    United States v. Zabawa, 39 F.3d 279, 284 (10th Cir. 1994) (holding that the district court properly narrowed the scope of the

government's indictment by striking surplusage).    This unwieldy Superceding

Indictment should be cut.

### Motion to Suppress Evidence of Searches and Seizures, Docket Entry 965

### The June 7, 2018 Search and Seizure

The Government declined to offer the testimony of the Minneapolis Police

Officers who arrested Mr. Robinson either day.    Instead, Matthew Schommer, an

IRS Agent without first-hand knowledge, provided a summary.    Motions

Transcript at pp. 31-32.    The IRS is a collateral agency to this case.    Tax fraud

was not a consideration when the murders were committed.

On June 7, 2018, MPD Gang Task Force officers reviewed a Snapchat video

of Shanami Shakur General-Thomas "waving around a firearm towards the

camera."    Motions Transcript at p. 33; Govt. Exh. A-1.    General-Thomas was,

according to reports, "a Highs member, namely with the FreeShotz."    T. 34.

About an hour later, duration left uncertain at the motions hearing, T. 40,

Officers Stetson and Grout conducted a traffic stop of the car in which General-

Thomas was a passenger, Mr. Robinson the driver, with one Jerry Williams, who

appeared in the Snapchat video, in the back seat.    T. 35; Govt. Exh. A-4.    Noted

Agent Schommer, "the only person that showed a gun in that video was General-

Thomas."   T. 40.   Mr. Robinson "did not have a gun on his person."   T. 40.

General-Thomas, agreed Agent Schommer, "was the object of the initial

detention."   T. 41.   Agent Schommer was unaware of whether or not Mr.

Robinson was ever charged.   T. 42.

No illicit driving conduct was mentioned at the motions hearing.   Compare

United States v. Walker, 840 F.3d 477, 483-84 (8th Cir. 2016)(stop for a cracked

windshield, and the subsequent smell of burned marijuana justified the warrantless

search of the defendant's vehicle).

Nor, at the motions hearing, was there a proven articulated basis for stopping

the car.   The Government claimed General-Thomas has a previous felony, hence

he could not possess the gun.   Memorandum at p. 90.   But no evidence of a

felony was produced.   This failure of proof was the chance the Government took

in not calling the relevant police officers at the scene.

For his part, Mr. Robinson had done nothing wrong, with no evidence that

he had actual or constructive possession of General-Thomas's handguns found

underneath the passenger seat, and not the driver's seat where he sat.   He should

not have been arrested.   Nonetheless, the Superceding Indictment claims Mr.

Robinson, with "another Highs member possessed two firearms."   Overt Act. 14.

The Government offers the automobile exception to justify the warrantless

14

search.    Memorandum at p. 94 (citing United States v. Mayo, 627 F.3d 709, 713-14 (8th Cir. 2010)).    Mayo describes various fact scenarios that have justified a search of an automobile incident to an arrest once the officer observes the defendant's "nervous behavior," apparent drug activity, the presence of drug paraphernalia, a dog sniff alert.    Id. at 714.    None of this occurred here.

The officers did not observe the gun in plain view, the other exception. E.g. United States v. Randolph, 628 F.3d 1022, 1023-26 (8th Cir. 2011)(plain view justification of the automobile search).

**The August 10th, 2021 Seizure.**

On August 7, 2021, Agent Schommer recalled that "a prominent member of the Highs, an individual named Prince Martin, was murdered at Winner Gas Station."    T. 43.    Minneapolis Police considered the area of Broadway and Lyndale Avenue North to be an area of "high crime."    T. 43.    A memorial for Mr. Martin was "set up at Winner Gas in which a lot of the Highs members would attend daily, kind of to pay their respects to Mr. Martin."    T. 43.

Three days later, on August 10, 2021, Mr. Robinson was a passenger in a maroon Chevrolet Monte Carlo, which left the Winner Gas Station, and drove to the 4th Street Saloon, "about a block away," and parked there.    T. 44.

Mr. Robinson had an outstanding warrant for his arrest.    T. 44.    He was

15

"peacefully" removed from the Monte Carlo.    T. 51.    The body camera video suggests thereafter Mr. Robinson dropped onto the street a small baggie containing fentanyl pills.    T. 46.

The driver was "Hannah Whitfield," whose first name appears in the reports as Amina.    E.g., Bates 48554.    She owned the title to the Monte Carlo.    T. 51. Ms. Whitfield was detained because of Mr. Robinson's warrant.    During a subsequent search of the Monte Carlo, Minneapolis Police discovered a gun "on the driver's side in between the center console and the driver's seat."    T. 51.

Mr. Robinson's arrest is beyond challenge.    See Utah v. Strieff, 579 U.S. 232 (2016)(barring defense challenge to an executed arrest warrant).    The analysis doesn't stop there, however.

In Arizona v. Gant, 556 U.S. 332 (2009), the driver was arrested for "a suspended license, handcuffed, and locked in the back of a patrol car" while the police searched his care and "discovered cocaine in the pocket of a jacket on the backseat."    Id. at 335.    Gant is famous for overruling New York v. Belton, 453 U.S. 454 (1981)).    In Gant, the Supreme Cort held "[p]olice may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest."    Id. at 351.    The Court

16

held that "Belton does not authorize a vehicle search incident to a recent

occupant's arrest after the arrestee has been secured and cannot access the interior

of the vehicle."    Id. at 335.    Gant thus emphasized the importance of a nexus

between the reason for the defendant's arrest, and the police expectation of finding

contraband.    Id. at 334.

No nexus was explained at the motions hearing by the IRS agent.

Gant applies once Mr. Robinson's arrest had been made.    He was

immediately cuffed.    United States v. Scott, 818 F.3d 424, 431 (8th Cir.

2016)(noting the distinction of a defendant's arrest near the car, and when no arrest

"has taken place").

We anticipate the Government's claim that Mr. Robinson lacks standing to

contest the search and seizure.    See generally Rakas v. Illinois, 439 U.S. 128, 139

(1978).    The concept of standing isn't necessarily narrow.    Brendlin v.

California, 551 U.S. 249 (2007) permits the car passenger to contest his arrest.

The Government is not permitted an inconsistency.    Steagald v. United

States, 451 U.S. 204, 211 (1981)(criticizing the Government's contrary assertions

with respect to standing and possession).    It cannot claim Mr. Robinson has no

standing to contest either search, but then charge that he has a possessory interest

in the guns seized.    United States v. Morales, 737 F.2d 761, 763 (8th Cir. 1984).

17

Which is what the Government has done.    Superceding Indictment at p. 12, para. 14, and page 20, para. 74.

**Motion to Suppress Evidence of Statements, Docket Entry 966**

After his August 10 arrest, and while in route to the Hennepin County jail, Mr. Robinson was recorded while in the back seat of the squad.    Govt. Exhs. A-8 and A-9.    There is no question as to his custodial status.    T. 54.

The enhanced audio, A-9, is difficult to hear.    At approximately 21:50, Mr. Robinson speaks of a probation officer, and his addiction.    But it is difficult to ascertain whether he is responding to a question or not.    We've listened and tried to understand, without success, the garbled words.    For lack of definiteness, the Government's proof fails.    The officer could have been called.

**Motion to Dismiss the Second Superceding Indictment, Docket Entry 962.**

This motion, as noted, is joined with our <u>Brady</u> requests.    The Government complains we've not shown enough, while at the same time blocking our requests for the data proving our claims.    Further response is in order, once the Government complies with its <u>Brady</u> obligations.

<u>United States v. Bass,</u> 536 U.S. 852 (2002) is cited as a primary bar for our relief.    Memorandum at pp. 10-11.    In <u>Bass,</u> the Black defendant, facing the

death penalty, moved to dismiss the government's penalty notice for reasons that

the "United States charges blacks with a death-eligible offense more than twice as

often as it charges whites. . ." Id. at 864 (quoting the Sixth Circuit opinion).

The High Court found that the Armstrong standard of showing "some evidence" of

both "discriminatory effect and discriminatory intent" could not be met with "raw

statistics" because the numbers said "nothing about charges brought against

similarly situated defendants." Id. at 864.

 We begin with similarly situated defendants.

 In Minnesota, there have been two RICO cases.    The second was the Native

Mob prosecution, United States v. McArthur, 850 F.3d 925, 931 (8th Cir. 2017),

featuring American Indian males engaged in drug trafficking, assaults, and the

protection of its members and territories.    Both prosecutions targeted men of

color.    The DOJ has found the MPD discriminates against these two specific

groups.    Report at p. 1.

 The 1970 RICO statute was originally enacted to punish the Mafia, whose

members were white Italians.    See Litt, at p. 83 n. 1 (summarizing the history of

RICO with respect to the Mafia).    For example, the John Gotti prosecution in

United States v. Locascio, 6 F.3d 924 (2nd Cir. 1983).    Minnesota's last Mob-

related case, with all white defendants, was not charged out under RICO.    United

States v. Gustafson, 728 F.2d 1078 (8th Cir. 1984).

The most violent street gang in Minnesota was once the Hells Angels.    That group was prosecuted here twenty-years ago in United States v Matter, 02-CR-36 (JMR/FLN).    The tough guy members were indicted on continuing criminal enterprise, distribution of cocaine, methamphetamine, money laundering, and even social security administration fraud, but not RICO.    They were all white.

The Government's description of why ours is a RICO case – multiple defendants, arms dealing, acts of violence, spacial domination, Memorandum at p. 1-3 – applies to nearly every drug conspiracy in federal court.    The Court may take judicial that the drugs arrive in Minnesota from Mexico.    The cartels and their expansive networks of traffickers in the United States are a criminal enterprise engaging in a pattern of racketeering activity with a foreign commerce component.    All the elements of the RICO statute are in play.    18 U.S.C. 1962. The cartels use the same enforcement mechanisms as this case, i.e., threats, assaults, murders, guns.

White defendants engaging in narcotics trafficking in Minnesota, selling cartel drugs, have not been charged with RICO, even when death has occurred (by overdose).    A representative case is the pending United States v. Azure, 22-CR-339 (ADM/DJF).    For a companion case, see United States v. Gray, 23-CR-253

(JSW/LIB) featuring a flood of methamphetamine across northern Minnesota.
The defendants are white

For its response, our hope, a faint one, is that the government will list all of
its narcotics cases in the last five years that feature white defendants, guns and
threats of violence, and confirm our observation that RICO was not charged.    We
suspect this Court has observed dozens of these cases already.

Armstrong left open the question of how many similarly situated defendants
we must show.    We've just provided required quantum of "some evidence."    417
U.S. at 469.

Once we show, and we have shown above, that RICO prosecutions in
Minnesota are brought in a "racially skewed manner," Floyd v. City of New York,
959 F.Supp.2d 540, 561 (S.D.N.Y. 2013), we've made considerable headway into
showing an equal protection violation, the Armstrong predicate, and surely good
reason to grant our Brady requests.

Beyond individual cases, the statistics have to matter.

We know Floyd was a Monell case, but the case remains important because
once there is a finding of police deliberative indifference in how the law is
enforced, there can be a conclusion of discriminatory effect and intent.    Floyd,
959 F.Supp.2d at 665-666.    Discriminatory effect and intent are what Bass and

<u>Armstrong</u> require us to show.    <u>Bass</u>, 536 U.S. at. 864; <u>Armstrong</u>, 517 U.S. at 465, 470.    The <u>Floyd</u> findings are based upon a statistical analysis.

Beyond proof of similarly situated defendants Black and white, the statistical analysis employed by the DOJ to find discriminatory intent in Minneapolis Police Department's conduct is a valid measure.    The numbers endorsed by the DOJ Report at p. 37 are proof of disparate law enforcement.

There have always been two ways to research racial disparities.    One is qualitative, the other quantitative.    See Darrly K. Brown, <u>Batson v. Armstrong:</u> <u>Prosecutorial Bias and the Missing Evidence Problem</u>, Oregon Law Review: Vol. 100: 357, 367 (2021-2022).    The most recent Supreme Court equal protection case analyzed both methods.    <u>Students for Fair Admission, Inc. v. President and</u> <u>Fellows of Harvard College</u>, 143 S.Ct. 2141, 2169-2172 (2023).

Professor Woods' Table 1 is a place to start.    Insist by order that the government, with its own data, confirm his assembled data.    The hard numbers prove RICO prosecutions disproportionately target gangs of color.    17 Michigan Journal of Race and Law, at p. 329.

Dated: August 1, 2024                    Respectfully submitted,

                                         */s/ Paul Eng*h
                                         PAUL ENGH
                                         Attorney No. 134685
                                         150 South Fifth Street, Suite 2860
                                         Minneapolis, MN 55402
                                         Tel: (612) 252-1100
                                         engh4@aol.com

                                         Attorney for Mr. Robinson