UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA,   ) | Criminal No. 23-160 (28)(NEB/JFD) |
| ) | |
| v.           Plaintiff,  ) | |
| ) | **DEFENDANT'S SENTENCING** |
| DEANDRAE POE,        ) | **POSITION PAPER** |
| ) | |
| Defendant.   ) | |

## INTRODUCTION

When Deandre Poe got out of prison in the spring of 2020, he was optimistic and hopeful. The last thing he expected was to be back in court, facing a lengthy federal sentencing, five years later. That isn't what he had in mind, and it isn't what he expected, wanted, or contemplated. He was determined to do right, and worked hard at it. For the first two years, he made wonderful progress and did some good things, really firsts in an otherwise difficult life filled with struggles and setbacks, and he was headed in the right direction. He had maintained fulltime employment, was attending Barber School, reconnected with his family, was straight and sober, and graduated from reentry court, then he veered from that rightful path and now he finds himself in an awful place – awaiting federal sentencing – a place he worked so hard to avoid. But it would be a mistake to view him as incapable of recovering or ever making something positive of himself because Mr. Poe possesses the insight, internal awareness, and self-determination to right this ship and get back to where he was headed – after he serves what will be, by any measurement, a very long and substantial time in prison. Importantly, he has not

1

given up on himself or the world, and remains upright and positive that he can still do good things and has a good future, albeit delayed, that he was on track of pursuing when he got out of prison in 2020.

Mr. Poe has spent the last fifteen months in jail deliberating and thinking through the errors, the choices he made, and reasons that he is where is at now, and has come to some rather profound conclusions about himself and his plight.  He has inserted himself in therapy, disavows further gang involvement, and acknowledges the destructive path of his past behaviors, and sees the errors, excuses and shortcuts that led to reverting back to crime as a means of livelihood.  He wants a chance to do it all over again.  And he means to succeed this time.

On October 6, 2024, Mr. Poe pled guilty to one count of  membership in a racketeering (RICO) conspiracy based on his drug dealing activities in 2022-2023.  While the plea agreement contemplated  an advisory guidelines offense level of 33, the PSR has determined the advisory offense level to be 31.[1]  With a criminal history category of VI, the guidelines would be 188-235 months if the offense level is 31;  235-293 months if the offense level is 33.  However, regardless of the guideline range, the government agreed that it would be appropriate for the court to sentence based on an offense level of 30,

---

[1] The PSR recommends against a two-point gun enhancement, noting that Poe did not possess a gun, and questions whether there are sufficient facts to support the enhancement. Counsel would note that this was stipulated in the plea agreement and, given the manner in which the parties have resolved the case, the court's resolution of the issue does not change the position of either party.

2

which, in this case, would result in a guideline range of 168-210 months.[2] Consistent with that agreement, the government has filed a position paper asking for a sentence within that recommended range.

The defense requests that the court impose a sentence of 168 months, i.e., 14 years, as an appropriate punishment that takes into account the sentencing factors at 18 U.S.C. § 3553(a) and the court's ultimate sentencing directive to impose a sentence that is "sufficient, but not greater than necessary" to achieve those goals.  A sentence of fourteen years is a lengthy term of imprisonment by any measurement, and more than sufficient to address the law enforcement goals of deterrence, promoting respect for the law, and reflecting the seriousness of the offense, while taking into account the unique individual circumstances of Mr. Poe's life, and is a sentence that would not result in an unwarranted sentencing disparity.  Mr. Poe's overall life, the difficult circumstances of his upbringing, the two years of positive growth and progress, his demonstrated commitment to change, and the positive approach he has taken in the face of adversity, all are circumstances that the court can and should take into account when fashioning an appropriate sentence in this case.  A sentence of 168 months is a sentence that is "sufficient, but not greater than necessary" to satisfy the overall purposes of sentencing set forth at 18 U.S.C. § 3553(a) and an appropriate outcome in this case.

---

[2] The government has taken this approach with a select number of these RICO cases and, for various reasons, determined it would be appropriate for these cases to be resolved based on a joint agreement for the court to impose a sentence within the offense level 30 guideline range. Mr. Poe is within that select group.

## FACTUAL BACKGROUND

Deandrae Poe is 35 years old. He was born and raised in Minneapolis. His mother and biological father never married. Mr. Poe barely knew his father and his father was not involved in his upbringing. Deandrae is the second of his mother's six children. His only full biological sibling was his younger brother, Deshaun, who was born 10 months after him in July of 1990. Deshaun was shot and killed in 2013 at age 23. DeAndrae was very close to his brother, and the death of his brother continues to affect him to this day.

Mr. Poe lived with his mother and his siblings and for most of his childhood; they lived-in low-income housing apartments in North Minneapolis and were "financially unstable," i.e. they were impoverished, and his childhood was otherwise filled with violence, neglect, and abuse. He recalls a drug raid at their residence when he was in first or second grade and being placed in foster care at St. Joseph's for a month or two as a child.

His mother, Jatira Sanders, married Travis Sanders when Deandrae was about 7; this was hardly an improvement in their circumstances. Sanders was physically abusive towards his mother, and they fought all the time. He was also a drug user and an alcoholic, and he dealt drugs in and out of the home. Mr. Poe recalls their home was raided by the police on multiple occasions, and witnessed his stepfather being arrested and detained. PSR Par. 74

Beyond her relationship issues. Poe's mother struggled with mental health and

4

chemical dependency issues. Mr. Poe recalls various times when his mother would physically discipline him and his siblings. She used a belt, wooden spoon, and anything else to inflict pain onto her children. She was also emotionally abusive to Deandre, which included statements such as, "you ain't gonna be shit, just like your dad." PSR. Par. 75

Mr. Poe struggled in school as a child. He had a significant speech impediment; his speech was slow, and had trouble forming words and talking. He was labeled as dumb and slow, and he took special speech classes. He was also a very large child, and the other children made fun of him because he was big and slow, and seldom talked. He had a hard time paying attention in class, and, due to his speech impediment, he rarely talked; his teachers thought there was something wrong with him, and he got tagged as a problem child. This is more or less how he spent his grade school years - misunderstood by his teachers and bullied by his peers.

Concerning his childhood, it is noteworthy that the current ACE childhood assessment tool puts Mr. Poe at the top of the scale for "adverse childhood experiences." As noted in the PSR:

> The defendant completed the ACE assessment during his presentence interview, and he accrued an ACE score of 10 out of 10. Specifically, the defendant reported his family struggled financially. His mother and stepfather engaged in violence with each other, the defendant was physically disciplined, and his mother was emotionally abusive to him. The defendant's mother struggled with her mental health, and both she and the defendant's stepfather abused substances. His stepfather sold drugs, which resulted in him being arrested. The defendant remembered feeling like he was not loved, and he experienced sexual abuse as a young child. PSR Par. 99.

Things did not get much better for Deandrae when he became a teenager and his mother finally divorced her abusive drug dealing husband.  In ninth grade, his mother rather abruptly decided to move to Chaska to live with a new boyfriend. She left Deandrae, his brother, and his sister at the apartment in North Minneapolis to fend for themselves;  she abandoned her children to be with her boyfriend.  Their apartment became a party house without parental supervision, Deandrae quit going to school and was hanging out, smoking pot, using drugs, and starting to get in trouble, and eventually even their mother could not ignore the situation she had created.  After several months she finally sent Deandrae to live with his grandmother in St. Cloud, and that did not work out well, and he eventually returned to Minneapolis. By the time he was 16, Deandrae was pretty much left to take care of himself, as he had no father and his mother had abdicated her parental responsibilities, and he had no place to live. There was no supervision or adult guidance in his life.  He quit going to school and began living on the street and roaming between friend's houses.

During this time of parental neglect and abandonment, Deandrae's drug and alcohol use got increasingly worse, and he started hanging out with older gang members in the neighborhood, smoking weed and getting high. On his 16th birthday, he got high on weed, ecstasy, and hard liquor to the point of blacking out. He woke up in the Hennepin County Juvenile Detention Center the next day on the floor in a pool of vomit.  He and some of his friends were at a White Castle the night before, and they

had robbed a customer; he got charged along with others in the group. On January 6, 2006, Poe took a deal in juvenile court for placement at Red Wing with an extended EJJ disposition. He spent most of the next two years in Red Wing. (PSR Par. 51).

Mr. Poe got out of Red Wing in December of 2007. He had just turned 18. He lived with his mother, who had returned to North Minneapolis, and picked up where he left off. He drank, smoked weed, started smoking wets (cigarettes soaked in embalming fluid), and did ecstasy. The next year and a half were a blur of drug use. Then, on May 19, 2009, he and group of friends robbed a person in an alley. He was apprehended. He realizes now that he "threw his life away for something unnecessary and stupid." He pled guilty and was sentenced to prison for 44 months in September 2009. He was nineteen years old. (PSR Par. 54).

Mr. Poe got out of prison in January of 2013. He had a hard time getting work with his criminal record. Then his brother was shot and killed in a car in North Minneapolis on July 19, 2013, his brother's birthday. His death was senseless and meaningless, and Deandrae had a very difficult time dealing with it on many levels. He didn't care about life, he lost all motivation to do much of anything, and he was depressed and withdrawn. He hurt inside, and all he wanted to do was get high to take the pain away. Thereafter followed a series of drug cases (mostly crack possession cases) and short-term jail incarcerations strung out over most of the next two years.

After he got released from jail on the last of these drug charges in February 2014, he returned to Minneapolis. He lived with Sheila, his girlfriend, and worked for

7

temporary agencies, and helped take care of her child (whom he considered and still considers his stepchild). Then his mother suffered a serious stroke in July of 2014 and was in a coma for several weeks, and her survival was in question. Deandrae went to St. Cloud and stayed with her in the hospital. Eventually she came out of the coma, but she suffered some brain damage and paralysis, and she was brought to North Memorial Hospital.

    Deandrae continued to live with Sheila in her apartment in Brooklyn Center, again watching her child and doing some occasional temporary work. Around this time he was a victim in two shooting incidents, and he got a gun for protection. He stored it in their closet. After the second of the shootings, he posted several messages on Facebook, discussing recent events, including the publicized killing of a gang member, and he posted lyrics from some rap songs, some of which suggested violence. Law enforcement (gang task force members) was by then monitoring social media postings and had concerns about those postings; they were also aware that he had been shot twice recently. This prompted law gang task force members to take corrective action leading to the execution of a search warrant at the apartment on April 29, 2015, and recovery of a gun. He was charged in federal court with being a felon in possession, he pled guilty, and on March 17, 2016, he was sentenced to 70 months imprisonment.

    Poe was imprisoned initially at USP McCreary, Kentucky, and finished his full term at Pekin, Illinois. Shelia was pregnant when he got arrested, and their daughter was born while he was incarcerated. He was released on May 29, 2000, (a family

8

member picked him up from prison at Pekin) and returned to Minneapolis. It was the first time he had held his daughter. It was also the day after George Floyd was murdered, the COVID pandemic was in full stream, and things were rather chaotic. Nonetheless, Mr. Poe started on a path of positive adjustment, and positive living. He lived at the halfway house for a short time because he did not have a place to stay, before moving in with a cousin in Brooklyn Park. He worked at UPS and did temporary work and got enrolled in Re-Entry Court in July, 2020, which got him into a job training program where he underwent OSHA training and obtained his forklift operator certificate.

In September, 2020, he moved in with a girlfriend in Columbia Heights, then got COVID and left his job at UPS, and worked number of temporary jobs, though employment was sporadic due to the COVID economy.

In 2021, he broke up with his girlfriend and moved in with his sister, Teneisha, in St. Paul, and worked at UNIFY (a Super Value Warehouse) and then Pinnacle Logistics in Eagan. He worked there from January through May, 2021, doing warehouse work, until he was let go after a background check revealed his criminal record. Pinnacle was a TSA subcontractor, and since he couldn't get TSA clearance, they could not hire him as a fulltime employee, and they had to let him go. But they did give him a good reference.

After that he worked for Martin Brower, a McDonald's distribution center in Eagan, for several months, through the summer and fall of 2021. He was again living

9

with his sister and continuing to work fulltime while participating in the reentry program. He was staying straight, a big accomplishment (he had two dirty UAs in two years after he got released from prison). Then, again, he was let go from Martin Brower after he reached fulltime employability and they did a background check, and they could no longer employ him due to his record.

Poe moved out of his sister's house at the end of 2021 and moved into an apartment in NE Minneapolis, and he began barber school at the Townsend Barber Institute in Roseville, thinking he would pursue a career where his criminal record was not likely to be an obstacle to advancement and success. School was more or less a full-time job, and he was able to cut hair on the side to support himself and pay the bills while he attended school. He completed the reentry program in January of 2022 and, at the end of May, 2022, he was discharged from supervised release a year early, due to his successful efforts in the reentry program.

He lived with his sister again for a few months then moved into an apartment in Inver Grove Heights. By the fall of 2022, he was running out of money and he had a meeting with the owner/director of the Barber school, and agreed to put his barber schooling on hold for a while, although he was getting near completion (just few months to go).

It was around this time that he approached that disastrous fork in the road and steered down the wrong path. He started spending more time with his old "friends," and he saw what was happening and what they were doing – there was a lot of easy

money now in fentanyl and in the fall of 2022 he jumped into that. At first it was a little here a little there, a few favors, some cash to pay bills, then it became more and more. He couldn't get a job and he had reached a point of frustration with the cycle of working hard for several months for good employers until he reached the point of fulltime hiring only to be let go because he could not pass the required background checks. He was frustrated, lost his patience, and took the easy way out. There was, quite frankly, a lot of internal struggles going on but also self-justification, and excuses, and there was the simple reality of money, and he fooled himself into thinking he could just do it for a short time then get back into the real world, get out, finish barber school, and continue on where he left off. With the drugs came more time hanging out with the "old boys" (not a great thing) and just a general breakdown in self-determination and priorities.

     He can see now how that fork unfolded and where he went wrong, how he went down that slippery path and ended up where he is – awaiting another federal sentence. And while it's hard to examine yourself and see your shortcomings, to swallow your pride and admit your faults, to see that you weren't as strong as you thought you were, this is what he's done. He sees that he took the easy way out, and harmed other people, and became part of larger problem. And he has learned to accept humility and acknowledge his personal failures and shortcomings, and he has worked hard on addressing his personal issues and putting together a plan for the future, without giving up on himself.

It is also noteworthy (probably exceptional) that during his probation interview, Mr. Poe he was honest and open about his gang involvement, which goes back to his teenage years, around the time that his mother abrogated her parental responsibilities, abandoned raising her child, and left him to the streets. The PSR notes:

> The defendant's gang history started in middle school. He was first a member of the Emerson Murder Boys (EMB), and by 2008 he was a member of the Young 'n' Thuggin' (YNT) gang. As noted in the instant offense description above, these gangs are subsects of the Highs gang. As a teenager, the defendant began using drugs and got into increasing trouble, which eventually resulted in his commitment to the Minnesota Department of Corrections for two years as a juvenile. The defendant indicated that his mother did not approve of his behavior, but she was living in a suburb while the defendant stayed with various friends in the city. The defendant attributes his poor choices to being "a kid trying to be grown" as well as his negative peers. PSR Par. 77.

In Mr. Poe's letter to the Court he acknowledges the harm that the gang culture and his membership has had on his life and the community he comes from, and disavows further gang affiliation. He reflects:

> TODAY I WANT TO AKNOWLEDGE THAT THE GANG LIFESTYLE IS TO DETERMENTIAL. TO THE COMMUNITY. I'VE LOST TO MANY FRIENDS AND FAMILY FAMILY MEMBERS TO GANG LIFE. I DENOUNE BEING APART OF THE EMERSON MURDER BOYZ/YNT WITH IS APART OF THE HIGHS. I LOST TO MUCH TIME BEING APART OF SOMETHING THAT PUT FEAR INTO THE COMMUNITY.

Deandrae Poe, Letter to the Court.[3]

---

[3] Mr. Poe's letter will be filed separately with this Position Paper.

Mr. Poe's acceptance of responsibility and acceptance of the consequences for his crimes are also insightful. As noted in the PSR, he provided the Probation Officer a handwritten statement the day of his PSR interview, in which he fully accepts responsibility for his wrongdoing:

> I am guilty of being a part of the RICO conspiracy and dealing drugs as charged. I am shamed that I am in trouble again, and I regret what I have done. I have devastated my children's future by falling back into illegal activity, and I have to live with this guilt and knowledge, and I truly regret what I have done. When I last got out of prison a few years ago, this is not what I saw for myself. I did [the] reentry program, and I was really sincere and trying to do good things for myself. But honestly it was the drugs and the money again, and I messed up and things went backwards. At first it was "just" a few favors here, a little bit here and there, and I was fool enough to think I could keep away.
>
> But I did get back into it, and I was dumb enough to continue even after I knew they were looking at me, because of the money, and maybe I just wasn't strong to stay away. I am ashamed and disappointed in myself, but I also accept full responsibility for my actions.
>
> I have nobody to blame but myself. I will not give up though. I will use this time to better myself and when I get out I might be a middle-aged man but I will do what it takes to stay straight, work a legitimate job, put the drugs and the gang life behind me, and move forward in life as a father and legitimate person. I am sorry I am here again but accept the consequences for my actions and even though I have said this before I intent to do better this day forward. PSR Par. 33.

Now he faces sentencing for this serious federal criminal offense.

### §3553(a) DISCUSSION

There are no significant guideline issues in this case,[4] but the sentencing guidelines are only advisory and the guidelines are not entitled to a presumption of

---

[4] Counsel notes a factual objection to the PSR that, quite frankly, does not need to be resolved to arrive at a just sentence given the overall dynamics and the plea agreement in this

13

reasonableness. "The Guidelines are not only ***not mandatory*** on sentencing courts; **they are also not to be *presumed* reasonable**." *Nelson v. United States,* 129 S.Ct. 890, 894 (2009) (emphasis added). The joint recommendation for treating the case as within the offense level 30 and thus outside the guideline range, reflects the now universally accepted recognition that a guidelines sentence is not necessarily an appropriate sentence. Even in pre-guidelines practice, the fact that the sentencing guideline calculations were determined to be arithmetically accurate, however, still did not mean that they constituted an appropriate, reasonable, and just sentence in any case. "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). The Supreme Court has ruled emphatically that the guideline sentence is not to be presumed reasonable in any individual case and

---

case. See PSR Addendum, p.A 2. However, it also important that the court not proceed to sentencing based on a misunderstanding of what might otherwise be considered an important fact. The PSR notes that Mr. Poe sent himself four packages from Phoenix in March of 2023. PSR Par. 19. However, these were not intercepted. Mr. Poe acknowledges that the packages contained fentanyl as noted the plea agreement and acknowledges responsibility for distributing the fentanyl; however the listed weights are the USPO mailing weights, i.e., the gross weight recorded for the paid postage. In fact, most of the content was packaging-layers of bubble wrap, tape, clothes and towels, not fentanyl. As noted, this matter does not need to be litigated or resolved, given the stipulations in the plea agreement, but silence would imply waiver and agreement, and we do not want that misunderstanding. However, and the important point here, Mr. Poe admits dealing fentanyl, in whatever quantities, and the sentencing numbers are high enough here without the court mistakenly concluding that Mr. Poe sent a full 32 pounds of fentanyl for distribution.

that the Court "must make an **individualized assessment** based on the facts presented" in each case. *Gall v. United States*, 128 S.C. 586, 602 (2007).

In *Booker*, the United States Supreme Court held that the United States Sentencing Guidelines are advisory, and that District Courts must examine all factors set forth in 18 U.S.C. §3553(a) and impose a sentence that is "sufficient but not greater than necessary" to accomplish the goals of sentencing. *United States v. Booker*, 543 U.S. 220 (2005). The triad of 2007 Supreme Court decisions made clear that Federal Courts must determine sentences based on the facts and unique circumstances of the particular case, and that the guidelines do not enjoy a presumption of reasonableness. *Gall v. United States,* 128 S.C. 586, 602 (2007) (finding a probationary sentence, substantially outside of the guidelines, to be reasonable); *Kimbrough v. United States*, 128 S.C. 558, 570 (2007) (noting that Courts may vary from guidelines ranges based solely on policy considerations, including disagreements with the guidelines); *Rita v. United States*, 127 S.C. 2456, 2465 (2007) (holding that a District Court may consider arguments that "the Guidelines sentence itself fails properly to reflect §3553(a) considerations"). These decisions "mean that the District Court is free to make its own reasonable application of the §3553(a) factors, and to reject (after due consideration) the advice of the Guidelines." *Kimbrough*, 128 S.C. at 577 (Scalia, J., concurring). The "truly advisory" holding of these cases was made abundantly clear by Justice Stevens: "I trust that those judges who had treated the Guidelines as virtually mandatory during the post-Booker interregnum

15

will now recognize that the **Guidelines are truly advisory."** *Rita*, 127 S.Ct. at 2474 (J. Stevens, concurring) (emphasis added).

While in practice, a District Court still must calculate the advisory Guidelines range, *Gall*, 128 S.C. at 596-97, the Court must then:

> [A]fter giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the §3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [they] may not presume that the Guidelines range is reasonable. [They] must make an **individualized assessment** based on the facts presented.

Id. (citation and footnote omitted)(emphasis added).

In making its individualized assessment for Mr. Poe, there are several factors that deserve consideration. Of course, the law enforcement and offense driven concerns are paramount in this Highs Rico prosecution. The sentence requested here respects that paramount concern. By any yardstick, a sentence of fourteen years is a substantial sentence, and one that sends a strong signal that promotes respect for the law, reflects the seriousness of the offense, and would have a significant individual and general deterrence effect. It will also be one of the longest sentences yet imposed in this case, and not result in any unwarranted sentencing disparities.

It is also important for the court to note that, unlike many of the other gang members involved here, Mr. Poe was not involved in acts of violence or gun possession. As noted by the government in their position paper, "Poe was not a decision-maker within the organization and his offense conduct did not involve direct acts of violence or possession of a firearm compared to several of his co-defendants. These mitigating

factors, along with his decision to accept responsibility early, warrant some leniency." Govt. PP, p. 10. The PSR similarly notes his lack of violent activity and that his gang involvement was limited to the drug distribution portion of the indictment: "Most Highs members engaged in some level of drug distribution in addition to other gang activities, and some High members engaged in primarily or only drug distribution. Many of these individuals had a mitigating role in the RICO conspiracy. **Deandrae Poe** falls into this category." PSR Par. 30.

Counterbalanced against the offense driven sentencing considerations are the "individual characteristics" of Mr. Poe, some of which we acknowledge do call for a lengthy term of imprisonment here, and fourteen years is certainly a lengthy prison term. However, there are other factors for the court to consider. First, the court can and should consider that a sentence of 168 months will be more than double the longest term of imprisonment Mr. Poe has faced. In terms of the incremental punishment, this will be more than double his longest previous sentence, which was the 70-month sentence imposed in 2016.

Second, and perhaps most important as it concerns Mr. Poe as a unique individual before this court, is that Mr. Poe is not a lost soul by any means, and he demonstrated he possesses the fabric of reformation and possibility of changed behavior by those two years of success he had when he got out of prison in 2020. That cannot be understated in terms of the what it means to him, and those around him, and suggests that he does have a future, a social conscience, and some native ability to actually rise up and do something

17

with himself, and that it is not just all lip synch, as so often appears the case. This court would be hard pressed to find a better-intentioned individual.

Third, in determining the appropriate sentence, of course the court can and should reflect on the rather dismal circumstances of his childhood, including the abuse and neglect he suffered throughout his childhood, as well has subsequent parental abandonment, which are reflected in his ACE score of 10, and is discussed at length throughout the PSR. That difficult childhood, while not offered as an excuse, remains part of who Mr. Poe is and may at least help to explain his continued struggles and difficulties, given where he has come from in life. Fourth, the court may consider the hardship he has endured through nearly a year and a half of time served in a local jail. Fifth, Mr. Poe continues to have the support of others who care about him. Sixth, the court should consider the insight and reflection he has demonstrated, and his willingness to self-examine and continue to honestly and sincerely pursue meaningful life changes. In short, there are significant mitigating circumstances involved here which warrant consideration in this court's individualized assessment and in determining the proper sentence.

In conclusion, the offense driven law enforcement factors required in this court's sentencing calculus will be more than satisfied by a sentence of 168 months in this case – a sentence of 168 is still a significant sentence that promotes respect for the law, reflects the seriousness of the offense, will provide deterrence to Mr. Poe and others, provide him the opportunity for additional programming and therapy while in prison, and would

not result in any unwarranted sentencing disparity, while taking onto account Mr. Poe's unique individual circumstances. Accordingly, a sentence of 168 months would be a sentence that is "sufficient but not greater than necessary," and is so requested.

Dated:   February 17, 2025			Respectfully submitted,

					*s/ Douglas Olson*

					Douglas Olson
					Attorney ID No. 169067
					Attorney for Defendant
					331 2nd Ave South, Suite 705
					Minneapolis, MN 55401
					612-868-5884