**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 23-CR-160 (NEB/JFD) |
| Plaintiff, | |
| v. | ORDER ON MOTIONS IN LIMINE |
| TYREESE GILES (6), JOSIAH TAYLOR (7), TREVAUN ROBINSON (10), WILLIAM BANKS (19), and GREGORY BROWN (26), | |
| Defendants. | |

Trial is set to begin on May 12, 2025, on charges brought in the Third Superseding Indictment (ECF No. 1708) against Giles, Taylor, Robinson, Banks, and Brown.[1] (ECF No. 1713 at 3.[2]) Before the Court are motions in limine filed by all parties,[3] and a

---

[1] Defendant Marques Walker (27) was originally slated to join Giles, Taylor, Robinson, Banks, and Brown in this trial. (ECF No. 1713 at 3.) Walker entered a guilty plea to Count Three of the Third Superseding Indictment on May 7, 2025. (ECF No. 1962.)

[2] Unless otherwise noted, page numbers reflect CM.ECF pagination.

[3] The motions in limine are docketed as follows:
- The government's motions in limine are docketed at ECF Nos. 1926, 1943, and 1954 (sealed).
- Defendants' joint motions in limine are docketed at ECF No. 1928. Giles orally joined in these shared motions at the pretrial conference.
- Taylor's motion in limine is docketed at ECF No. 1941.
- Robinson's motions in limine are docketed at ECF No. 1912.
- Banks' motions in limine are docketed at ECF Nos. 1929 and 1930.

memorandum filed by Robinson pertaining to jury instructions.[4] The government

submitted a consolidated response memorandum to Defendants' original motions in

limine and Robinson's jury instructions memorandum (ECF No. 1937), a response to

Taylor's motion (ECF No. 1956), and a response to Brown's fourth motion in limine (ECF

No. 1967). But none of Defendants filed a response to any of the government's motions.[5]

The Court heard oral argument on the motions in limine during the pretrial

conference held on May 6, 2025. (ECF No. 1960.) The Court now considers each of these

motions. In doing so, the Court notes that its evidentiary rulings "are preliminary and

may change depending on what actually happens at trial." *Walzer v. St. Joseph State Hosp.*,

231 F.3d 1108, 1113 (8th Cir. 2000); *see Luce v. United States*, 469 U.S. 38, 41–42 (1984)

("[E]ven if nothing unexpected happens at trial, the district judge is free, in the exercise

---

- Brown's motions in limine are docketed at ECF Nos. 1915, 1916, 1917, and 1963. Taylor filed his individual motion in limine on May 1, 2025, which was after the April 28, 2025 deadline for filing motions in limine listed in the pretrial order. (ECF No. 1941; *see* ECF No. 1720 at 6.) The government's latter two consolidated motions in limine were also filed belatedly on May 2, 2025, and May 3, 2025, respectively. (ECF Nos. 1943, 1954 (sealed).) Banks' eighth motion in limine was filed belatedly on May 6, 2025, in response to additional exhibits added by the government. (ECF No. 1958.) And Brown's fourth motion in limine was filed late on May 7, 2025, after additional expert disclosures were made by the government. (ECF No. 1963.)

[4] Robinson's memorandum in support of jury instructions is filed at ECF No. 1911. The Court treats this memorandum as a motion to include First Amendment jury instructions.

[5] Thus, unless noted by the Court that an objection was made orally by a Defendant during the pretrial conference, all of the government's motions are made without objection.

of sound judicial discretion, to alter a previous in limine ruling."). This is the second trial before the Court on this indictment. To the extent feasible, the Court has endeavored for its rulings to be consistent with its written and oral rulings in *United States v. Dantrell Johnson, et al.* ("Trial One"). (*See* ECF Nos. 1800, 1810 (restricted), 1832, 1865.)

## ANALYSIS

### I. Government's Motions in Limine

#### A. *First Motion in Limine to Admit Self-Authenticating and Certified Records (ECF No. 1926 at 2–13.)*

The government moves for an order conditionally admitting self-authenticating records, under Rules 902(4) and 902(11) of the Federal Rules of Evidence. (ECF No. 1926 at 2.) For each record, the government has provided certifications to Defendants—signed by the respective records custodians—showing that the records that it moves to conditionally admit meet the requirements of Rules 902(11) or 902(14). (*Id.* at 2–3.) The government represents that it has met and conferred with Defendants' counsel regarding this motion and that Defendants' counsel "agreed to the general framework of admitting records in this manner." (*Id.* at 3.)

The record exhibits at issue in the government's motion are as follows:

- Social media records for Facebook, Instagram, and Snapchat accounts from Meta Platforms, Inc.;
- Airline carrier records from Delta Airlines, American Airlines, Sun Country Airlines, and United Airlines;

3

- Financial and domiciliary records from various financial institutions and other businesses;[6]
- Cellular data records from T-Mobile;
- Correctional records from the Minnesota Department of Corrections;[7]
- Medical records from the Hennepin County Medical Center and North Memorial Health Hospital;
- Video surveillance records from various entities that captured footage of the relevant events;[8]
- 911 call records from the Minneapolis Police Department dispatch;
- Tax records from the United States Internal Revenue Service; and
- Filing records from the Office of the Minnesota Secretary of State.

The Court is in receipt of the certifications of authenticity for each of these records that have been provided by the government.[9]

---

[6] The financial records come from Marty's Auto, Luther Brookdale, TD Auto Finance, Mondelez, Capri Jewelers, PNC Bank, Cash App, Zazapaws (US Bank), Bancorp, Veridian, and UNFI. The domiciliary records come from Google, Equifax, Albosaad Rental, Cingular Wireless, Airbnb, and FedEx.

[7] The admissibility of the correctional records are separately challenged on other grounds in Trevaun Robinson's first and second motions in limine addressed below. Robinson objected at the pretrial conference to this motion by the government to the extent that it overlapped with his first and second motions in limine.

[8] The video surveillance records come from 1900 Glenwood Avenue, Wendy's House of Soul, McDonalds, Salvation Army, Winner Gas, Skyline Market, Wally's Foods, Minneapolis Police Department Milestone Cameras, Minneapolis-St. Paul International Airport, Hennepin County Medical Center, Pennwood Market, Fourth Street Saloon, Minneapolis Public Schools, the Minnesota Department of Transportation, 4908 Humboldt Lane, and 500 49th Avenue North.

[9] The certifications of authenticity that have been provided to the Court in the government's first amended exhibit list (provided conventionally) are as follows:
- Social media records (Gov't Exs. T-1, T-2, T-3, T-4, T-5, T-6, T-7, T-8, T-9, T-10, T-11 T-12A, T-12B, T-13, T-35, T-36, T-42, T-43, T-44, T-45, T-46, T-48, T-49, T-50, T-53, T-54);

The Court concludes that the social media records, airline carrier records, financial records, domiciliary records, cellular data records, correctional records, medical records, video surveillance records, and 911 call records are self-authenticating certified domestic records of a regularly conducted activity under Rule 902(11) of the Federal Rules of Evidence. Similarly, the Court concludes that the tax records and state filing records are self-authenticating certified public records under Rule 902(4) of the Federal Rules of Evidence. The government's motion is thus granted as to the conditional admissibility of the self-authenticating records for which the government has provided certificates of authenticity.[10] Defendants may still object at trial to the admissibility of these exhibits on other grounds, such as unfair prejudice or relevance.

- Airline carrier records (Gov't Exs. T-26, T-27, T-28, T-29, T-30, T-31);
- Financial and domiciliary records (Gov't Exs. T-39, T-57, T-58, T-59, T-60, T-61, T-62, T-63, T-65, T-66, T-67, T-68, T-69, T-70, T-71, T-72, T-73, T-74, T-75, T-76, T-80, T-81);
- Cellular data records (Gov't Exs. T-40, T-41);
- Correctional records (Gov't Ex. T-64);
- Medical records (Gov't Exs. T-24, Y-9, UU-2);
- Video surveillance records (Gov't Exs. T-14, T-15, T-16, T-17, T-18, T-19, T-20, T-21, T-23, T-24, T-25, T-37, T-38, T-82, T-84);
- 911 call records (Gov't Ex. T-22);
- Tax records (Gov't Exs. A-182A, A-182B, A-182C, A-182D);
- State filing records (Gov't Ex. A-220).

The Court has not been provided with Government Exhibit T-78 for FedEx.

[10] As for the social media records, the Court concludes that such records are self-authenticating insofar as they purport to be account records from Meta Platforms with the listed account names and registration information. But beyond this threshold determination, the government bears the burden of showing at trial that each account is actually associated with the individuals with whom they claim the accounts are

**B.** ***Second Motion in Limine to Admit Crime Scene and Autopsy Photographs (ECF No. 1926 at 13–15.)***[11]

The government moves for the admission of crime scene photographs, surveillance footage, body-worn camera footage, still-frames of body-worn camera footage, and autopsy photographs relating to the murders of Prince Martin and Jaylen Salter and the alleged retaliatory murders of Darryl Wells, Darien Berry, and Harvey Williams.[12] (ECF No. 1926 at 13–15.) In advance of Trial One, the government made a similar motion in limine relating to evidence of the Wells murder. (ECF No. 1757 at 14.) In the government's Trial One motion, the government directed the Court to review specific exhibits that it intended to introduce. (*Id*. (citing photographic exhibits filed at ECF Nos. 1757-1 and 1757-2 and a videographic exhibit filed conventionally with the

---

associated. *See United States v. Perez*, 61 F.4th 623, 626 (8th Cir. 2023) ("[T]he authentication of social media evidence presents some special challenges because of the great ease with which a social media account may be falsified or a legitimate account may be accessed by an imposter. . . . Thus, a certification from a social media platform alone is insufficient to establish authenticity." (citations omitted and cleaned up)). Consistent with *Perez*, the Court will not authenticate that each record is associated with a given account holder; the government will "need[] to produce sufficient evidence linking [the purported account holder] to the account at issue." *Id*. at 626–27 (affirming district court's finding that the government met this burden with circumstantial evidence); *see also United States v. Recio*, 884 F.3d 230, 237 (4th Cir. 2018) (same).

[11] Defendants jointly objected to this motion in limine at the pretrial conference. Robinson spoke on behalf of Defendants and directed the Court to arguments he made in his motion to sever, docketed at ECF No. 963.

[12] Darryl Wells, Darien Berry, and Harvey Williams are identified in the Third Superseding Indictment as Victims J, K, and L, respectively. (ECF No. 1708.)

Court).) The Court was then able to rule—after "review[ing] each of the photographs and still-frames, as well as the body-worn camera footage"—that "each of these items of evidence, individually, [were] probative and not outweighed by a substantial risk of unfair prejudice to the Defendants." (ECF No. 1810 at 12.)

By contrast, here, the government has not directed the Court's attention to any specific exhibits. The government appears to be asking the Court to make a prophylactic ruling under Rule 403 of the Federal Rules of Evidence that the probative value of such broad categories of evidence is not substantially outweighed by a danger of unfair prejudice. (ECF No. 1926 at 13.) The Court will not do so. The government's motion is reserved.[13]

### C. Third Motion in Limine to Admit Co-Conspirator Statements (ECF No. 1926 at 15–23.)

The government moves "for an Order admitting co-conspirator statements pursuant to [Rule 801(d)(2)(E) of the Federal Rules of Evidence]." (ECF No. 1926 at 15.) Rule 801(d)(2)(E) provides that a statement "offered against an opposing party" that "was

---

[13] The Court does note, however, that it considers the categories of evidence identified by the government to generally be probative of whether the alleged murders took place and of their cause. *See United States v. Simpson*, 44 F.4th 1093, 1098 (8th Cir. 2022) (upholding the introduction of crime scene photographs and videos as well as autopsy photos in a prosecution for kidnapping resulting in death). This is especially true for the alleged Berry and Williams murders, given that the jury will be asked to rule in special interrogatories on whether Giles and Taylor committed these respective murders, which are charged as special sentencing factors in the Third Superseding Indictment. (ECF No. 1708 at 33–34; ECF No. 1924 at 3, 5–6.)

made by the party's co-conspirator during and in furtherance of the conspiracy" is not hearsay. To establish that a statement falls within the hearsay exception of Rule 801(d)(2)(E), the government bears the burden of showing by a preponderance of the evidence "(1) that a conspiracy existed; (2) that the defendant and the declarant were members of the conspiracy; and (3) that the declaration was made during the course and in furtherance of the conspiracy." *United States v. Whitlow*, 815 F.3d 430, 434 (8th Cir. 2016) (citing *United States v. Bell*, 573 F.2d 1040, 1043 (8th Cir. 1978)). The government cannot meet this burden by simply bootstrapping the existence of the conspiracy from the contents of the statements; the government must introduce "independent evidence outside of the statements themselves" to establish the conspiracy. *Id*. (citation omitted).

In *Bell*, the Eighth Circuit held that district courts may provisionally admit co-conspirator statements at trial, consistent with the below procedure:

> [W]e submit that the following procedural steps should be utilized when the admissibility of a coconspirator's statement is at issue, regardless of the nature of the charge or charges:
>
> (1) If the prosecutor propounds a question which obviously requires a witness to recount an out-of-court declaration of an alleged coconspirator, the court, upon a timely and appropriate objection by the defendant, may conditionally admit the statement. At the same time, the court should, on the record, caution the parties (a) that the statement is being admitted subject to defendant's objection; (b) that the government will be required to prove by a preponderance of the independent evidence that the statement was made by a coconspirator during the course and in furtherance of the conspiracy; (c) that at the conclusion of all the evidence the court will make an explicit determination for the record regarding the admissibility of the statement; and (d) that if the court determines that the government has failed to carry the burden delineated in (b) above, the court will, upon

appropriate motion, declare a mistrial, unless a cautionary instruction to the jury to disregard the statement would suffice to cure any prejudice. The foregoing procedural steps should transpire out of the hearing of the jury.

(2) After a ruling on the record that the out-of-court declaration is admissible under Rule 801(d)(2)(E), the court may submit the case to the jury. The court should not charge the jury on the admissibility of the coconspirator's statement, but should, of course, instruct that the government is required to prove the ultimate guilt of the defendant beyond a reasonable doubt. An appropriate instruction on credibility should be given, and the jury should be cautioned with regard to the weight and credibility to be accorded a coconspirator's statement.

573 F.2d at 1044 (citations omitted).

The Court will consider the admissibility of co-conspirator statements on a case-by-case basis under the *Bell* procedure. Because the Court will rule on each offered statement individually, the Court does not make a ruling based on the government's broad categories of co-conspirator statements to be introduced at trial.[14] The government's motion is thus reserved.

---

[14] In the government's motion in limine, the government categorized the co-conspirator statements it intends to introduce at trial as: (a) lyrics from rap videos; (b) social media posts and/or direct messages involving phrases related to the Highs; (c) social media posts and/or direct messages involving phrases related to Broadway; (d) social media posts and/or direct messages involving phrases related to the Highs enterprise; (e) social media posts and/or direct messages involving phrases related to deceased members; (f) social media posts and/or direct messages involving tributes to deceased members; (g) co-conspirator testimony, including co-conspirator statements made by Highs members or associates; and (h) social media direct message and text message conversations between Highs co-conspirators. (ECF No. 1926 at 18–23.)

***D.*** ***Fourth Motion in Limine to Permit Introduction of Defendants' Prior Felony Convictions for the Limited Purpose of Impeachment (ECF No. 1926 at 23–27.)***

The government moves to use Defendants' prior felony convictions "for the limited purpose of impeaching their credibility *if they elect to testify*." (ECF No. 1926 at 23 (emphasis added).) The Court does not know if Defendants intend to testify. Thus, this issue is not ripe. This motion in limine is denied as premature.

***E.*** ***Fifth Motion in Limine to Preclude References to Potential Punishment (ECF No. 1926 at 27–28.)***

The government styles its motion as one about "reference[s] to potential punishment and to state punishment," but it only moves to preclude Defendants "from mentioning or referring to the potential punishment the defendants may face if convicted." (*Id.* at 27–28.) To the extent that the government requests to preclude references to Defendants' own potential punishment, the Court grants the government's motion.[15] Any such reference is irrelevant to the elements of the offenses for which Defendants are being tried. *See United States v. Thomas*, 895 F.2d 1198, 1200 (8th Cir. 1990) ("[D]etails regarding a defendant's possible punishment are irrelevant to the issues that

---

[15] In Trial One, in a similarly titled motion in limine, the government also moved to preclude the defendants from "in any way referencing" the state prosecutions for conduct underlying the federal indictment. (ECF No. 1757 at 26.) This issue was actually and extensively litigated before the Court in advance of Trial One. (ECF No. 1810 at 16–17; ECF No. 1832 at 12–17.) Here, there is no argument about any specific reference to state punishment in the government's motion aside from the header for the motion in limine. The Court thus reserves this motion to the extent that the government requests to preclude references to state-court convictions for Defendants.

a federal jury must decide. To inform a federal jury about a defendant's punishment would only introduce improper and confusing considerations before it."). References to potential punishment only serve an impermissible purpose of "appealing to the sympathies, passions[,] or prejudices of the jury." *United States v. Dunn*, No. 19-CR-268 (MJD/BRT), 2021 WL 2143054, at *2 (D. Minn. May 26, 2021) (citation omitted). Thus, evidence of the potential punishment Defendants face is excluded under Rules 401 and 403 of the Federal Rules of Evidence.

### F. Sixth Motion in Limine to Preclude Evidence and Argument Relating to Discovery Issues (ECF No. 1926 at 28.)

The government moves to preclude evidence and argument relating to discovery issues and the procedural history of this case. (ECF No. 1926 at 28.) The Court considers the procedural history of this litigation—and the discovery disputes between the parties—to be irrelevant to the elements of the offenses for which Defendants are being tried. Fed. R. Evid. 401. Moreover, any possible probative value is substantially outweighed by a risk of confusing the issues and misleading the jury. Fed. R. Evid. 403. The Court grants this motion in limine.

### G. Seventh Motion in Limine to Admit Summary Charts (ECF No. 1926 at 29–33.)

The government moves to admit six summary charts of voluminous records pursuant to Rule 1006 of the Federal Rules of Evidence. (ECF No. 1926 at 29–33.) The summarized data comes from: (1) subpoena returns provided by Sun Country Airlines,

United Airlines, Delta Airlines, and American Airlines (Gov't Ex. A-69[16]); (2) subpoena returns provided by Cash App (Gov't Ex. A-172[17]); (3) subpoena returns provided by PNC Bank (Gov't Exs. A-163, A-164[18]); and (4) United States Postal Service records, which United States Postal Inspection Service Investigators Brent Bardner and Josh Bergeron will testify about (Gov't Exs. LL-2 and RR-1[19]). As discussed above in the Court's analysis of the government's first motion in limine, the underlying flight records, Cash App records, and PNC Bank records are considered to be self-authenticating records.

---

[16] Government Exhibit A-69 is a summary chart listing information on flight numbers, carriers, dates, times, passengers, origins, destinations, companion travelers, and other notes for purported co-conspirators Gregory Brown, Montez Brown, Calvin Wright, Avante Nix, Marques Walker, Deandrae Poe, Robert Lesure, and Ronnell Lockhart.

[17] Government Exhibit A-172 is a summary chart of Cash App transaction data—including display names, subscriber information, and transaction details—for transactions involving purported co-conspirators Gregory Brown, Calvin Wright, Avante Nix, Marques Walker, Deandrae Poe, Robert Lesure, Ja'darius Wright, and Carlos Serrano.

[18] Government Exhibit A-163 is a summary chart of ATM transaction records tied to surveillance footage capturing various purported co-conspirators depositing money into the PNC Bank account of purported co-conspirator Ja'darius Wright. Government Exhibit A-164 is a summary chart of sources and uses of funds in the PNC Bank account of purported co-conspirator Ja'darius Wright.

[19] Government Exhibits RR-1 is a summary chart of postal transaction data tied to the shipment of various parcels by purported co-conspirators Gregory Brown, Marques Walker, Deandrae Poe, Ja'darius Wright, and others, which includes origin information, destination information, postage price, photographs of the sender, mailing type, and parcel weight. The Court has not yet been provided Government Exhibit LL-2.

Rule 1006 provides that the "court may admit as evidence a summary, chart, or calculation to prove the content of voluminous admissible writings, recordings, or photographs that cannot be conveniently examined in court." Whether to permit such summary materials is in the discretion of the trial court. *United States v. Wainright*, 351 F.3d 816, 820 (8th Cir. 2003). The Court conditionally grants the government's motion to introduce Government Exhibits A-69, A-172, A-163, A-164, and RR-1 as summaries of voluminous materials under Rule 1006.[20]

### H. Eighth Motion in Limine to Preclude Defendants' Use of Self-Serving Hearsay (ECF No. 1926 at 34–35.)

The government moves to preclude Defendants from offering self-serving hearsay statements during cross-examination or in their case-in-chief. (ECF No. 1926 at 34.) Rule 801(d)(2) of the Federal Rules of Evidence provides that an out-of-court statement made by a party opponent is not hearsay. But that Rule is confined to statements that are "offered against an opposing party." *See* Fed. R. Evid. 801(d)(2). And so, a party's out-of-court statement offered in his own favor falls outside the scope of this exemption from the definition of hearsay. *United States v. Ngombwa*, No. 14-CR-123-LRR, 2016 WL 111434,

---

[20] In the event that the government does not introduce any other evidence of a purported co-conspirator's involvement in the conspiracy, and that purported co-conspirator is listed on the summary materials, the government will be required to redact the summary materials to remove references to them. This was the procedure that the Court followed in Trial One for flight records of purported co-conspirators listed on Government Exhibit A-69 for whom no other evidence was introduced at trial linking them to the conspiracy. As for Government Exhibit LL-2, the Court reserves ruling until it reviews the exhibit.

at *10 (N.D. Iowa Jan. 10, 2016) (citing *United States v. Waters*, 194 F.3d 926, 931 (8th Cir. 1999), for the proposition that "when a defendant offers exculpatory out-of-court statements for their truth, 'such statements . . . are hearsay'" (cleaned up and citation omitted)).

Because such statements are hearsay, they are admissible only if they fall within an exception to the rule against hearsay. Fed. R. Evid. 802; *see Williamson v. United States*, 512 U.S. 594, 600 (1994) (recognizing that even statements collateral to a self-inculpatory statement should not "be treated any differently from other hearsay statements that are generally excluded"). Because the government has identified no particular self-serving hearsay statements that Defendants intend to introduce, the Court cannot consider at this time whether such statements fall within the scope of any exception to the rule against hearsay. The Court thus reserves ruling on this motion in limine.

I. *Ninth Motion in Limine to Admit Witness Plea Agreements and Cooperation Agreements (ECF No. 1926 at 35–36.)*[21]

The government intends to offer testimony from five cooperating co-conspirators at trial. These cooperating co-conspirators have entered into plea agreements and cooperation agreements with the government. (ECF No. 1926 at 35.) The government moves to admit these agreements. (*Id*. at 36.) Defendants jointly move to preclude the introduction of such witness plea agreements in a separate motion in limine, arguing that

---

[21] Defendants orally objected to this motion during the pretrial conference.

14

because the government drafted the factual basis for these plea agreements, they are "in essence[, inadmissible] self-serving hearsay." (ECF No. 1928 at 19.)

In the Eighth Circuit, "a confederate's guilty plea or plea agreement is admissible on the government's direct examination of the witness as evidence of the witness' credibility or of his acknowledgement of participation in the offense." *United States v. McClellon*, 578 F.3d 846, 858 (8th Cir. 2009) (citation omitted). But the decision whether to admit evidence of a written plea agreement is left "to the sound discretion of the district court." *Id*. at 859.

The Court concludes that the plea agreements and cooperation agreements for the government's cooperating witnesses are admissible at trial during the direct examination of the cooperating witness, subject to a proper limiting instruction.[22] *See United States v. Solomon*, No. 23-CR-156 (SRN/TNL), at ECF No. 275 at 2 (D. Minn. Aug. 9, 2024) (granting a pretrial motion in limine to admit the plea agreements of cooperating witnesses against RICO conspiracy defendants, subject to a proper limiting instruction). The government's motion in limine is granted, but the Court leaves open whether the plea agreements should be redacted in any way to avoid juror confusion or unfair prejudice to Defendants.

---

[22] To the extent that Defendants argue that the factual bases in the plea agreements are the government's own self-serving hearsay, the Court emphasizes that each of the cooperating co-conspirators testified under penalty of perjury to the facts as alleged in the factual bases of their respective plea agreements. Of course, Defendants are free to cross-examine the cooperating co-conspirators at trial regarding the statements made in their plea agreements.

### J. Tenth Motion in Limine to Preclude References to National or Local Police Controversies (ECF No. 1926 at 37–38.)[23]

The government moves to preclude Defendants from referencing national or local police controversies regarding the use of force by police officers. (ECF No. 1926 at 37.) The government argues that any such evidence or argument would be "designed to elicit jury nullification and . . . suggest[] to the jury that it decide this case on anything other than the evidence and the law as provided by the Court in its instructions." (*Id*.)

This litigation is about whether Giles, Taylor, Robinson, Banks, and Brown are guilty of the crimes charged in the Third Superseding Indictment. (ECF No. 1708.) This case is not a forum for generally litigating the policing practices of the Minneapolis Police Department, the Hennepin County Sheriff's Office, the Drug Enforcement Administration, or any other law enforcement agency. Thus, the Court grants the government's motion that evidence and argument of police use-of-force controversies are irrelevant under Rule 401 of the Federal Rules of Evidence and would tend to confuse and mislead the jury under Rule 403 of the Federal Rules of Evidence.

---

[23] Defendants orally objected to this motion to the extent that it precludes cross-examination of law enforcement witnesses, including any law enforcement expert witnesses, on matters of bias. The government confirmed during the pretrial conference that Minneapolis Police Sergeant David Ligneel has been disclosed as an expert, but that the government has not decided whether or not it intends to call him for that purpose.

**K.** *Eleventh Motion in Limine to Exclude Expert Testimony of Odell Wilson (ECF No. 1926 at 38–42.)*[24]

The government represents that Robinson "indicated that he intends to call Odell Wilson as an expert witness;[25] [and] has adopted Mr. Wilson's previous Rule 16 disclosure."[26] (ECF No. 1926 at 38.) The government moves to preclude Wilson's expert testimony under Rule 702 of the Federal Rules of Evidence on the grounds that Wilson is not "qualified as an expert by knowledge, skill, experience, training, or education." (*Id.* at 38–39 (citation omitted).)

Odell Wilson was a United States Probation and Pretrial Services Officer for the District of Minnesota for twenty-six years. (ECF No. 1952 at 1663:1–9 (restricted).[27]) During that time, Wilson supervised criminal defendants on pretrial and supervised release, including numerous defendants with affiliations in North Minneapolis. (*Id.* at 1663:11–1664:11.) Wilson also grew up in the east-side projects of Boston, Massachusetts

---

[24] Robinson and Brown objected to this motion at the pretrial conference.

[25] On May 6, 2025, Brown also filed an amended proposed witness list, including Wilson as a proposed witness. (ECF No. 1957 at 2.)

[26] Odell Wilson testified as a witness at Trial One for defendant Dantrell Johnson. In Brown's amended proposed witness list, Brown stated that Wilson will offer "testimony consistent with that offered in Trial One." (ECF No. 1957 at 2.)

[27] Pagination for the Trial One transcript reflects native pagination, and not CM/ECF pagination.

(*id*. at 1680:23–24), and has lived with his family in North Minneapolis for thirty years. (*Id*. at 1668:20–25.)

At Trial One, Wilson testified as an expert witness on behalf of defendant Dantrell Johnson regarding the structure and activities of the various "cliques" in North Minneapolis. As most relevant here, Wilson testified that there is no such thing as a "Highs" or "Lows" affiliation among the various "cliques" in North Minneapolis, and that such terms are just geographical descriptors. (*Id*. at 1672:4–18; 1673:21–1674:16.) As foundation for his testimony, Wilson relied on his experiences growing up in East Boston and of living in North Minneapolis, and to a lesser extent, on his decades of experience as a United States Probation Officer in this District. (*See*, *e.g.*, *id*. at 1669:12–23, 1673:21–1674:10, 1680:23–1682:24.)

Under Rule 702 of the Federal Rules of Evidence, the proponent of expert testimony must show by a preponderance of the evidence that:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

From the Court's review of Wilson's testimony at Trial One, the Court does not consider Wilson's testimony to have met this standard to the extent that he testified based on a foundation of having grown up in East Boston and of living in North Minneapolis. But

the Court does consider Wilson's experience as a United States Probation Officer to provide a basis for specialized knowledge sufficient to render expert testimony as to opinions that are reliably derived from that experience.

The government's motion is thus granted in part. Robinson and Brown are not precluded from offering expert testimony by Odell Wilson, but such testimony is limited to that which reliably derives from Wilson's specialized knowledge as a former United States Probation Officer in this District. The Court will hear objections from the government on a question-by-question basis at trial about whether opinions offered by Wilson are reliably derived from this specialized knowledge.

### L. Twelfth Motion in Limine to Exclude Testimony or Evidence of a Cooperating Witness's Juvenile Convictions and Pending Charges (ECF No. 1926 at 42–44.)

One of the cooperating witnesses who the government intends to call at trial sustained three felony convictions as a juvenile in 2008 and 2010.[28] That same cooperating witness also faces two pending criminal charges in state court.[29] The government moves to preclude Defendants from introducing the cooperating witness's juvenile convictions and pending charges, arguing that they are impermissible grounds for impeachment under Rule 609 of the Federal Rules of Evidence. (ECF No. 1926 at 42–44.)

---

[28] The cooperating witness was convicted as a juvenile for criminal sexual conduct and assault in 2008 and for failing to report a change of address in 2010. (ECF No. 1926 at 43.)

[29] The cooperating witness faces pending charges for an alleged failure to register in Hennepin County, Minnesota State District Court and for an alleged violation of a restraining order in Wright County, Minnesota State District Court. (ECF No. 1926 at 44.)

*Juvenile Convictions.* Rule 609(d) provides that "[e]vidence of a juvenile adjudication is admissible . . . only if: (1) it is offered in a criminal case; (2) the adjudication was of a witness other than the defendant; (3) an adult's conviction for that offense would be admissible to attack the adult's credibility; and (4) admitting the evidence is necessary to fairly determine guilt or innocence." Here, the admissibility of the cooperating witness's juvenile convictions turns on the fourth prong of the inquiry. Because the cooperating witness's juvenile convictions are not "necessary to fairly determine guilt or innocence" of Defendants, the Court considers them to be inadmissible under Rule 609(d). *See* Charles Alan Wright & Arthur R. Miller, 28 Fed. Prac. & Proc. Evid. § 6138 (2d ed.) ("[T]here is discretion to admit under subdivision (d) only in the clearest of cases where a fair outcome could not otherwise be obtained. Thus, where the witness could be impeached by other means or the evidence says little about credibility, it is not 'necessary' and should not be admitted.").

In reaching this conclusion, the Court emphasizes four points. First, the cooperating witness's juvenile convictions (and his release from custody on those convictions) occurred over a decade ago, making them presumptively inadmissible under Rule 609(b). Second, none of the crimes that the cooperating witness was convicted of as a juvenile constitute *crimen falsi*, and so they have limited impeachment value on his character for truthfulness. Third, the cooperating witness has been convicted of multiple other felonies as an adult, which provide other proper bases for Defendants to impeach

20

the witness. Fourth, it is significant to the Court that the government intends to also offer testimony from four other cooperating witnesses, as well as substantial other physical and testimonial evidence. And so, the government's case does not necessarily turn on the credibility of this particular cooperating witness. The Court thus grants the government's motion to preclude impeachment of the cooperating witness with evidence of his juvenile adjudications.

*Pending Charges.* Similarly, the Court grants the government's motion to preclude Defendants from introducing evidence of the cooperating witness's pending state charges under Rule 609. On its face, Rule 609 may be used only "to attack[] a witness's character for truthfulness by evidence of a criminal *conviction*." Fed. R. Evid. 609(a) (emphasis added). Because the cooperating witness has not been convicted of these charged felonies, they fall outside the proper scope of impeachment under Rule 609.

### M. Thirteenth Motion in Limine to Exclude Testimony of Ferome Brown and Jeffrey Grell (ECF No. 1943.)

The government moves to exclude two witnesses listed on Brown's original proposed witness list: Ferome Brown and Professor Jeffrey Grell. (ECF No. 1933 (restricted) ¶¶ 6–7.) After the government filed this motion, Brown filed an amended proposed witness list that no longer lists either Ferome Brown or Professor Grell.[30] (ECF No. 1957 (restricted).) The government's motion is denied as moot.

---

[30] Brown's counsel confirmed at the pretrial hearing that he does not intend to call these witnesses.

### N. Fourteenth Motion in Limine to Preclude Improper Impeachment of Special Agent Alexandra Duong (ECF No. 1954 at 2–3.)[31]

The government intends to call Minnesota Alcohol and Gambling Enforcement Division Special Agent Alexandra Duong to testify regarding the recovery of evidence and an interview she conducted with Banks. (ECF No. 1954 at 2.) The government moves to preclude Defendants from impeaching Special Agent Duong about a sustained complaint of excessive force from 2020 when she was a sergeant with the Minneapolis Police Department. (*Id*.) The government argues that such findings are inadmissible under Rule 608(b) of the Federal Rules of Evidence because they do not bear on her truthfulness or bias. (*Id*.) The government further considers impeachment regarding the complaint—which arose out of an incident relating to the civil unrest in wake of the murder of George Floyd—to be highly confusing and incendiary relative to its probative value under Rule 403 of the Federal Rules of Evidence. (*Id*. at 2–3.)

At this time, the Court reserves ruling on this motion. There is insufficient information in the record about whether this complaint could implicate appropriate impeachment issues of bias. The government did not attach to its motion any information on the facts of the underlying complaint. The Court simply does not have enough information to rule on whether the complaint is a proper subject for cross-examination.

---

[31] Brown objected during the pretrial conference to each of the motions filed by the government at ECF No. 1954 that seek to preclude cross-examination of law enforcement witnesses about incidents in their history. This objection covers the government's fourteenth through twenty-first motions in limine.

*O.* *Fifteenth Motion in Limine to Preclude Improper Impeachment of Officer Gabriel Grout (ECF No. 1954 at 3.)*

The government intends to call Minneapolis Police Department Officer Gabriel Grout to testify regarding a search he made of a vehicle. (*Id*. at 3.) The government moves to preclude Defendants from impeaching Officer Grout regarding a sustained complaint from 2014 for failing to notify a supervisor of a use-of-force incident. (*Id*.) The government similarly considers the complaint to fall outside of the scope of permissible impeachment under Rule 608(b) of the Federal Rules of Evidence and to create a danger of unfair prejudice and confusion under Rule 403 of the Federal Rules of Evidence.

As with Special Agent Duong, the government has not provided any information on the underlying facts of the complaint and if it would bear on Officer Grout's character for truthfulness. The Court reserves ruling on this motion.

*P.* *Sixteenth Motion in Limine to Preclude Improper Impeachment of Sergeant Efrem Hamilton (ECF No. 1954 at 4.)*

The government intends to call Minneapolis Police Department Sergeant Efrem Hamilton to testify in this case regarding his recovery of a firearm from a vehicle. (*Id*. at 4.) The government moves under Rules 608(b) and 403 of the Federal Rules of Evidence to preclude Defendants from impeaching Sergeant Hamilton regarding: (1) a current open matter relating to his administrative review of an excessive force complaint and (2) charges of which he was acquitted for firing into a vehicle in 2018. (*Id*.)

The Court reserves ruling on the propriety of impeaching Sergeant Hamilton regarding the open matter as the Court has not been provided with any information about this matter and the extent to which it bears on Sergeant Hamilton's character for truthfulness or bias. But the Court grants the government's motion to the extent that it seeks to preclude Defendants from impeaching Officer Hamilton on the 2018 charges of which he was acquitted. The Court considers that such evidence would have a danger of confusing the jury that would substantially outweigh any possible probative impeachment value. *See* Fed. R. Evid. 403.

Q. ***Seventeenth Motion in Limine to Preclude Improper Impeachment of Officer Conan Hickey (ECF No. 1954 at 4–5.)***

The government intends to call Minneapolis Police Department Officer Conan Hickey to testify regarding the recovery of fentanyl pills from a vehicle and an arrest of Robinson. (ECF No. 1954 at 4–5.) Officer Hickey received a sustained complaint for unreasonable use of force and for failing to document that use of force in 2020. (*Id*. at 4.) The government moves to preclude impeachment relating to this complaint as not bearing on his character for truthfulness or bias and as being unfairly prejudicial and confusing to the jury. (*Id*. at 5 (citing Rules 608(b) and 403 of the Federal Rules of Evidence).)

As with Special Agent Duong, Officer Grout, and Sergeant Hamilton, the Court has not received information on the facts of this underlying complaint. The Court thus reserves ruling on this motion.

**R.** *Eighteenth Motion in Limine to Preclude Improper Impeachment of Lieutenant Adam Lepinski (ECF No. 1954 at 5–12.)*

The government intends to call Minneapolis Police Department Lieutenant Adam Lepinski to testify regarding the search of co-defendant Dantrell Johnson's residence. (*Id.* at 5.) The government moves to preclude Defendants from impeaching Lepinski in cross-examination by referencing adverse credibility findings made by United States Magistrate Judge Steven E. Rau in 2011. (*Id.* (citing *United States v. Rosas*, 11-CR-188 (RHK/SER), 2011 WL 7046028 (D. Minn. Nov. 23, 2011)).) The government argues that such impeachment evidence constitutes inadmissible hearsay evidence, violates the prohibition in Rule 608(b) of the Federal Rules of Evidence against the introduction of extrinsic evidence, and is unfairly prejudicial and likely to mislead the jury under Rule 403 of the Federal Rules of Evidence. (ECF No. 1954 at 5–12.)

The Court need not dispose of the government's hearsay and Rule 608(b) arguments,[32] because the Court determines that even if the prior judicial credibility finding is otherwise admissible, its probative value is substantially outweighed by a danger of unfair prejudice and misleading the jury. As the Fourth Circuit cogently described, "judicial findings of fact present a rare case where, by virtue of their having been made by a judge, they would likely be given undue weight by the jury, thus creating

---

[32] The Court notes that the Eighth Circuit has not yet ruled on whether prior judicial findings constitute inadmissible hearsay. *United States v. Jones*, 728 F.3d 763, 767 (8th Cir. 2013) (citation omitted).

a serious danger of unfair prejudice." *Nipper v. Snipes*, 7 F.3d 415, 418 (4th Cir. 1993) (citation and quotation marks omitted). The Court agrees. Introducing the adverse credibility determination made in the *Rosas* Report and Recommendation risks usurping the focus of this trial, and will "necessarily require a mini-trial regarding a tangential issue of dubious probative value that is laden with potential undue prejudice." *See United States v. Wright*, 534 F. Supp. 3d 397, 398 (M.D. Pa. 2021) (citation and quotation marks omitted). Defendants are precluded under Rule 403 from cross-examining Lieutenant Lepinski about the adverse credibility findings made in the *Rosas* Report and Recommendation.

**S.** ***Nineteenth Motion in Limine to Preclude Improper Impeachment of Officer Alex Nonnemacher (ECF No. 1954 at 12.)***

The government intends to call Minneapolis Police Department Officer Alex Nonnemacher to testify regarding a search he made of a vehicle. (ECF No. 1954 at 12.) In 2020, Officer Nonnemacher received a sustained complaint for driving down a one-way street without due consideration for safety while conducting a vehicular pursuit. (*Id*.) The government moves to preclude Defendants from impeaching Officer Nonnemacher about this complaint under Rules 608(b) and 403 of the Federal Rules of Evidence. Although the Court has not received any information on the underlying complaint in this matter, the Court cannot possibly envision how this particular complaint could bear on Officer Nonnemacher's character for truthfulness or bias. The Court thus grants the government's motion to preclude such impeachment under Rule 608(b).

**T.** ***Twentieth Motion in Limine to Preclude Improper Impeachment of Officer Michael Osbeck (ECF No. 1954 at 13.)***

The government intends to call Minneapolis Police Department Officer Michael Osbeck to testify regarding searches he made of various vehicles. (*Id*. at 13.) Officer Osbeck received a sustained complaint for excessive force in 2021, which the government moves to preclude Defendants from using to impeach Officer Osbeck under Rules 608(b) and 403 of the Federal Rules of Evidence.

Because the underlying facts of the complaint are not in the record, the Court cannot ascertain at this time whether these findings could bear on Officer Osbeck's character for truthfulness. This motion is reserved.

**U.** ***Twenty-First Motion in Limine to Preclude Improper Impeachment of Sergeant Marcus Ottney (ECF No. 1954 at 13.)***

Finally, the government intends to call Minneapolis Police Department Sergeant Marcus Ottney as a witness. The government moves to preclude Defendants from impeaching Sergeant Ottney in cross-examination by reference to his prior criminal conviction. (ECF No. 1954 at 13.) In 2021, Sergeant Ottney was convicted of third-degree driving of a motor vehicle while impaired. *State v. Ottney*, No. 02-CR-20-4433 (Anoka Cnty. Minn. Dist. Ct. July 26, 2021). The crime of third-degree driving of a motor vehicle while impaired is a gross misdemeanor crime in Minnesota. Minn. Stat. § 169A.26. As a gross misdemeanor, the maximum sentence of imprisonment for the crime under Minnesota law is 364 days. Minn. Stat. § 609.0341, subdiv. 1. The crime of third-degree

27

driving while impaired also does not require proof of a dishonest act or false statement as an element of the offense. Minn. Stat. § 169A.20. Thus, the conviction falls outside the permissible scope for impeachment under Rule 609(a)(1) of the Federal Rules of Evidence. The Court grants the government's motion to preclude references to Sergeant Ottney's gross misdemeanor conviction.

## II. Defendants' Joint Motions in Limine

### A. First Motion in Limine to Preclude Shackling of Defendants During Trial (ECF No. 1928 at 1–4.)

Defendants jointly move to preclude the use of "shackling" (the use of leg restraints) as a means to secure Defendants during the trial. (ECF No. 1928 at 1–4.) "Visible shackling undermines the presumption of innocence and the related fairness of the factfinding process." *Deck v. Missouri*, 544 U.S. 622, 630 (2005). And so, the use of restraints on criminal defendants is subject to "[c]lose judicial scrutiny . . . to ensure that [the] inherently prejudicial measure[ is] necessary to further an essential state interest." *Hellum v. Warden, U.S. Penitentiary Leavenworth*, 28 F.3d 903, 907 (8th Cir. 1994) (citations and quotation marks omitted). Courts in this Circuit are thus instructed to "balance the need to maintain courtroom security against the possibility of prejudice to the defendant." *United States v. Honken*, 541 F.3d 1146, 1162 (8th Cir. 2008) (citation omitted).

Here, the potential for violence and escape from each of the Defendants cannot be seriously disputed. Each are alleged to have participated in a RICO conspiracy, in which "[c]ommitting, conspiring to commit, [and] attempting . . . to commit acts of violence,

28

including murder, robbery, and assault" are alleged to be among the manner and means of the racketeering enterprise. (ECF No. 1708 at 6–7.) Giles and Taylor are each alleged to have murdered Victims K and L, respectively, in furtherance of that conspiracy. (*Id*. at 19–20.) Also, in furtherance of the conspiracy, Robinson is alleged to have fired shots into a crowd in downtown Minneapolis (*id*. at 13), Robinson and Taylor are alleged to have possessed controlled substances while possessing firearms (*id*. at 19, 26), and Banks is alleged to have possessed controlled substances while possessing a loaded firearm magazine. (*Id*. at 14.) Separately, Banks has previously been convicted of escaping from custody. *State v. Banks*, No. 27-CR-14-2094, Dkt. No. 11 (Minn. Dist. Ct. Aug. 28, 2014). And each Defendant has ample incentive to attempt to effectuate an escape, given that they are all facing lengthy prison sentences if convicted. Finally, the Court notes that trying the five Defendants together heightens the need for courtroom security.

Under these circumstances, there is a significant need to maintain courtroom security. *See Honken*, 541 F.4th at 1162 (upholding the shackling of a defendant with "potential for violence" and a "history of escape attempts"); *United States v. Solomon*, No. 23-CR-156, 2024 WL 4444728, at *2 (D. Minn. Oct. 8, 2024) (ordering the use of leg restraints where the defendants were "each charged with committing or aiding and abetting murders in furtherance of a criminal enterprise" and the government "set forth ample evidence of the [gang's] penchant for violence").

Against this weighty interest in courtroom security, Defendants argue that the use of restraints will unduly prejudice their right to a fair trial. (ECF No. 1928 at 2.) To ameliorate Defendants' concerns of prejudice, the Court follows the procedures upheld by the Eighth Circuit in *Honken*:

> The district court took a number of measures to ensure prejudice to [the defendant] would be minimized, including directing "(1) that [the defendant] not be moved in the presence of the jury; (2) that table skirts be placed on all counsel tables to prevent the jurors from seeing the shackles . . . ; [ ](3) that the Marshal determine the best available means to prevent the shackles from making any noticeable noise during ordinary movements of the defendant while seated [;]" and (4) that the Marshal ensure the shackles be fitted with sufficient chain to allow [the defendant] to stand naturally when required and to confer with his counsel.

541 F.3d at 1163 (noting that "[t]hese measures sufficiently minimized, if not completely eliminated, the danger of the shackles suggesting to the jury that [the defendant] was guilty").

Thus, the Court denies Defendants' joint motion to preclude shackling and orders that Defendants be restrained during the trial in a manner that minimizes prejudice to them.[33] *See Solomon*, 2024 WL 4444728, at *2 (explaining that "[t]he Court ordered the use of leg restraints only (which did not prevent the Defendants from standing or walking), and relied on the expertise of the U.S. Marshals Service to ensure that the restraints were

---

[33] Because the Court is concerned that leg restraints will be visible to prospective jurors seated directly behind the Defendants during voir dire, the Court will not require the Defendants to wear leg restraints on the first day of trial, Monday, May 12, 2025, for the voir dire process.

not visible to the jury at any point during the trial" (parenthetical in original)). Finally, the Court adds that it imposed identical restrictions in Trial One and was satisfied that the measures taken by the U.S. Marshals Service kept the restraints from being seen or heard by the jury in that trial.

**B.** ***Second Motion in Limine to Preclude the Use of an Anonymous Jury (ECF No. 1928 at 4–7.)***

Defendants jointly move to preclude the empanelment of an anonymous jury in this case. An anonymous jury "may be [e]mpaneled where necessary to protect the integrity of the jury's decision making process." *United States v. Edmond*, 52 F.3d 1080, 1090 (D.C. Cir. 1995) (collecting cases). But a Court may only empanel an anonymous jury if it "concludes that there is strong reason to believe the jury needs protection, and takes reasonable precautions to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are protected." *United States v. Darden*, 70 F.3d 1507, 1532 (8th Cir. 1995) (cleaned up) (citing *United States v. Paccione*, 949 F.2d 1183, 1192 (2d Cir. 1991)).

In *Darden*, the Eighth Circuit adopted the Eleventh Circuit's five-factor formulation regarding when a district court may exercise its discretion to empanel an anonymous jury:

> Sufficient reason for empaneling an anonymous jury has been found to exist upon a showing of some combination of several factors, including: (1) the defendant's involvement in organized crime, (2) the defendant's participation in a group with the capacity to harm jurors, (3) the defendant's past attempts to interfere with the judicial process, (4) the potential that, if

convicted, the defendant will suffer a lengthy incarceration and substantial monetary penalties, and (5) extensive publicity that could enhance the possibility that jurors' names would become public and expose them to intimidation or harassment.

*Id*. at 1532 (citing *United States v. Ross*, 33 F.3d 1507, 1520 (11th Cir. 1994)). In applying those factors, the *Darden* court found that all five factors pertained to the multiple defendant RICO trial involving a violent drug-trafficking enterprise in St. Louis, Missouri. *Id*. at 1533 (considering the district court to have "had ample reason to conclude that the jurors in this case needed the protection of anonymity").

Here, at least three of the five factors support empaneling an anonymous jury.[34] First, each of the Defendants are alleged to be involved in organized crime as members and associates of the Highs criminal enterprise. (ECF No. 1708 at 2–3.) Second, members of the Highs are alleged to engage in "threats, intimidation, violence, and destruction" to "[p]reserv[e] and protect[] the power, territory, reputation, and profits of the Enterprise." (*Id*. at 6.) And so, the Highs are certainly alleged to be a group with the capacity to harm jurors. Third, as in *Darden*, each of the Defendants face possible sentences of life in prison

---

[34] The Court does not have sufficient information about past efforts by these Defendants to interfere with the judicial process, and so the Court does not consider that factor in its analysis. But the Court does take judicial notice of the fact that Taylor was previously charged with two since-dismissed counts of aggravated tampering with a witness in Hennepin County, Minnesota State District Court. *See State v. Taylor*, No. 27-CR-12-18515 (Minn. Dist. Ct. June 13, 2012). As for the extensive publicity factor, based on the Court's experience in Trial One, the Court does not assume there will be extensive publicity, but given the significance of the charges, there is certainly a possibility of media coverage.

if convicted under Count One of the Third Superseding Indictment. *See* 18 U.S.C. § 1963(a).

Nevertheless, the Court recognizes and appreciates "the danger that the use of an anonymous jury could prejudice the jurors against the defendants." *Darden*, 70 F.3d at 1532. So, the Court will not empanel an anonymous jury in this case. It will instead take the following measures to reasonably protect juror identities. The Court mailed to prospective jurors written questionnaires asking them for basic biographical and other information bearing on their fitness to serve as jurors in this case. (ECF No. 1909 (restricted).) The written questionnaires identify each prospective juror by a number. On Thursday, May 8, 2025, and Friday, May 9, 2025, counsel reviewed the answers to the written questionnaires in-person at the Federal Courthouse. On Monday, May 12, 2025, counsel will be provided with a list of names corresponding to the numbered juror questionnaires prior to the start of voir dire. This list of names is to be kept secure and confidential by counsel. Any notes taken on the jurors by Defendants must be provided to counsel on court breaks and at the end of trial each day. Defendants' notes on jurors and voir dire shall not leave the courtroom.

The Eighth Circuit has long approved of this type of procedure for identifying the jury venire by numbers, while providing counsel with prospective juror names. *See, e.g.*, *United States v. Lee*, 886 F.2d 998, 1001–02 (8th Cir. 1989) ("Although defendants characterized the use of numbers to identify the jury venire as an unconstitutional

'anonymous' jury, we note that defendants' counsel were provided with the names of the jurors, and find no prejudice in the court's procedure."). Thus, the Court considers the procedure it adopts to strike an appropriate balance between protecting the safety of empaneled jurors and guarding against prejudice to Defendants. Because the Court is not empaneling an anonymous jury, this joint motion is denied as moot.

### C. Third Motion in Limine for a Public Trial (ECF No. 1928 at 8–13.)

Defendants jointly move for a public trial. (ECF No. 1928 at 8–13.) The Court does not intend to limit access to the courtroom during trial at this time, and the courtroom will be accessible to the public, subject only to courtroom capacity limitations. Defendants' motion is thus denied as moot.[35]

### D. Fourth Motion in Limine for the Disclosure of Testifying Witnesses (ECF No. 1928 at 13.)

Defendants jointly move for an order "requiring the [g]overnment to reveal the identities of intended witnesses prior to close of trial the prior day." (ECF No. 1928 at 13.) The Court imposed such a requirement at Trial One. (ECF No. 1810 at 37.) The government generally does not object to following a similar procedure at this trial, except that the government "requests time at the end of the trial day to assess testimony and confirm witness availability." (ECF No. 1937 at 37.) The Court agrees that the government

---

[35] The Court reserves the right to implement reasonable limitations on the number of persons allowed in the primary courtroom, consistent with the First Amendment, if it determines that such measures are necessary to preserve courtroom security. If it does so, an overflow courtroom will be provided.

is entitled to a brief amount of time at the end of each trial day to assess testimony and confirm witness availability. The Court thus grants Defendants' motion in part. Defendants are entitled to know the identities of the government's intended witnesses before 6:00 p.m. Central Standard Time of the prior day in order to properly prepare for trial and to prevent needless delay.

### E. Fifth Motion in Limine to Sequester Witnesses (ECF No. 1928 at 14.)

Defendants jointly move under Rule 615 of the Federal Rules of Evidence to sequester government witnesses. (ECF No. 1928 at 14.) The government generally does not oppose this motion, except that it requests that two of its case agents—Internal Revenue Service Criminal Investigations Special Agent Matthew Schommer and Minneapolis Police Sergeant and FBI Task Force Officer David Ligneel—be exempt from sequestration and be permitted to remain at the counsel table during trial.[36] (ECF No. 1937 at 38.)

Rule 615(a) provides that "[a]t a party's request, the court must order witnesses excluded from the courtroom so that they cannot hear other witnesses' testimony." But this rule does not mandate the exclusion of "one officer or employee of a party that is not a natural person if that officer or employee has been designated as the party's representative by its attorney." Fed. R. Evid. 615(a)(2). The Eighth Circuit has upheld the

---

[36] The government formally made this request to sequester Special Agent Schommer and Sergeant Ligneel during the pretrial conference.

designation of a law enforcement agent as the government's party representative to be present in the courtroom during witness testimony. *United States v. Engelmann*, 701 F.3d 874, 877 (8th Cir. 2012).

But, here, the government wants to have two witnesses excluded from the sequestration order, and so either Special Agent Schommer or Sergeant Ligneel must fall within the scope of Rule 615(a)(3) of the Federal Rules of Evidence as being "essential to presenting the [government's] claim." The Court has "wide latitude" regarding sequestration orders. *Engelmann*, 701 F.3d at 877 (citation omitted). At the pretrial conference, the Court was satisfied with the government's argument for the necessity of exempting two agents from sequestration, given the complexity of this case and the volume of witnesses and exhibits.[37]

Thus, the Court grants Defendants' sequestration motion, subject to the exemption of Special Agent Schommer and Sergeant Ligneel from sequestration. In addition, per Defendants' request, without objection from the government, the Court hereby "instruct[s] all witnesses to not discuss the trial testimony of any witness with each other" and "prohibit[s] excluded witnesses from accessing trial testimony." (ECF No. 1928 at 14.)

---

[37] The Court notes that it exempted Agent Schommer and Sergeant Ligneel from sequestration at Trial One. (ECF No. 1810 at 36.)

*F.*     ***Sixth Motion in Limine to Prohibit Out-of-Court Statements of Co-Conspirators (ECF No. 1928 at 14–15.)***

Defendants jointly move "to prohibit the [g]overnment from introducing out-of-court statements of co-defendants, for the truth of the matters asserted, and which were not made in furtherance of the alleged conspiracy."[38] (ECF No. 1928 at 14.) As discussed above in the Court's analysis of the government's third motion in limine, the Court will consider objections to co-conspirator statements on a case-by-case basis, consistent with the procedure described in *Bell*. *See* 573 F.2d at 1044.

Defendants also seek "an order from the Court for the [g]overnment to identify any similar statements that it seeks to admit under Rule 801(d)(2)([E]) as co-conspirator statements." (ECF No. 1928 at 15.) But Rule 801(d)(2)(E) does not contain such a notice requirement, and Defendants have pointed to no authority in support of such a requirement. The Court denies Defendants' motion to the extent that they move for the Court to require pre-trial disclosure of co-conspirator statements that the government intends to introduce at trial.

*G.*     ***Seventh Motion in Limine for Additional Peremptory Challenges (ECF No. 1928 at 15–16.)***

Defendants jointly move for each Defendant to receive five additional peremptory strikes to be exercised separately. (*Id*. at 15–16.) In support of this motion, Defendants

---

[38] At Trial One, Gregory Hamilton and Dantrell Johnson brought similar motions, but identified specific exhibits for the Court to rule on prior to trial. (ECF Nos. 1737, 1751.) Defendants here have not made similar requests for specific pre-trial rulings on this issue.

speculate that they "may have conflicting, contradictory and mutually exclusive defenses," which "require additional peremptory challenges to be separately exercised." (*Id*. at 16.) Defendants further argue that the government is not entitled to "any additional strikes due to the mass media attention surrounding the issue[s] of drug use, manufacturing and distribution." (*Id*.)

Under the Federal Rules of Criminal Procedure, in a non-capital felony case, "[t]he government has 6 peremptory challenges and the defendant or defendants jointly have 10 peremptory challenges." Fed. R. Crim. P. 24(b)(2). Rule 24(b) provides the trial court with discretion to allow additional peremptory challenges in criminal cases with multiple defendants and to allow the defendants to exercise those challenges separately or jointly.

Defendants' joint motion for further additional peremptory strikes is granted in part. In this five-defendant trial, the Court provides Defendants with sixteen peremptory strikes, to be exercised jointly, and the government with nine peremptory strikes. In addition, because the Court is seating three alternate jurors, each side is granted two additional peremptory strikes. Fed. R. Crim. P. 24(c)(4)(B). This is consistent with the Court's past practice in multiple-defendant trials. At Trial One, the Court offered twelve peremptory strikes to the defendants, seven peremptory strikes to the government, and two additional peremptory strikes to each side for alternate jurors in a three-defendant trial with three alternate jurors. Similarly, in *United States v. Farah, et al.*, No. 22-CR-124 (NEB/DTS), ECF No. 447 at 7 (D. Minn. Apr. 11, 2024), the Court offered eighteen

peremptory strikes to the defendants and ten peremptory strikes to the government[39] in a seven-defendant trial).

**H.**     *Eighth Motion in Limine to Preclude the Government from Using Inflammatory Language in its Opening Statement (ECF No. 1928 at 17–18.)*

Defendants jointly move to preclude the government from using "inflammatory language" in its opening statement. (ECF No. 1928 at 17.) Specifically, Defendants consider the descriptives references that the government made at Trial One in its opening statement—that North Minneapolis is a "war zone;" that defendants are engaged in "war" or "combat;" and that defendants target "enemies"—to each constitute "inflammatory statements . . . only made to inflame the fear and prejudices of the jury." (*Id*.) During the pretrial conference, the government disputed Defendants' characterization of its Trial One opening statement. The government represented that it anticipates that its opening statement at this trial will have a somewhat different theme, but that it will still analogize to the concept of a war in the streets of North Minneapolis.

The Court agrees with the general proposition that the government may not make inflammatory remarks in its opening statement that are disconnected from the evidence

---

[39] In the pretrial order for the second trial on the Feeding Our Future conspiracy, the Court affirmed that "[i]n the seven-defendant *Farah* trial, the Court allowed the government ten strikes and the defendants eighteen strikes." *United States v. Bock*, No. 22-CR-223 (NEB/DTS), ECF No. 486 at 14–15 (D. Minn. Jan. 24, 2025). In *Bock*, the Court originally intended to offer the government eight peremptory strikes and the defendants fourteen peremptory strikes when the trial was set to have four defendants. *Id*. at 15. But when the trial dropped to two defendants, the Court gave seven peremptory strikes to the government and twelve peremptory strikes to the defendants.

that will be presented at trial. But the Court disagrees with Defendants that analogizing to a war in the streets is improper for the government to include in its opening statement.

Each of the Defendants are charged in the Third Superseding Indictment with RICO conspiracy arising from an alleged violent gang rivalry in North Minneapolis. (ECF No. 1708.) The government's theory of its case on the RICO conspiracy count is that "[D]efendants perpetrated a series of shootings and a murder as part of an over-arching gang war with its rivals." (ECF No. 1937 at 41.) And the government is entitled to advance its theory of the case, so long as the descriptive phrases it uses for its theory of the case are not mere "invectives" offered "only to inflame passions." *See United States v. Bentley*, 561 F.3d 803, 811 (8th Cir. 2009) (considering that the government's use of the phrase "[s]exual predator" was not clear error as it fairly advanced the government's theory of the case in a child exploitation prosecution); *United States v. Shoff*, 151 F.3d 889, 893 (8th Cir. 1998) (determining that the government's use of the phrase "con man" in opening statements of a money laundering and mail fraud prosecution was not clear error because "[t]he prosecutor's opening was limited to describing what the government would attempt to prove [and] [t]he use of colorful pejoratives is not improper").

The government also represents that witness testimony at trial will describe the nature of that gang rivalry between the Highs and the Lows in North Minneapolis.[40] It is

---

[40] The government confirmed at the pretrial conference that it expects witness testimony to establish the violent nature and exchange of hostilities of the gang rivalry between the Highs and the Lows.

"a permissible inference that could be drawn from the evidence the government [will] ultimately produce[] in the case" that the rivalry between the Highs and the Lows may be analogous to a war in the streets.[41] *United States v. Bolzer*, 367 F.3d 1032, 1037 (8th Cir. 2004). The Court thus denies Defendants' joint motion.[42]

**I.      *Ninth Motion in Limine to Exclude Plea Agreements (ECF No. 1928 at 18–19.)***

Defendants jointly move to preclude the government from introducing the plea agreements of cooperating co-conspirator witnesses. (ECF No. 1928 at 18–19.) As discussed above in the Court's analysis of the government's ninth motion in limine, the Court considers such plea agreements to be admissible at trial, subject to a proper limiting instruction. But as noted above, the Court leaves open whether the plea agreements should be redacted in any way to avoid juror confusion or unfair prejudice to Defendants. Defendants' joint motion is denied.

---

[41] The Court has already seen a significant amount of the evidence that the government intends to offer at this trial during Trial One. In the Court's view, analogizing the gang rivalry between the Highs and the Lows to a war in the streets "d[oes] not go beyond inferences that might normally be drawn from the evidence." *Bolzer*, 367 F.3d at 1037 (citing *United States v. Wilkinson*, 754 F.2d 1427, 1435 (2d Cir. 1985)).

[42] Defendants also jointly ask the Court to "preclude the [g]overnment from making any reference to or mention of changing conditions in North Minneapolis after the indictment was issued." (ECF No. 1928 at 17.) The government represents that it "does not intend to offer this evidence" unless "[D]efendants open the door to this testimony." (ECF No. 1937 at 42.) The Court thus denies Defendants' joint motion as premature to the extent it seeks to preclude such evidence.

*J.*     *Tenth Motion in Limine to Exclude "Other Acts" Evidence (ECF No. 1928 at 19–21.)*

Defendants jointly move to exclude evidence of purported "other acts" included in the overt acts section of the Third Superseding Indictment under Rule 404(b) of the Federal Rules of Evidence. (*Id*. at 19–21.) In support of this motion, Defendants argue that "most of the alleged 'overt acts' . . . are not relevant either to proof of an enterprise, or to proof of a pattern of racketeering activity." (*Id*. at 20.)

The Court concludes that evidence of the alleged overt acts listed in the Third Superseding Indictment is admissible at trial if it is relevant to proving an essential element of the RICO conspiracy offense—that is, if it is probative of the existence of an association-in-fact, a conspiracy to commit a pattern of racketeering activity, or of Defendants' agreement to participate in the conspiracy in furtherance of the enterprise. Such evidence is admissible because it constitutes relevant circumstantial evidence of the offense charged, not because it is character evidence under Rule 404(b).

In *United States v. Henley*, the Eighth Circuit determined that there are two alternative prongs by which the government can prove a conspiratorial agreement to violate RICO in accordance with the Supreme Court's holding in *Salinas v. United States*, 522 U.S. 52, 63–65 (1997):

> [B]y proving either that a defendant personally agreed to commit two predicate acts in furtherance of the enterprise or that a defendant agree[d] to participate in the conduct of the enterprise with the knowledge and intent that other members of the conspiracy would commit at least two predicate acts in furtherance of the enterprise.

766 F.3d 893, 908 (8th Cir. 2014) (citation and quotation marks omitted). In so holding, the

*Henley* court recognized that under the second prong, "[t]he government can prove such

an agreement with circumstantial evidence showing that each defendant must

necessarily have known that others were also conspiring to participate in the same

enterprise through a pattern of racketeering activity." *Id*. at 908–09 (citation and quotation

marks omitted). Thus, evidence of overt acts—even if it does not constitute evidence of

racketeering activity—may be relevant circumstantial evidence that the defendant "must

necessarily have known that others were also conspiring to participate in the same

enterprise through a pattern of racketeering activity." *Id*. at 909.

That is not to say that all the overt acts listed in the Third Superseding Indictment

constitute relevant circumstantial proof of the RICO conspiracy. The Court will take

specific objections on a case-by-case basis at trial as to whether evidence of various overt

acts that the government intends to offer constitutes circumstantial proof of the elements

of RICO conspiracy, or instead constitutes impermissible bad acts character evidence.

Defendants' joint motion is denied.

### III.     Taylor's Motions in Limine

### A.     *First Motion in Limine to Suppress Evidence Seized in June 2022 (ECF No. 1941.)*

Taylor moves to suppress evidence obtained from a search of his vehicle and his

person on June 10, 2022, pursuant to a warrant issued by Hennepin County, Minnesota

State District Court Judge Lisa K. Janzen. (ECF No. 1941; ECF No. 1941-2.) The fruits of this search appear to be the basis for overt act 134 in the Third Superseding Indictment, which states that "[o]n or about June 10, 2022, Taylor and a Highs member possessed a firearm and possessed with intent to distribute oxycodone hydrochloride pills."[43] (ECF No. 1708 at 26.)

Taylor claims that the evidence obtained from this search should be suppressed because the warrant application failed to establish probable cause, arguing that it was based on uncorroborated allegations of confidential informants. (ECF No. 1941 at 2–4.) Taylor represents that he had filed a motion to suppress this evidence in his state-court case, which was dismissed when he was federally indicted in this matter.[44] (*Id*. at 1.) But Taylor did not file the suppression motion in this case until May 1, 2025.

In response, the government argues that the underlying warrant issued by Judge Janzen was valid and supported by probable cause. (ECF No. 1956 at 3–6.) The government contends that the affidavit in support of the warrant application included

---

[43] Pursuant to this search, the government obtained a Glock 10mm handgun with an extended magazine and a bag of blue pills from the search of the vehicle, as well as a bag of additional pills from a body scan search of Taylor's person. (ECF No. 1956-1 at 2.) Taylor also allegedly admitted to officers that he did not have a prescription for the pills recovered from his person and that he sells them for $35.00 per pill. (*Id*.) Additionally, the search warrant authorized the seizure of cell phones from Taylor. (ECF No. 1941-2 at 5.) It is unclear in the record if any phones were seized and subsequently searched.

[44] *State v. Taylor*, No. 27-CR-22-12078, at Dkt. No. 25 (Minn. Dist. Ct. May 10, 2023) (dismissing charges).

information from two confidential informants with a track record of reliability, and that the information provided was corroborated by both physical and electronic surveillance. (*Id*. at 5–6 (citing ECF No. 1941-2 at 2–3).) Second, the government argues that the *Leon*[45] good faith exception to the exclusionary rule applies because officers reasonably relied upon the warrant issued by Judge Janzen. (*Id*. at 6–7.) Third, the government asserts that when Taylor fled the traffic stop,[46] he committed a new crime of fleeing, and so officers were justified in searching his vehicle under the automobile exception and in searching his person incident to arrest. (ECF No. 1956 at 7–8.) When asked by the Court at the pretrial hearing about the timeliness of Taylor's motion, the government took no position.

The Court denies Taylor's motion as untimely. The December 29, 2023 Third Amended Pretrial Scheduling and Litigation Management Order ("Litigation Management Order") governs the timeliness of litigation practice in this case. (ECF No. 666.) The Litigation Management Order stated that "[a]ll pretrial motions . . . shall be filed and served consistent with Federal Rules of Criminal Procedure 12(b) and 47 on or before April 29, 2024." (*Id*. at 11 (citing D. Minn. L.R 12.1(c)(1)).) The Court granted a continuance, extending the motions filing deadline to May 28, 2024. (ECF No. 978 at 2.)

---

[45] *United States v. Leon*, 486 U.S. 897 (1984).

[46] After the search warrant was issued by Judge Janzen on June 4, 2022, officers located Taylor inside his vehicle on June 10, 2022, and approached the vehicle in their squad cars with lights activated. (ECF No. 1956-1 at 2.) At that time, Taylor "accelerated his vehicle driving onto the adjacent sidewalk[,] . . . str[iking] a parked car before lodging his own van between a light pole and a building." (*Id*.)

Taylor was aware of that timeline as he filed other motions on May 28. (*See* ECF No. 1066 (motion to dismiss); ECF No. 1067 (motion for disclosure of *Brady* materials); ECF No. 1068 (motion to sever count seven).) Taylor was also on notice that the government intended to put on evidence relating to this search, as the original Indictment (filed on April 26, 2023) included what is now-labeled as overt act 134.[47] (ECF No. 12 at 18.) Still, Taylor did not file the instant suppression motion until the eve of trial—nearly a year after the deadline for filing such motions.

Rule 12(c) of the Federal Rules of Criminal Procedure provides that the Court may set a deadline for the parties to make pretrial motions, and "[i]f a party does not meet the deadline for making a Rule 12(b)(3) motion, the motion is untimely." Fed. R. Crim. P. 12(c)(1), (3). The Court has discretion to consider an untimely motion "if the party shows good cause." Fed. R. Crim. P. 12(c)(3). The Eighth Circuit has recognized that "[t]he desire to suppress incriminating evidence . . . [is] not by [itself] sufficient to establish good cause to justify relief from a waiver of a defense, objection, or request under Rule 12." *United States v. Trancheff*, 633 F.3d 696, 698 (8th Cir. 2011) (per curiam) (holding that the district court "did not abuse its discretion by denying [defendant's] motion in limine as untimely on the ground that it was an untimely effort to preserve issues that could have been raised

---

[47] Overt act 134 was listed as overt act 80 in the original indictment. (ECF No. 12 at 18.)

in a timely motion to suppress."). Taylor's counsel has not established good cause for

filing this belated motion,[48] and so the Court denies Taylor's motion as untimely.[49]

## IV.  Robinson's Motions in Limine

### A.  *First Motion in Limine to Preclude the Admission of Government Exhibit A-214 of Mugshot Photographs (ECF No. 1912 at 1.)*

Robinson moves to preclude the government from offering Government Exhibit

A-214, a Minnesota Department of Corrections Offender Photo Report, which includes

sixteen mugshot photographs taken of Robinson.[50] (ECF No. 1912 at 1.) The photographs

include seven front-profile mugshots, seven side-profile mugshots, and two photographs

---

[48] The Court recognizes that Taylor filed a suppression motion in state court relating to the same evidence challenged here. But Taylor was aware of the relevance of this evidence to the federal prosecution for over a year before the motions deadline when the original indictment was filed. There is not good cause for Taylor's failure to timely file this motion.

[49] Even if the Court were to consider Taylor's motion, suppression is not an appropriate remedy. Assuming for sake of argument that the warrant was not supported by probable cause, the executing officers reasonably relied in good faith on a search warrant issued by the neutral and detached Judge Janzen. *See Leon*, 486 U.S. at 920–21. And none of the exceptions to the *Leon* good faith rule apply here—there is no *Franks* violation; Judge Janzen did not wholly abandon her judicial role; it is not entirely unreasonable to believe that the affidavit provided probable cause to issue the warrant; and the warrant is not so facially deficient that no officer could reasonably presume its validity. *See United States v. Puckett*, 466 F.3d 626, 630 (8th Cir. 2006) (delineating exceptions to the *Leon* good faith rule). As for the third exception, it is not entirely unreasonable to believe that the affidavit provided probable cause, because the affidavit contained information from two reliable confidential informants whose information was corroborated by both physical and electronic surveillance. (ECF No. 1941-2 at 2–3.)

[50] As discussed above in the Court's analysis of the government's first motion in limine, these correctional records are considered self-authenticating.

zoomed-in on Robinson's tattoos on his right arm and neck. (*Id.* at 6–7.) Robinson argues that "[t]he photographs add nothing to the [g]overnment's case, other than an inference of Mr. Robinson's past criminality," and that "[t]he tattoo shots are likewise pejorative." (*Id*. at 1 (citing Fed. R. Evid. 403).)

In response, the government "agrees that it will not offer any of Robinson's mugshots (unless Robinson were to raise a foundational objection to the records . . . )." (ECF No. 1937 at 13.) To the extent that Robinson's motion seeks to preclude the introduction of the front- and side-profile Department of Corrections mugshots, and the right arm tattoo photograph, the motion is granted as agreed.

But the government maintains that the zoomed-in image of Robinson's neck tattoo has probative value. (*Id*.) The government represents that it will establish at trial that the number "25" is a symbol of the Young N' Thuggin' ("YNTs") clique of the Highs. (*Id*. at 13–14.) The government argues that Robinson's neck tattoo of the number "25" is probative of his membership in the YNTs clique of the Highs. (*Id*. at 14.) The Court agrees. *See United States v. Quinn*, 131 F.4th 846, 857 (8th Cir. 2025) (considering "specific tattoos" to be relevant evidence of the "distinct affiliation" of the gang enterprise in a violent crimes in aid of racketeering case).

To the extent that Robinson is concerned that the probative value of the neck tattoo image is substantially outweighed by a risk of unfair prejudice, the Court has reviewed the government's revised Government Exhibit A-214 (ECF No. 1937 at 15), and the Court

does not consider the image to evoke the same inference of past criminality as the front- and side-profile mug shots. In fact, it is impossible to discern from the revised exhibit that the image was even taken as part of a correctional intake process. (*Id*.) Robinson's motion is denied to the extent it seeks to preclude the introduction of the revised Government Exhibit A-214, which is just the zoomed-in photograph of his neck tattoo.

> **B.**    ***Second Motion in Limine to Preclude the Admission of Government Exhibit Y-17 of Body Camera Footage of Robinson's August 1, 2019 Arrest at Winner Gas Station (ECF No. 1912 at 1–2.)***

Next, Robinson moves to preclude the government from introducing Government Exhibit Y-17, which is police body-worn camera footage of Robinson's arrest at the Winner Gas Station in North Minneapolis. (ECF No. 1912 at 1.) Robinson argues that "[t]here is no point to this evidence, other than to show [him] being cuffed" following a shooting in downtown Minneapolis,[51] which will lead the jury to "make the common sense assumption that [he] was responsible for the assault."[52] (*Id*. at 1–2.)

---

[51] Overt act number 23 in the Third Superseding Indictment alleges that "on or about July 7, 2019, T. Robinson and another Highs member shot in a crowded area and injured a female in downtown Minneapolis." (ECF No. 1708 at 13.)

[52] The government represents that Government Exhibit Y-17 depicts Robinson's arrest on or about August 1, 2019. (ECF No. 1937 at 15.) Overt act number 26 in the Third Superseding Indictment alleges that "[o]n July 31, 2019, T. Robinson was at Winner Gas Station while in possession of marijuana." (ECF No. 1708 at 13.) It is unclear to the Court if Government Exhibit Y-17 refers to the same allegation made in overt act number 26 of the Third Superseding Indictment.

The Court has reviewed the footage in the original proposed Government Exhibit Y-17 in its entirety. The footage depicts officers driving up to Winner Gas while someone on the police dispatch discusses the location of a target person. (Gov't Ext. Y-17 at 00:00–00:21.) Then, upon arriving at the gas station, one of the officers precedes to arrest Robinson while appearing to have a taser drawn. (*Id*. at 00:21–00:40.) Another officer then tells Robinson, "you've got warrants bro," as Robinson is led away in handcuffs toward the police vehicle. (*Id*. at 00:40.) After Robinson is detained near the vehicle, the footage depicts officers conducting a search of Robinson's person, from which officers obtain a bag of marijuana, a cellular device, and United States currency. (*Id*. at 00:52–01:46.) During the search, the officer inquires whether Robinson has "pills or anything on [him]." (*Id*. at 01:10–01:11.) Robinson is then placed into the back of the squad car. (*Id*. at 01:46–01:56.)

The government argues that the video footage constitutes relevant evidence of Robinson's association with the Highs enterprise. (ECF No. 1937 at 15–16 (citing the allegation in the Third Superseding Indictment that "the Highs congregated at specific businesses and residences from which they controlled the area drug trade and dealt drugs[;] . . . these included Winner Gas (626 West Broadway Avenue)").) The government

considers "Robinson's arrest at a gang hangout [to be] relevant to his association with the

Highs enterprise."[53] (*Id*.)

The Court agrees with the government that the footage of Robinson at Winner Gas

has probative value; it tends to make it more likely that Robinson is associated with the

purported Highs enterprise, which allegedly congregates at Winner Gas. But the Court

reserves ruling on whether the probative value of the footage is substantially outweighed

by a danger of unfair prejudice under Rule 403. The government represented during the

pretrial conference that it intends to modify Government Exhibit Y-17. The Court will

hear any outstanding Rule 403 objections at the time that the government offers

Government Exhibit Y-17 in its amended format.

**C.      *Third Motion in Limine to Preclude the Admission of Department of Corrections Intake Interview Evidence (ECF No. 1912 at 2–3.)***

Robinson moves to preclude the government from admitting Government

Exhibits A-208 and A-209, which are Minnesota Department of Corrections Offender

Intake Interview Reports for Robinson from 2015 and 2018.[54] (ECF No. 1912 at 2.) In each

of the Intake Interview Reports, the data field for "Security Threat Group" contains an

---

[53] During the pretrial conference, the government confirmed that it was not offering the video footage to establish Robinson's involvement in drug-trafficking, despite the footage's depiction of officers confiscating marijuana and U.S. currency from Robinson. The government stated on the record that it did not believe it could establish that the marijuana seized from Robinson's person constituted a distribution amount.

[54] Per the Court's ruling on the government's first motion in limine, these documents are considered self-authenticating correctional records.

entry of "Young N Thuggin (YNT)." (Gov't Exs. A-208, A-209.) Robinson makes two arguments in support of his motion. First, Robinson argues that the intake interview reports violate Rule 609(a)(2) of the Federal Rules of Evidence because they improperly "introduce the inference of felony conviction." (ECF No. 1912 at 2.) Second, Robinson contends that the data entered into the "Security Threat Group" field constitutes non-disclosable, confidential data under the Minnesota Government Data Practices Act. (*Id*.)

As for Robinson's first argument, the Court agrees that the intake interview reports introduce unfairly prejudicial evidence from which the jury could infer Robinson's prior felony convictions. The government likewise "appreciates that admission of these exhibits may be prejudicial," and represents that it "will agree not to offer the exhibit[s]." (ECF No. 1937 at 17.) Thus, Robinson's motion to preclude the admission of Government Exhibits A-208 and A-209 is granted as agreed.[55]

### D. Fourth Motion in Limine to Preclude the Admission of Proposed Evidence of an April 3, 2022 Incident (ECF No. 1912 at 3–4.)

On April 24, 2025, the government sent Robinson's counsel a notice that it intends to offer evidence of an April 3, 2022, incident in which Robinson collided with a vehicle at Merwin Liquors in North Minneapolis. (ECF No. 1912 at 12.) During the incident,

---

[55] The government represents that it intends to offer Robinson's admission that he is a member of the YNTs indirectly through the testimony of Minnesota Department of Corrections Investigator Erin Voss. (ECF No. 1937 at 17.) Voss will testify that she "is aware that Robinson twice previously stated to law enforcement officials that he was a member of YNT." (*Id*. at 17–18.) The Court will consider the admissibility of such testimony at the time the government seeks to offer it.

Robinson allegedly got into a verbal altercation with the passenger of the other vehicle before grabbing a firearm from his own vehicle and firing three times at the passenger in the other vehicle. (*Id*.) The government represents that it will introduce testimony from law enforcement and civilian witnesses, surveillance footage, body worn camera clips, and victim medical records regarding this incident. (*Id*.) This incident is not referenced as an overt act charged in the Third Superseding Indictment.

Robinson moves to preclude the government from offering this evidence, arguing that it constitutes inadmissible bad acts evidence under Rule 404(b). (ECF No. 1912 at 3.) Robinson further argues that even if the evidence were permissible under the Federal Rules of Evidence, it was not timely disclosed, pursuant to an "Order filed March 16, 2023, at page 7, para. 6, [by] Magistrate Judge Docherty."[56] (*Id*.) In response, the government maintains that it "considers the proposed evidence [to be] intrinsic to the RICO Conspiracy count and provided notice only out of an abundance of caution."[57] (ECF No. 1937 at 18.)

---

[56] No such order was issued on March 16, 2023, as the initial complaint was not even filed in this case until April 5, 2023. (ECF No. 2.) The Court assumes that Robinson meant to refer to the operative Litigation Management Order issued on December 29, 2023. (ECF No. 666; *see also* ECF No. 1720 at 1 ("The parties shall follow the Court's orders regarding disclosure requirements [] as laid out in Magistrate Judge John F. Docherty's December 29, 2023 order.").)

[57] The government indicated in the notice itself that it "maintains that this is not 'extrinsic' Rule 404(b) evidence but rather the *res gestae* of the crimes alleged in the Third Superseding Indictment," and provided the notice only "[o]ut of an abundance of caution

The Court agrees with the government; this evidence constitutes intrinsic evidence of RICO conspiracy and is admissible. As discussed above in the Court's analysis of the Defendants' tenth joint motion in limine, the government can prove a conspiratorial agreement to violate RICO in two ways:

> [B]y proving either that a defendant personally agreed to commit two predicate acts in furtherance of the enterprise or that a defendant agree[d] to participate in the conduct of the enterprise with the knowledge and intent that other members of the conspiracy would commit at least two predicate acts in furtherance of the enterprise.

*Henley*, 766 F.3d at 908 (citation and quotation marks omitted). Pursuant to this burden of proof for RICO conspiracy, "[t]here is no requirement of some overt act or specific act in [§ 1962(d)], unlike the general conspiracy provision applicable to federal crimes." *Salinas*, 522 U.S. at 65. Thus, even though the Third Superseding Indictment included a section on "overt acts" (ECF No. 1708 at 9–32), the government was not required to include them, and the government is not limited in its presentation of evidence to the overt acts delineated in the Third Superseding Indictment.

Instead, the government may offer evidence beyond the listed overt acts if such evidence is probative of an essential element of the RICO conspiracy offense. Here, the alleged incident that took place in the Merwin Liquors parking lot on April 3, 2022, is intrinsically relevant to proving Robinson's association with the Highs enterprise and his

---

. . . under Rule 404(b) to prove intent, knowledge, and absence of mistake." (ECF No. 1912 at 12.)

knowing agreement to conduct or participate in the affairs of the enterprise, given that

he was present and armed at an alleged Highs hangout.[58] (*Id*. at 5, 7.) Robinson's motion

to preclude the evidence of the April 3, 2022 is denied.[59]

>   **E.**     *Fifth Motion in Limine to Preclude the Admission of Alleged Murder Evidence (ECF No. 1912 at 4–5.)*

Finally, Robinson moves to preclude the government from introducing evidence

of the killings of Darryl Wells, Darien Berry, and Harvey Williams at trial, because there

is no evidence that he participated in or aided and abetted these crimes.[60] (ECF No. 1912

at 4–5.) In doing so, Robinson reiterates his prior argument in his motion to sever that

"the unfair prejudice found in the close ups of the bullet holes at autopsy, the dead bodies

on the sidewalks, will be indelible." (*Id*. at 5; *see also* ECF No. 963 at 4–5.)

---

[58] To the extent that Robinson objects that the government does not allege that the April 3, 2022 incident "refers to 'gang' activity" or that the victim was a Lows member (ECF No. 1912 at 3), such a concern goes to the weight of the evidence and not its admissibility.

[59] Robinson may still object at trial to the admissibility of the evidence that the government intends to offer of the April 3, 2022 incident on other grounds.

[60] Robinson also argues that evidence of these killings is "unnecessary" at this trial unlike the evidence of the Darryl Wells murder at Trial One. (ECF No. 1912 at 5.) Although the government has discretion as to what evidence it will introduce to prove the RICO conspiracy count, the Third Superseding Indictment requires that the government put on evidence to prove the alleged murders of Darien Berry and Harvey Williams, given that Giles and Taylor are each charged with these murders in the special sentencing factors. (ECF No. 1708 at 33–34.) Moreover, the parties have included special interrogatories in their joint proposed verdict form, which requires the jurors to answer whether Giles and Taylor committed first-degree murder under Minnesota law as part of the RICO conspiracy offense. (ECF No. 1924 at 3, 5–6.) Thus, evidence of the alleged Berry and Williams murders are necessary at this trial.

But the Third Superseding Indictment alleges that Robinson conspired to join the purported racketeering enterprise, which allegedly furthered its purpose to "preserv[e] and protect[] the power, territory, reputation, and profits . . . through . . . violence . . . including, but not limited to, acts involving murder." (ECF No. 1708 at 6.) And so, the alleged murders are still intrinsically relevant to the government's case against Robinson as to whether he agreed to participate in the conspiracy in furtherance of the Highs enterprise with the knowledge and intent that his co-conspirators would commit a pattern of racketeering acts, including murder.[61] *Cf. United States v. Dierling*, 131 F.3d 722, 734 (8th Cir. 1997) ("[A] joint trial is permissible even if all conspirators did not participate in a killing where violence is a modus operandi of a conspiracy and the action was committed in furtherance of the conspiracy." (citation omitted)). Robinson's motion to

---

[61] As described in further detail in the Court's severance order, Robinson is properly joined in the indictment with Taylor, Giles, and other Defendants charged in Count One who were also accused of murder, and Robinson is not unfairly prejudiced by that joinder. (ECF No. 1598 at 9–11, 16–21.) It is the very nature of the RICO conspiracy charged against Robinson that these alleged racketeering acts of murder are relevant to proving the existence of the racketeering enterprise as to each of the Defendants indicted for the conspiracy. *See United States v. McArthur*, No. 12-CR-26 (JRT/JSM), 2013 WL 101925, at *3 (D. Minn. Jan. 8, 2013) ("Evidence of these [predicate murders] might be admissible as to each individual defendant because of the nature of a RICO conspiracy; if this is so, the defendants' arguments about suffering undue prejudice, which are based on the premise that the evidence is inadmissible as to them, would fail."); *United States v. Eufrasio*, 935 F.2d 553, 567 (3d Cir. 1991) ("[T]he murder conspiracy and all the other acts charged in this case were related and formed a single pattern of racketeering activity, because each was committed in furtherance of the [racketeering] enterprise.").

preclude evidence of the Darryl Wells, Darien Berry, and Harvey Williams killings is denied.[62]

## V.     Banks' Motions in Limine

### A.     *First Motion in Limine to Preclude the Admission of Government Exhibit BB-4 (ECF No. 1929 at 1.)*

Government Exhibit BB-4 is a seventeen-second video clip of Minneapolis Police Department Officer Conan Hickey's body-worn camera while he searches through a closet. (Gov't Ex. BB-4; *see also* ECF No. 1937 at 45 (identifying that the footage came from Officer Hickey's body-worn camera).) In the audio of the footage, Officer Hickey mentions finding a "magazine,"[63] but the video of the footage does not clearly capture the image of the firearm magazine being found. (Gov't Ex. BB-4.)

Banks moves to preclude that footage under Rule 403, arguing that Government Exhibit BB-4 "does not actually provide any new, or substantive evidence or information [and] is confusing and a waste of time for the jury." (ECF No. 1929 at 1.) The government

---

[62] Consistent with the Court's ruling on the government's second motion in limine, the Court will consider objections on a case-by-case basis at trial as to whether certain evidence of the alleged murders is inadmissible under Rule 403.

[63] Banks and the government both describe the audio in their briefs as stating something about a "clip." (ECF No. 1929 at 1; ECF No. 1937 at 45 (quotation marks around "clip" included in both).) The Court has reviewed the footage, and concludes that the officer says "magazine," not "clip." (Gov't Ex. BB-4.) The government's briefing describes "clip" as another term for a "firearm magazine" (ECF No. 1937 at 45), and so the Court construes the parties' dispute as being about the audio regarding a "magazine."

responds that it "intends to offer the video during Officer Hickey's testimony to establish when and where he found the magazine."[64] (ECF No. 1937 at 45.)

Because Officer Hickey will testify at trial as to what the footage in Government Exhibit BB-4 depicts, the exhibit will provide a useful visual to the jury to supplement Officer Hickey's testimony about where the firearm magazine was located. Banks' motion to preclude Government Exhibit BB-4 is denied.

### B. Second Motion in Limine to Preclude the Admission of Government Exhibit BB-5 (ECF No. 1929 at 1.)

Banks moves to preclude the admission of Government Exhibit BB-5, which is a screenshot of body-worn camera footage that depicts Banks being detained by law enforcement. (ECF No. 1929 at 1.) The government represents that it will not introduce this exhibit at trial. (ECF No. 1937 at 46.) Banks' motion is denied as moot.

### C. Third Motion in Limine to Preclude the Admission of Government Exhibit BB-6 (ECF No. 1929 at 1.)

As originally proposed, Government Exhibit BB-6 is a six-second clip from Minneapolis Police Department Officer William Martin's body-worn camera that shows an unidentified woman being arrested in a bedroom. (Gov't Ex. BB-6; *see also* ECF No. 1937 at 46 (identifying that the footage came from Officer Martin's body-worn camera).) In the background of the footage is a white, plastic bag on the floor of a closet

---

[64] The Court confirmed at the pretrial conference that the government intends to have Officer Hickey testify to the footage at trial.

in which law enforcement allegedly found 100 grams of marijuana. (Gov't Ex. BB-6 at 00:04.)

Banks moves to preclude Government Exhibit BB-6 under Rule 403 on the grounds that the footage violates the privacy of the unidentified woman and is "redundant and would only serve to confuse the jury or waste its time." (ECF No. 1929 at 1.) In response, the government represents that it will modify Government Exhibit BB-6 "to be a screenshot of just the frame shown at 00:04." (ECF No. 1937 at 46.) At the pretrial conference, Banks withdrew his motion as to the modified Government Exhibit BB-6. The Court grants Banks' motion as agreed as to precluding the original Government Exhibit BB-6, and denies Banks' motion as withdrawn as to precluding the modified Government Exhibit BB-6.

### D. Fourth Motion in Limine to Preclude the Admission of Government Exhibits QQ-2, QQ-4, and QQ-5 (ECF No. 1929 at 2.)

Government Exhibit QQ-2 contains a set of images taken of the inside of the Boost Mobile Store in North Minneapolis following an alleged incident in which Defendants' purported co-conspirators attempted to evade law enforcement by locking themselves in the store on January 17, 2023. (ECF No. 1937 at 47–48.) Government Exhibit QQ-4 depicts images of a firearm found inside the Boost Mobile store. (*Id*.) As originally proposed, Government Exhibit QQ-5 depicted two co-conspirators detained by law enforcement in the Boost Mobile store (*id*.), but this exhibit has been removed from the government's first amended exhibit list shared conventionally with the parties. The government asserts that

the exhibits relate to the conduct charged in overt acts 167, 168, and 169 of the Third Superseding Indictment. (ECF No. 1937 at 47; *see* ECF No. 1708 at 29–30.)

Banks moves to preclude these exhibits under Rule 403, arguing that their inclusion "completely misleads the jury into believing that the stop of Mr. Banks for selling the drugs in the parking lot outside is related or connected to the robbery inside the store." (ECF No. 1929 at 2.) As for Government Exhibit QQ-5, the government no longer lists the exhibit in its first amended exhibit list, so the motion is moot. And as for Government Exhibits QQ-2 and QQ-4, the motion is denied.

As discussed above in response to the Defendants' tenth joint motion in limine, the government can prove elements of RICO conspiracy with "circumstantial evidence showing that each defendant must necessarily have known that others were also conspiring to participate in the same enterprise through a pattern of racketeering activity." *Henley*, 766 F.3d at 908–09 (citation and quotation marks omitted). The fact that narcotics were found in the Boost Mobile store in which Defendants' purported co-conspirators hid from law enforcement tends to make it more likely that Banks knowingly agreed to conduct or participate in the affairs of the enterprise, given that he was also allegedly captured selling fentanyl outside that same Highs hangout. (*See* ECF

No. 1708 at 5.) The images in Government Exhibits QQ-2 and QQ-4 are thus probative and not unfairly prejudicial.[65]

**E.** ***Fifth Motion in Limine to Preclude the Admission of Any Intake Forms, Pretrial Reports, or Other Identifying and/or Administrative Documents Pertaining to Banks (ECF No. 1929 at 2.)***

Banks moves to preclude "[a]ny intake forms, pretrial reports, or other identifying and/or administrative documents pertaining to [him] as part of his booking, arrest, arraignment, or case management in or outside the jail." (ECF No. 1929 at 2.) The government does not intend to offer such records at trial. (ECF No. 1937 at 48.) Banks' motion is denied as moot.

**F.** ***Sixth Motion in Limine to Preclude the Admission of Prior Criminal History or Prior Bad Acts Evidence (ECF No. 1929 at 2.)***

Banks moves to preclude the government from introducing evidence of his prior bad acts or criminal history. (ECF No. 1929 at 2.) The government represents that it does not intend to offer such evidence unless Banks testifies at trial. (ECF No. 1937 at 49.) Because the Court does not know if Banks will testify in his own defense, the Court denies the motion as premature.[66]

---

[65] The government represents that it reduced the number of photographs in each exhibit to be introduced at trial so that the evidence is not cumulative. (ECF No. 1937 at 48.) The Court declines to rule that these exhibits are not cumulative, given that Banks did not make that motion. (ECF No. 1929 at 2.)

[66] To the extent that Banks' motion overlaps with Defendants' tenth joint motion in limine, the Court denies the motion for the reasons discussed in its analysis above.

*G.*      *Seventh Motion in Limine to Strike Surplusage from the Third Superseding Indictment (ECF No. 1930.)*

Banks moves to strike any references to his alleged nicknames or aliases from the Third Superseding Indictment[67] and from "all documents."[68] (ECF No. 1930 at 1 (citing Fed. R. Crim. P. 7(d)).) As in Trial One, the Court will not provide the Third Superseding Indictment to the jury. As for other case documents provided to the jury—such as the evidence list, exhibit list, and verdict forms—the Court will not include references to Defendants' alleged nicknames or aliases. Banks' motion is denied as moot.

*H.*      *Eighth Motion in Limine to Preclude the Admission of Government Exhibits QQ-11, QQ-12, QQ-12A, and QQ-12B (ECF No. 1958.)*

Banks moves to exclude Government Exhibits QQ-11, QQ-12, QQ-12A, and QQ-12B. (ECF No. 1958 at 1–2.) The government has not responded in writing to these motions and did not address them during the pretrial conference, given the late date of their filing after the late date of the disclosure of the exhibits.

Government Exhibit QQ-11 is body-worn camera footage of an officer looking into the passenger side of an SUV in which Banks was arrested, and for the duration of the footage, the muzzle of the officer's firearm is in view. (*Id*. at 1; Gov't Ex. QQ-11.) Banks

---

[67] Banks is identified by the aliases of "Bear" and "Big Will" in the Third Superseding Indictment. (ECF No. 1708 at 1.)

[68] The Court construes Banks' reference to "all documents" to mean case documents that are provided to the jury. The Court does not understand Banks' motion to seek to exclude any references to his purported nicknames or aliases that appear in the government's evidence.

argues that the exhibit is unfairly prejudicial under Rule 403. (ECF No. 1958 at 1.) Because the Court does not know the government's theory of relevance for this exhibit, the Court cannot properly weigh the probative value of the exhibit against any possible prejudicial effect. Banks' motion is reserved for trial as to Government Exhibit QQ-11.

Government Exhibit QQ-12 is video surveillance footage of the Boost Mobile parking lot depicting men gathering outside what appears to be a Dodge Charger before one man proceeds to enter the Boost Mobile store. (Gov't Ex. QQ-12.) Banks claims that the video is unrelated to him and irrelevant. (ECF No. 1958 at 1.) Without a response from the government, the Court does not know what the government's theory of relevance is for this footage and it is unclear if the men in the exhibit are Banks' purported co-conspirators. The Court reserves Banks' motion to preclude Government Exhibit QQ-12.

As for Government Exhibits QQ-12A, and QQ-12B, Banks' motion to preclude the exhibits as irrelevant and prejudicial (ECF No. 1958 at 1–2) is denied. These exhibits depict Banks' purported co-conspirators attempting to evade law enforcement inside and in back of the Boost Mobile store on January 17, 2023. (Gov't Exs. QQ-12A, QQ12B). As discussed above, the fact that narcotics were found in the Boost Mobile store in which Defendants' purported co-conspirators locked themselves in an attempt to hide from law enforcement tends to make it more likely that Banks knowingly agreed to conduct or participate in the affairs of the enterprise, given that he was also allegedly captured

selling fentanyl outside that same Highs hangout. (*See* ECF No. 1708 at 5.) Thus, the exhibit is not irrelevant and it is not unfairly prejudicial to Banks.

## VI. Brown's Motions in Limine

### A. *First Motion in Limine to Exclude Rap Videos as Evidence at Trial (ECF No. 1915.)*

The government intends to introduce various rap videos featuring Brown and other purported co-conspirators, including "Not From the Lows"[69] (Gov't Ex. N-1), "Traumatized" (Gov't Ex. N-2), "I'm so Minneapolis" (Gov't Ex. N-4), "Traumatized Pt. II" (Gov't Ex. N-6), and "Money Mission" (Gov't Ex. N-8). (ECF No. 1937 at 26–29.) In the videos, Brown and his co-conspirators are shown making references to the Highs enterprise, its constituent cliques, and its current and deceased members; making disparaging allusions to the Lows gang; and referencing various racketeering activity, including drug-trafficking. (*See* Gov't Exs. N-1, N-2, N-4, N-6, and N-8.)

Brown moves to exclude evidence of these rap videos on four grounds. (ECF No. 1915.) First, he argues that they constitute inadmissible hearsay. (*Id*. at 2–3.) Second, he claims that the videos constitute impermissible propensity evidence under Rule 404(b). (*Id*. at 3.) Third, he asserts that they are unfairly prejudicial under Rule 403. (*Id*. at 3–6.) Finally, Brown contends that they are inadmissible as protected speech under the First Amendment of the United States Constitution (*Id*. at 6–8.)

---

[69] "Not From the Lows" was admitted as a video exhibit at Trial One.

*Hearsay*. Under the Federal Rules of Evidence, hearsay statements are generally inadmissible. Fed. R. Evid. 802. Statements[70] constitute hearsay when they are made out of court and are offered to prove the truth of the matter asserted. Fed. R. Evid. 801(c). As relevant here, excluded from this definition are: (1) statements not offered for their truth; (2) statements made or adopted by an opposing party; and (3) statements made by an opposing party's co-conspirator during and in furtherance of the conspiracy. Fed. R. Evid. 801(c), (d)(2)(A), (B), (E).

First, to the extent that the government is offering the rap videos for purposes other than proving the truth of the statements made therein, they are not hearsay. For example, the rap videos depict various purported co-conspirators together as a group. This is probative of the co-conspirators' association with one another, even though such depiction is not a statement being offered for the truth of the matter asserted.

Second, to the extent that Brown is, himself, making statements in the rap videos or adopting the statements of others in the videos, such statements are admissible non-hearsay party admissions. Fed. R. Evid. 801(d)(2)(A), (B). In *United States v. Graham*, the Eastern District of Michigan considered various rap tracks in a RICO case to be non-hearsay party admissions or adopted admissions, because each of the defendants are seen in the videos "participating by wearing gang colors, making gang signs, throwing money

---

[70] "'Statement' means a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion." Fed. R. Evid. 801(a).

and singing along to the lyrics." 293 F. Supp. 3d 732, 738 (E.D. Mich. 2017). The Court

finds *Graham*'s reasoning persuasive here.

Finally, to the extent that statements are made in the rap videos by individuals

other than Brown (and which are not fairly attributable to him as adopted admissions),

they are conditionally admissible under the *Bell* procedure as co-conspirator statements

that may have been made in furtherance of the conspiracy. Fed. R. Evid. 801(d)(2)(E); *see*

*United States v. Wilson*, 493 F. Supp. 2d 460, 463 (E.D.N.Y. 2006) (finding the rap lyrics of

a racketeering defendant's co-conspirator to be relevant evidence of enterprise and thus

"not hearsay because they are statements by a co-conspirator made during the course of

and in furtherance of a conspiracy involving [the defendant]").

***Permissible Purpose.*** Next, Brown argues that these videos are being offered for

impermissible propensity purposes under Rule 404(b) of the Federal Rules of Evidence.

But, as discussed above, the government is permitted to prove its RICO conspiracy case

with "circumstantial evidence showing that each defendant must necessarily have

known that others were also conspiring to participate in the same enterprise through a

pattern of racketeering activity." *Henley*, 766 F.3d at 908–09.

Each of these rap videos offer probative, intrinsic evidence of the existence,

structure, methods, and purposes of the Highs enterprise. (*See* Gov't Exs. N-1, N-2, N-4,

N-6, and N-8.) In a similar case, the Southern District of Iowa affirmed RICO conspiracy

convictions for five defendants who contested the enterprise element post-trial. *See United*

*States v. White*, No. 3:23-CR-43, 2024 WL 5054963, at *16–17 (S.D. Iowa Sept. 3, 2024).

Among the evidence that the court found sufficient to establish the existence of an enterprise was a rap video made by the defendants and their co-conspirators. *Id*. at *16. Likewise, here the rap videos are probative of the existence of the Highs enterprise, the conspiracy, and Defendants' agreement to participate in the conspiracy in furtherance of the enterprise.

**Prejudice.** Brown also argues that he would be unfairly prejudiced by the introduction of these rap videos at trial under Rule 403 of the Federal Rules of Evidence. The Court recognizes that these rap videos are unhelpful to Brown's case, but unfair prejudice "does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence; rather, it refers to evidence which tends to suggest decision on an improper basis." *United States v. Mills*, 367 F. Supp. 3d 664, 671 (E.D. Mich. 2019) (citation omitted) (denying RICO conspiracy defendants' motion to preclude the admission of various rap videos and lyrics, reasoning that they were not unfairly prejudicial relative to their probative value on the elements of RICO conspiracy).

Here, Brown has not pointed the Court to any specific lyrics or segments of the rap videos that would risk causing the jury to issue a decision on an improper basis. Rather, Brown seems to argue generally that the introduction of the rap videos, with themes of violence and drugs, is unfairly prejudicial. The Court disagrees. Any prejudice to Defendants from these rap videos does not "substantially outweigh[]" the significant

probative value of this evidence on the central disputed issues in this case. Fed. R. Evid 403; *see also Mills*, 367 F. Supp. 3d at 672 ("[Defendant] does not attempt to explain why those [rap] verses are so highly inflammatory that they would create an undue tendency for the jury to decide the case based on an improper basis.").

*Protected Speech.* Finally, Brown argues that because the rap videos constitute protected expression under the First Amendment of the United States Constitution, they are inadmissible at trial.[71] As an initial matter, the Court agrees with Brown that rap videos are a form of expression protected by the First Amendment. *Ward v. Rock Against Racism*, 491 U.S. 781, 790 (1989). But it does not follow that because such expression is protected from legal proscription that it may not be admitted as relevant evidence in a criminal trial. *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993) ("The First Amendment . . . does not prohibit the evidentiary use of speech to establish the elements of a crime.").

The government does not contend that any Defendant's criminal liability in this case hinges on the content of their protected expression (or their protected association). Rather, Defendants' involvement in the enterprise only becomes criminal once they conspire to conduct or participate, directly or indirectly, in the affairs of the enterprise *through a pattern of racketeering activity. See* 8th Cir. Model Jury Instr. 6.18.1962B, RICO—Conspiracy (18 U.S.C. § 1962(d)) (2024). Significantly, the government confirmed in its

---

[71] Robinson and Brown make a related request for First Amendment jury instructions, which the Court addresses below.

briefing and during the pretrial conference that it is not asserting that the rap videos

themselves constitute racketeering activities.[72]

> [D]efendants in this trial are charged with RICO Conspiracy, narcotics
> trafficking, and firearms offenses—notably, not threat-related offenses.
> While some of the evidence to be introduced at trial includes statements
> made by defendants to taunt and insult their rival gang, the Lows, those
> statements are intended only to show their association and promotion of
> the enterprise, not that the statements themselves were unlawful or rose to
> the level of actual threats.

(ECF No. 1937 at 8; *see also id*. at 11 ("Here, the government is not attempting to

characterize any of the [D]efendant's threats or taunts as true threats warranting criminal

prosecution.").)

In cases brought under the RICO statute, courts have consistently rejected First

Amendment challenges where, as here, the speech "is not itself the proscribed conduct,"

but instead "was used to establish the existence of, and [the defendant's] participation in,

the alleged RICO enterprise." *See United States v. Pierce*, 785 F.3d 832, 841 (2d Cir. 2015)

(quotation marks and citations omitted) (finding no error in the admission of a rap video

and tattoo images in a RICO case); *Mills*, 367 F. Supp. 3d at 668 (admitting rap lyrics and

---

[72] Had the government instead stated that threats made in the rap videos (or in social media postings) themselves constituted racketeering acts, Defendants' liability could turn on the content of their expression, which would require the Court to analyze whether the threats were "true threats" that are unprotected or just offensive expression that is protected. *Cf. Elonis v. United States*, 575 U.S. 723 (2015) (overturning defendant's conviction under 18 U.S.C. Section 875(c) for rap lyrics posted online, where the jury was not instructed that defendant must have posted the lyrics for the purpose of issuing a threat or with knowledge that they would be viewed as a threat).

videos for the purpose of establishing the enterprise and the defendant's participation in and association with members of the enterprise). The Court further notes that the Eighth Circuit recently relied on First Amendment-protected expression in denying a challenge to the sufficiency of the evidence of enterprise in a violent crimes in aid of racketeering case. *See Quinn*, 131 F.4th at 857 (considering evidence that the enterprise "identified its members through recognizable hand signs, specific tattoos, and social media posts"). The Court finds the reasoning of *Pierce* and *Mills* persuasive, especially in light of the Eighth Circuit's opinion in *Quinn*. The government may offer the rap videos, consistent with the Constitution, so long as they are not themselves offered as racketeering acts, but instead are offered for permissible purposes, such as to establish the existence of the Highs enterprise and Brown's association with it.[73]

Because the Court considers the rap videos to be (1) admissible non-hearsay, (2) intrinsic and probative, (3) not unfairly prejudicial, and (4) not offered for an unconstitutional purpose under the First Amendment, the Court denies Brown's motion.

---

[73] The Court does not consider that the government is offering the rap videos "merely to show that [Brown] was morally reprehensible due to his abstract beliefs." *See United States v. Fell*, 531 F.3d 197, 229 (2d Cir. 2008) (citation and quotation marks omitted). Instead, the government is offering the videos for permissible purposes to establish essential elements of the RICO conspiracy count. *See Mills*, 367 F. Supp. 3d at 668.

**B.** ***Second Motion in Limine to Exclude All References to Alleged Narcotics Seized from Brown Absent Proof of Chain of Custody (ECF No. 1916.)***

Brown next moves to exclude all references to a seizure of controlled substances from his person, unless the government can produce the substance or establish a chain of custody for it. (ECF No. 1916.) He also moves to suppress such evidence, arguing that the government did not have reasonable suspicion to initially seize his person and did not have probable cause to search him. (*Id*.) In response, the government indicates that Brown's motion pertains to drugs seized from him on January 22, 2021 (ECF No. 1937 at 35), which forms the basis for overt act 53 in the Third Superseding Indictment. (ECF No. 1708 at 16.) The government argues that Brown's motion is improper because (1) the "trial is not the venue to relitigate discovery and suppression issues" and (2) chain of custody defects are not an admissibility issue. (ECF No. 1937 at 36.)

***Timeliness.*** As discussed above in the Court's analysis of Taylor's motion to suppress evidence, the deadline for filing suppression motions has long since passed. Brown's deadline for filing such motions was August 21, 2024. (ECF No. 1164 at 3.) Brown was on notice that the government intended to introduce evidence of the January 22, 2021 drug seizure in this litigation when the Superseding Indictment was filed on November 8, 2023, and Brown was added as a Defendant in the case. (*See* ECF No. 450 at 18 (listing the narcotics seizure in overt act 52 of the Superseding Indictment).) In fact, Brown's prior counsel filed a timely suppression motion relating to this drug seizure (ECF No. 1333 (sealed)), but Brown's counsel subsequently withdrew that motion as improvidently

71

filed. (ECF No. 1410 (sealed).) Brown's current counsel never sought to reassert a suppression motion relating to the seizure of these drugs. Now, Brown moves to suppress evidence obtained from this January 22, 2021 search the week before trial and has not offered any good cause for the belated filing. The Court denies Brown's motion as untimely to the extent that it seeks the suppression of evidence. Fed. R. Crim. P. 12(c)(3); *Trancheff*, 633 F.3d at 698.

**Chain of Custody.** As for Brown's argument that the government must establish chain of custody for the narcotics before they may be admitted, "any defect in the chain of custody goes more to the weight of the evidence rather than its admissibility." *United States v. Edwards*, 111 F.4th 919, 925 (8th Cir. 2024) (cleaned up and citation omitted). In *Edwards*, the Eighth Circuit upheld this Court's admission of narcotics evidence in a drug conspiracy trial where the defendant lodged an untimely chain of custody objection. *Id*. (reasoning that "[a]ll that is required" to establish chain of custody "is testimony that the evidence in question was the same as that involved in the offense and that it is substantially unchanged" (citation omitted)). Brown's motion is denied; the government is not precluded from introducing evidence of the seized drugs, so long as the government offers testimony to chain of custody at trial.[74]

---

[74] Brown is not precluded from cross-examining government witnesses about their testimony on chain of custody. The Court does not consider its ruling above on the government's sixth motion in limine to preclude such inquiry, because it is relevant to the weight that the jury should give to the evidence introduced by the government. *Edwards*, 111 F.4th at 925.

### C. Third Motion in Limine to Adopt Co-Defendant Motions Already Filed (ECF No. 1917.)

Brown moves to adopt three motions made by his co-defendants. (ECF No. 1917.) The government does not oppose this motion. (ECF No. 1937 at 36.) First, Brown moves to adopt Robinson's memorandum in support of First Amendment jury instructions (ECF No. 1911) and the underlying *Brady* motion in which Robinson initially raised the First Amendment argument (ECF No. 961). The Court grants Brown's motion to join these motions filed by Robinson. Second, Brown moves to join a motion filed by Gregory Hamilton during Trial One to preclude the expert testimony of Special Agent Michael Flanagan (ECF No. 1878). But that motion was based on Special Agent Flanagan's proposed testimony about the specific evidence actually introduced at Trial One. (*Id*. at 2–8.) Based on the government's proposed witness and exhibit lists, the Court expects the government will offer different evidence of drug-trafficking at this trial that Special Agent Flanagan may testify about. The Court denies Brown's motion to join Hamilton's Trial One motion, but Brown may still bring his own motion to exclude testimony by Special Agent Flanagan if it is based on the evidence to be introduced at this trial.

### D. Fourth Motion in Limine to Exclude Expert Testimony by Susan Caton (ECF No. 1963.)

Brown represents that he received an expert disclosure of proposed witness Susan Caton from the government for the first time on May 7, 2025. (ECF No. 1963 at 1.) Brown claims that the disclosure provided by the government does not contain a peer-reviewed

publication, confirms that Caton has never testified previously in any litigation, and states that she has never been acknowledged as an expert in the field. (*Id*.) In Brown's proposed witness list, he includes Aly[75] Holman, a French bulldog breeding consultant, who intends to testify as a fact witness "to her work assisting [Brown] in establishing his entity, securing dams and studs, properly raising pups, preparing and carefully executing an insemination, tracking sales, [and] registration obligations with the [American Kennel Club]."[76] (*Id*. at 2; *see also* ECF No. 1957 at 1.)

Brown seeks to preclude Caton's testimony as improper and untimely disclosed expert witness testimony. (ECF No. 1963 at 1–2.) Because he is offering Holman as a fact witness, Brown further contends that Caton does not represent a permissible balancing of experts. (*Id*. at 2.) The government responded to Brown's motion late on May 8, 2025, and confirmed with the Court that it is calling Caton in an expert capacity. (ECF No. 1967.) The government argues that Caton is qualified to testify as an expert and that her disclosure was timely. (*Id*.) The Court reserves ruling on this motion at this time and will hear argument from the parties at an appropriate opportunity.

---

[75] Brown spells Ms. Holman's first name as "Aly" in his motion (ECF No. 1963 at 2), but as "Ali" in his amended proposed witness list (ECF No. 1957 at 1).

[76] The government has indicated that it "will offer certain filings from Mr. Brown's purported dog breeding business" to "prove at trial that Mr. Brown routinely falsified his income as a cover for the illicit cash proceeds he earned through narcotics trafficking." (ECF No. 1926 at 12–13.)

## VII.    Jury Instructions Motion

### A.    *Robinson's Motion for First Amendment Jury Instructions (ECF No. 1911.)*

Robinson renews his argument that the government is unconstitutionally prosecuting Defendants for their association and expression that is protected under the First Amendment of the United States Constitution. (ECF No. 1911.) Robinson (and Brown[77]) request that the Court provide the jury with two instructions on First Amendment defenses of the right of assembly and the right of free speech. (*Id*. at 17, 19.)

As discussed above in response to Brown's first motion in limine, the Court declines to preclude the introduction of probative evidence at this trial simply because it also constitutes protected First Amendment activity. The Court has reviewed Robinson's and Brown's proposed instructions and concludes that they improperly ask the jury to consider questions of law.[78] The proposed language offered by Robinson and Brown asks the jury—and not the Court—to consider whether the First Amendment precludes their conviction of RICO conspiracy. *See Georgia v. Brailsford*, 3 U.S. 1, 4 (1794) ("[O]n questions of fact, it is the province of the jury, on questions of law, it is the province of the court to

---

[77] As discussed above, the Court permits Brown to join in Robinson's memorandum in support of First Amendment jury instructions.

[78] To the extent that Robinson and Brown argue that the RICO Conspiracy count is unconstitutional under the First Amendment as applied to them, such an argument is more properly raised in a motion for acquittal at the close of trial. The Court declines to prematurely analyze the issue of whether the RICO conspiracy count is unconstitutional as applied to Defendants until it is raised in a proper motion.

decide."); *Quercia v. United States*, 289 U.S. 466, 469 (1933) ("In a trial by jury in a federal court, the judge is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct and of determining questions of law."). Such instructions would improperly invite the jury to consider nullification of the law. *United States v. Scott*, 112 F.3d 955, 961 (8th Cir. 1997).

That said, the Court recognizes that there may be some value in communicating to the jury that Defendants' mere association or expression does not itself constitute racketeering activity. As stated at the pretrial conference, the Court instructs the parties to meet and confer on whether they can reach mutual agreement on proposed language.[79] The Court will address final jury instruction language at the charge conference.

## CONCLUSION

Based on the foregoing and on all the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. The government's consolidated motions in limine (ECF No. 1926) are GRANTED IN PART, DENIED IN PART, and RESERVED IN PART consistent with this order;

   a. The government's first motion in limine is GRANTED;

   b. The government's second motion in limine is RESERVED;

---

[79] The Court is particularly interested in any jury instruction language that the parties can provide that was used by other courts in instructing the jury on a RICO charge.

c.    The government's third motion in limine is RESERVED;

d.    The government's fourth motion in limine is DENIED as premature;

e.    The government's fifth motion in limine is GRANTED as to references to Defendants' potential punishment and RESERVED to the extent motion seeks to preclude references to state prosecutions for conduct underlying the federal indictment;

f.    The government's sixth motion in limine is GRANTED;

g.    The government's seventh motion in limine is GRANTED, except that it is RESERVED as to Government Exhibit LL-2;

h.    The government's eighth motion in limine is RESERVED;

i.    The government's ninth motion in limine is GRANTED;

j.    The government's tenth motion in limine is GRANTED;

k.    The government's eleventh motion in limine is GRANTED IN PART; Odell Wilson is precluded from testifying to expert opinions based on a foundation of having grown up in the East Boston projects or having lived in North Minneapolis, but Odell Wilson may offer expert opinion testimony that reliably derives from his specialized knowledge as a former United States Probation Officer in this District;

l.    The government's twelfth motion in limine is GRANTED;

2. The government's thirteenth motion in limine (ECF No. 1943) is DENIED as moot;

3. The government second consolidated motions in limine (ECF No. 1954 (sealed)) are GRANTED IN PART and RESERVED IN PART consistent with this order;

   a. The government's fourteenth motion in limine is RESERVED;

   b. The government's fifteenth motion in limine is RESERVED;

   c. The government's sixteenth motion in limine is GRANTED IN PART as to precluding the impeachment of Sergeant Efrem Hamilton based on 2018 charges for which Sergeant Hamilton has since been acquitted; and is otherwise RESERVED;

   d. The government's seventeenth motion in limine is RESERVED;

   e. The government's eighteenth motion in limine is GRANTED;

   f. The government's nineteenth motion in limine is GRANTED;

   g. The government's twentieth motion in limine is RESERVED;

   h. The government's twenty-first motion in limine is GRANTED;

4. Defendants' joint consolidated motions in limine (ECF No. 1928) are GRANTED IN PART, DENIED IN PART, and RESERVED IN PART consistent with this order;

   a. Defendants' first joint motion in limine is DENIED;

b. Defendants' second joint motion in limine is DENIED as moot;

c. Defendants' third joint motion in limine is DENIED as moot;

d. Defendants' fourth joint motion in limine is GRANTED IN PART; the government must provide Defendants with the identities of witnesses that it intends to call before 6:00 p.m. Central Standard Time of the prior day of trial;

e. Defendants' fifth joint motion in limine is GRANTED, subject to the exemption of government witnesses Special Agent Matthew Schommer and Sergeant David Ligneel from sequestration;

f. Defendants' sixth joint motion in limine is DENIED to the extent that Defendants move for pre-trial disclosure of co-conspirator statements that the government intends to introduce at trial; and is otherwise RESERVED;

g. Defendants' seventh joint motion in limine is GRANTED IN PART; Defendants will have sixteen peremptory strikes, to be exercised jointly, the government will have nine peremptory strikes, and each party will have two additional peremptory strikes because the Court is seating three alternate jurors;

h. Defendants' eighth joint motion in limine is DENIED;

i. Defendants' ninth joint motion in limine is DENIED;

j.    Defendants' tenth joint motion in limine is DENIED;

5.    Josiah Taylor's motion in limine to suppress evidence (ECF No. 1941) is DENIED;

6.    Trevaun Robinson's consolidated motions in limine (ECF No. 1912) are GRANTED IN PART, DENIED IN PART, and RESERVED IN PART, consistent with this order;

    a.    Robinson's first motion in limine is GRANTED AS AGREED as to the inadmissibility of the original proposed Government Exhibit A-214, but DENIED as to the revised Government Exhibit A-214 proposed by the government;

    b.    Robinson's second motion in limine is RESERVED;

    c.    Robinson's third motion in limine is GRANTED AS AGREED as to the inadmissibility of Government Exhibits A-208 and A-209, but RESERVED as to the admissibility of Robinson's admission through the testimony of Department of Corrections Investigator Erin Voss;

    d.    Robinson's fourth motion in limine is DENIED;

    e.    Robinson's fifth motion in limine is DENIED;

7.    William Banks' consolidated motions in limine (ECF No. 1929) are GRANTED IN PART and DENIED IN PART, consistent with this order;

    a.    Banks' first motion in limine is DENIED;

b.  Banks' second motion in limine is DENIED as moot;

c.  Banks' third motion in limine is GRANTED AS AGREED as to the inadmissibility of the original proposed Government Exhibit BB-6, but DENIED as withdrawn as to the revised Government Exhibit BB-6 proposed by the government;

d.  Banks' fourth motion in limine is DENIED as to Government Exhibits QQ-2 and QQ-4, and DENIED as moot as to Government Exhibit QQ-5;

e.  Banks' fifth motion in limine is DENIED as moot;

f.  Banks' sixth motion in limine is DENIED as premature;

8.  William Banks' seventh motion in limine to strike surplusage (ECF No. 1930) is DENIED as moot;

9.  William Banks' eighth motion in limine (ECF No. 1958) is RESERVED as to Government Exhibits QQ-11 and QQ-12, and DENIED as to Government Exhibits QQ-12A and QQ-12B;

10. Gregory Brown's first motion in limine (ECF No. 1915) is DENIED;

11. Gregory Brown's second motion in limine (ECF No. 1916) is DENIED;

12. Gregory Brown's third motion in limine (ECF No. 1917) is GRANTED as to joinder with Trevaun Robinson's motions at ECF Nos. 961 and 1911, and DENIED as to joinder with Gregory Hamilton's motion at ECF No. 1878;

13. Gregory Brown's fourth motion in limine (ECF No. 1963) is RESERVED;

14. Trevaun Robinson's motion for First Amendment jury instructions (ECF No. 1911) is DENIED as to the proposed instructions; the Court instructs the parties to meet and confer on whether they can reach mutual agreement on proposed jury instruction language.

Dated: May 9, 2025

BY THE COURT:

s/Nancy E. Brasel
Nancy E. Brasel
United States District Judge