UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>Tyreese Giles(6),<br>Josiah Taylor(7),<br>Trevaun Robinson(10),<br>William Banks(19),<br>Gregory Brown(26),<br><br>Defendants. | File No. 23-cr-160<br>(NEB/JFD)<br><br>Courtroom 13W<br>Minneapolis, Minnesota<br>Thursday, May 22, 2025<br>4:40 p.m. |

---

BEFORE THE HONORABLE NANCY E. BRASEL
UNITED STATES DISTRICT COURT DISTRICT JUDGE

**VOLUME VII - JURY TRIAL PROCEEDINGS**
**EXCERPT OF CROSS-EXAMS OF ADAM LEPINSKI TESTIMONY**

Court Reporter: RENEE A. ROGGE, RMR-CRR
United States District Courthouse
300 South Fourth Street, Box 1005
Minneapolis, Minnesota 55415

* * *

Proceedings recorded by mechanical stenography; Transcript produced by computer.

* * *

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | UNITED STATES ATTORNEY'S OFFICE<br>BY: THOMAS CALHOUN-LOPEZ<br>CARLA BAUMEL<br>300 South Fourth Street, #600<br>Minneapolis, Minnesota 55415 |
| | DEPARTMENT OF JUSTICE<br>ORGANIZED CRIME AND GANG SECTION<br>BY: BRIAN W. LYNCH<br>ALYSSA LEVEY-WEINSTEIN<br>1301 New York Avenue NW, #700<br>Washington, D.C. 20530 |
| For the Defendant Tyreese Giles(6): | RIVERS LAW FIRM, P.A.<br>BY: BRUCE RIVERS<br>701 Fourth Avenue South, #300<br>Minneapolis, Minnesota 55415 |
| For the Defendant Josiah Taylor(7): | WOLD LAW<br>BY: PETER B. WOLD<br>JOHN FEE<br>331 Second Avenue South, #705<br>Minneapolis, Minnesota 55401 |
| For the Defendant Trevaun Robinson(10): | PAUL ENGH, ATTORNEY AT LAW<br>BY: PAUL C. ENGH<br>150 South Fifth Street, #2860<br>Minneapolis, Minnesota 55402 |
| For the Defendant William Banks(19): | CATHERINE TURNER, ATTORNEY AT LAW<br>BY: CATHERINE L. TURNER<br>331 Second Avenue South, #705<br>Minneapolis, Minnesota 55401 |
| For the Defendant Gregory Brown(26): | NORTH STAR LAW GROUP PLLC<br>BY: DANIEL S. ADKINS<br>1295 Bandana Boulevard North, #335<br>St. Paul, Minnesota 55108 |

* * *

ADAM LEPINSKI,

called on behalf of the government, was duly sworn, was examined and testified as follows:

THE COURT: Cross-examination, Mr. Wold.

MR. WOLD: Thank you.

CROSS-EXAMINATION

BY MR. WOLD:

Q. Lieutenant Lepinski, how you doing?
A. Good, Mr. Wold. How are you?
Q. Nice to see you again.
A. Thank you. You too.
Q. I just want a point of context. We were just looking at videos going in and out of that vehicle. The red vehicle had been moved since you were going in and out of the white one, or they had been right next to each other; is that right?
A. They were right -- right behind each other. From what I remember is, the white van moved, struck the back of the red van and then wedged itself in there.
Q. Okay. But as we saw, Mr. Robinson went from the white van to the red van to get out, right?
A. Yes.
Q. So at that point, were they next to each other?
A. Correct, yes. At that point they were next to each other.

Q. Right, right. So, and just for -- I'll get to that.

Sergeant Schroeder had set this up, is that right, this investigation or this stop or this group meeting at that point?

A. Yes. He had coordinated the stop and arrest for his investigation.

Q. And he told you, or he told everyone that went there, that you will find Josiah Taylor in this vehicle sitting at 21st and Washington, right?

A. Yes.

Q. He says I know that's where he'll be sitting, true?

A. Yes.

Q. And could we put up A3, perhaps? I'm going to try to do it myself. Thanks.

There we go.

So 21st and Washington. Can you just put a dot on where that is on this map, sir?

A. (Indicating).

Q. That's, that's -- isn't it on the other side of 94, sir?

A. Yeah, the screen kind of put it.

Q. It would be over more like that, fair?

A. Near there, yes. It's hard to tell because it's so zoomed out.

THE COURT: Is this A3? I don't think A3 is in evidence.

MR. CALHOUN-LOPEZ: Your Honor, may I have a moment to confer with counsel?

THE COURT: You may.

(Counsel confer)

MR. WOLD: Yeah. We have, I guess an identical one had been introduced. It's something else so --

THE COURT: I think that was A1 maybe. Do you both want A3 some?

MR. WOLD: We can use it as an illustrative exhibit at this point.

THE COURT: Fair enough.

BY MR. WOLD:

Q. So anyway, this point is on Washington Avenue on the other side of I-94, correct?

A. Yes, sir, on the east side of I-94.

Q. Okay. Fair enough. On the west side of I-94?

No, no. You are right. On the east side. Been a long day.

East side of 94. We are right.

So at that point, you had come up, and after the white van that Josiah Taylor was in was caught between the light post, the building and the red van, where were you to -- had you come up alongside him before they squeezed in there or at what point? I guess I don't know.

A. Yes, I arrived. I parked my vehicle right basically

next to the white van or very close to, to kind of block it in and exited my vehicle and ran to behind the squad car.

So when I initially arrived, presumably Mr. Taylor wouldn't have known I was the police until the squad cars arrived and turned on the lights, and that's when the fleeing happened.

Q. Okay. Would he see you next to him, though, at that point? I'm just trying to understand exactly.

A. I would guess I was parked right next to him. He should have seen me. Because I was in the type of vehicle that I was in, he might not have known that I was an officer.

Q. Right, right. So you were parked in a lane of traffic next to him; is that right?

A. Yes, that's correct.

Q. Okay. So he was parked fairly legally on the side of the, of Washington going northbound; is that correct?

A. That is correct.

Q. Okay. Okay. And then there would have been the red vehicle in front of his, and you were parked beside him. And then the other officers were coming from behind?

A. Yes.

Q. That's how everything happened in those few seconds?

A. Exactly.

Q. Okay. And then there's a lot of yelling going on, we heard after they were in there, and get out. They basically

couldn't have got out on the passenger side because they were up against the building wall, right?
A. They definitely could have gotten out of the passenger side because there was enough room to get to the passenger side.
Q. Was there? And eventually you saw -- what happened was, Mr. Robinson came out from the backseat of the white van through the door of the red van and came out. Is that what you've reconstructed?
A. Correct.
Q. Okay. And clearly Josiah Taylor was in the front part of the white van, figured that out, right?
A. Yes.
Q. Okay. And I mean, the people sitting in the white van are hearing the shouting. And then they hear 40, 40, 40, right?
A. Correct.
Q. I mean, you guys know what 40, 40, 40 means, right?
A. Yes.
Q. I mean, we don't know likely what 40, 40, 40 means, true?
A. That's true.
Q. And then they hear sounds like a big gunfire going off, right?
A. Yes. It's significantly less loud than an actual

firearm, but I would agree.
Q. Until it breaks a window in the back of your vehicle. I mean, it's probably scary to most people, fair?
A. Yes.
Q. Okay. You, we know that Mr. Robinson came out through the back, right?
A. He came out crawling through the red van, that's correct.
Q. Yeah. But through the backseat of the white van. You know that. They saw the door slide open in the back, and he came out through that vehicle?
A. That's possible. I just remember him crawling out of the front driver's side of the red van.
Q. Okay. Okay. And the, the firearm was taken, and you know it was tested for DNA?
A. Yes.
Q. Okay. And you know, sir, that it was Mr. Robinson's DNA, not Mr. Taylor's, on the gun, true?
A. Yes.
Q. Okay. And the pills were sent to the BCA to be tested, right?
A. That is correct.
Q. Okay. And you saw that bag. I couldn't see the last one you showed, but approximately how many pills were in there? Could you tell?

A. So this was done by grams. There's different ways to do this. You can count all the pills, or you can weigh them and --
Q. Yeah.
A. -- do the grams. So it's 6.4 grams approximately.
Q. I mean, can you tell? Do you have an estimate of how many pills that is? I mean, can you see it just by eye measure, sir?
A. It's hard to see. I would estimate maybe around, around 50, but I would have to count them to be exactly sure.
Q. No. That's fine. That's fine. Okay.
MR. WOLD: Thanks. I have no other questions.
THE WITNESS: Thank you, sir.
THE COURT: Any other cross-examination? Mr. Engh.

CROSS-EXAMINATION

BY MR. ENGH:
Q. Lieutenant Lepinski, I wrote down a sentence that you mentioned at the start of your testimony, and it was, quote, "We called them the Highs," end of quote.
Do you recall saying that?
A. I do.
Q. Okay. And that is the police designation of an area north of Broadway; isn't that correct? It's something that you use, and it originated with the police; is that correct?

A. I wouldn't say it originated with the police, but it is definitely a term that the police use.

Q. And tell me how long the police have used that term.

A. That, I don't know.

Q. In fact, one of the reasons it started is that the Minneapolis police used it in the jail, Hennepin County Jail, to designate people above Broadway who are arrested and people who are below Broadway.

Do you know that?

A. I don't work in the jail, sir. I'm not sure what they use.

Q. Okay. Do you know how long the police have designated or used the term "Highs"?

A. I do not.

Q. Thank you.

THE COURT: Anyone else?

(End of requested excerpt)

* * *

I, Renee A. Rogge, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Certified by: /s/Renee A. Rogge
Renee A. Rogge, RMR-CRR