UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | | |
|---|---|---|
| United States of America, | ) | File No. 23-cr-160 (NEB/JFD) |
| Plaintiff, | ) | |
| v. | ) | |
| Tyreese Giles(6), Josiah Taylor(7), Trevaun Robinson(10), William Banks(19), Gregory Brown(26), | ) | Courtroom 13W Minneapolis, Minnesota Wednesday, May 14, 2025 9:03 a.m. |
| Defendants. | ) | |

---

BEFORE THE HONORABLE NANCY E. BRASEL
UNITED STATES DISTRICT COURT DISTRICT JUDGE

**VOLUME III - JURY TRIAL PROCEEDINGS**
**EXCERPT OF ERIN VOSS TESTIMONY**

Court Reporter: RENEE A. ROGGE, RMR-CRR
United States District Courthouse
300 South Fourth Street, Box 1005
Minneapolis, Minnesota 55415

* * *

Proceedings recorded by mechanical stenography; Transcript produced by computer.

* * *

APPEARANCES:

For the Plaintiff: UNITED STATES ATTORNEY'S OFFICE
BY: THOMAS CALHOUN-LOPEZ
CARLA BAUMEL
300 South Fourth Street, #600
Minneapolis, Minnesota 55415

DEPARTMENT OF JUSTICE
ORGANIZED CRIME AND GANG SECTION
BY: BRIAN W. LYNCH
ALYSSA LEVEY-WEINSTEIN
1301 New York Avenue NW, #700
Washington, D.C. 20530

For the Defendant Tyreese Giles(6): RIVERS LAW FIRM, P.A.
BY: BRUCE RIVERS
701 Fourth Avenue South, #300
Minneapolis, Minnesota 55415

For the Defendant Josiah Taylor(7): WOLD LAW
BY: PETER B. WOLD
JOHN FEE
331 Second Avenue South, #705
Minneapolis, Minnesota 55401

For the Defendant Trevaun Robinson(10): PAUL ENGH, ATTORNEY AT LAW
BY: PAUL C. ENGH
150 South Fifth Street, #2860
Minneapolis, Minnesota 55402

For the Defendant William Banks(19): CATHERINE TURNER, ATTORNEY AT LAW
BY: CATHERINE L. TURNER
331 Second Avenue South, #705
Minneapolis, Minnesota 55401

For the Defendant Gregory Brown(26): NORTH STAR LAW GROUP PLLC
BY: DANIEL S. ADKINS
1295 Bandana Boulevard North, #335
St. Paul, Minnesota 55108

* * *

# I N D E X


| | PAGE |
|---|---|
| **ERIN VOSS** | |
| Direct Examination by Mr. Calhoun-Lopez | 26 |
| Cross-Examination by Mr. Wold | 43 |
| Cross-Examination by Mr. Engh | 45 |
| Cross-Examination by Mr. Adkins | 50 |
| Redirect Examination by Mr. Calhoun-Lopez | 56 |
| Recross-Examination by Mr. Wold | 58 |
| Recross-Examination by Mr. Engh | 62 |
| Recross-Examination by Mr. Adkins | 63 |
| Redirect Examination by Mr. Calhoun-Lopez | 64 |

| GOVERNMENT'S EXHIBITS | REC'D |
|---|---|
| A212 | 30 |
| A213 | 30 |
| A215 | 32 |
| A217 | 40 |
| A223 | 32 |
| A223a | 32 |
| GG57 | 29 |
| GG58 | 29 |
| GG59 | 29 |
| GG60 | 29 |
| GG61 | 29 |


* * *

**9:21 A.M.**

**IN OPEN COURT**

**(JURY PRESENT)**

THE COURT: You may all be seated. And good morning again.

We are ready with the continuation of testimony of Investigator Voss. And so we'll continue.

Mr. Calhoun-Lopez.

MR. CALHOUN-LOPEZ: Thank you, Your Honor.

ERIN VOSS,

called on behalf of the government, was duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. CALHOUN-LOPEZ:

Q. Good morning, Investigator Voss.

A. Good morning.

Q. I'm going to ask you to get close to that microphone. Thank you.

I would like to begin where we ended yesterday and that was at Government Exhibit GG56, which has been admitted. I'm going to pull that exhibit up again.

Now, this is a call you said between a man called Clinton Brown and a man Deboris Jones; is that right?

A. That is.

Q. And I'm going to play just a portion of the call

beginning at the starting point of Government Exhibit GG56.

(Audio recording played)

Q. All right. Pausing there at about 15 seconds.

Sitting here today, Investigator Voss, do you recall the phone number that Mr. Brown was using for this call?

A. I believe it ended in 3246.

Q. And did you help to annotate that number, the full number on an exhibit list?

A. Yes, I did.

Q. And if I were to show you that exhibit list, would that refresh your recollection as to the phone number?

A. Yes.

Q. And sitting here, do you recall the date that the call was placed?

A. Yes.

Q. You do? What was the date?

A. August 11th, 2021.

MR. CALHOUN-LOPEZ: May I approach the witness Your Honor?

THE COURT: You may.

BY MR. CALHOUN-LOPEZ:

Q. Investigator Voss, I'll ask you to take a look at that and look up at me when you when have finished reviewing it.

Okay. I'm going to retrieve the item from the

witness.

Investigator Voss, has that refreshed your recollection?

A. Yes, it does.

Q. Do you now recall the full known number?

A. Yes, I do.

Q. What is it?

A. 612 407-3246.

Q. Thank you. Now we ended yesterday with a conversation about defendant Josiah Taylor's calls, and I believe that you testified that you had an opportunity as case agent to listen to lawfully recorded calls made by Mr. Taylor; is that right?

A. That is correct.

Q. And that, those calls included a call made by Clinton Brown, the man we just heard from in Government Exhibit GG56 is that true?

A. Yes.

Q. And have you reviewed a copy of those calls that are marked for identification as Government Exhibit GG57, 58, 59, 60 and 61?

A. Yes.

Q. And are those exhibits marked for identification true and accurate copies of selections of those recordings?

A. Yes, they are.

MR. CALHOUN-LOPEZ: Your Honor, at this point I move to admit what's been marked for identification as Government Exhibit GG57, 58, 59, 60 and 61.

THE COURT: Any objection?

MR. WOLD: No objection.

THE COURT: All right. Those exhibits are admitted.

BY MR. CALHOUN-LOPEZ:

Q. I'd like to pivot now, Investigator Voss, and talk about defendant Gregory Brown. In your capacity as case agent, did you have an opportunity to listen to a lawfully recorded call made by Mr. Brown?

A. Yes.

Q. And have you reviewed a copy of that call that has been marked for identification as Government Exhibits A212 and 213?

A. Yes.

Q. And that's one call broken into two parts; is that right?

A. That is correct.

Q. And are those -- both those exhibits true and accurate selections of recordings from that call?

A. Yes.

MR. CALHOUN-LOPEZ: Your Honor, at this point I move to admit what's been marked for identification as

Government Exhibit A212 and 213.

THE COURT: Any objection?

MR. ADKINS: No objection, Your Honor.

THE COURT: 212 and 213 of the A series are admitted.

BY MR. CALHOUN-LOPEZ:

Q. Do you recall when this call was made?

A. Yes.

Q. When was it made?

A. July 1st, 2023.

Q. And do you recall who Mr. Brown was talking to?

A. A Mr. Ramone Vercher.

Q. Is that spelled are R-A-M-O-N-E, and then V-E-R-C-H-E-R?

A. Yes.

Q. I'll now publish what has been admitted as Government Exhibit A212.

(Audio recording played)

Q. I'm pausing there at about 13 seconds in.

This appears to be a reference to dogs, is that right, made by Mr. Brown?

A. That is correct.

Q. Do you know anything about Gregory Brown and dogs?

A. I do.

Q. What do you know?

A. I know that he was involved in operating a business

called Odd Frenchies. That was a dog breeding business for French bulldogs.

Q. And he's saying in this call that business was slow; is that correct?

A. Yes.

Q. I'm resuming the exhibit.

(Audio recording played)

Q. All right. The exhibit is now complete.

And I will publish what has been admitted as Government Exhibit A213.

Before I begin, this is again the same call, a different portion of it?

A. Yes, it is.

Q. And the same participants in the call?

A. That is correct.

Q. Publishing A213.

(Audio recording played)

Q. I'm pausing here at 24 seconds into the exhibit.

There's a reference to Lil' G and Knowledge. Do you know, are you familiar with those nicknames?

A. Yes, I am.

Q. Whose nicknames are they associated with?

A. Gregory Brown.

Q. Resuming the exhibit.

(Audio recording played)

And the exhibit is complete.
Q. Investigator Voss, I'd like to go back now to JPay. In your capacity as case agent, did you review a JPay message of a photograph by defendant Gregory Brown?
A. Yes.
Q. And those were several photographs; is that right?
A. That is correct.
Q. And did you review those photographs that have been marked as Government Exhibit A215, A223, and A223a?
A. Yes, I did.
Q. And are those true and accurate copies of the JPay messages you lawfully obtained?
A. Yes, they are.
MR. CALHOUN-LOPEZ: Your Honor, at this point I move to admit what has been marked for identification as Government Exhibit A215, A223, and A223a.
THE COURT: Any objection?
MR. ADKINS: Without objection, Your Honor.
THE COURT: Those exhibits are admitted.
BY MR. CALHOUN-LOPEZ:
Q. I will publish for the witness and for the jury Government Exhibit A215.
This is a message from Mr. Brown's account; is that right?
A. This is an account Mr. Brown used in conjunction with a

Larisha Lampkin.
Q. So he is the recipient of this message?
A. He was the sender of the message.
Q. He was using a different account for it?
A. Yes, that of Larisha Lampkin.
Q. And how do you know he was using this account for this message?
A. I reviewed other messages where he had identified himself as Lil' G and that he was using this account in addition to videos and other photographs to indicate that he was also using this account.
Q. And I'll zoom in on the photograph here.
Does Mr. Brown appear in this photograph?
A. Yes, he does.
Q. Can you identified him please?
A. He's the gentleman wearing the sunglasses, featured in the middle wearing a black polo with a white color.
Q. Second from the left?
A. Yes.
Q. Do you recognize anybody else in this photograph?
A. Yes, I do.
Q. Who do you recognize?
A. To the left of Mr. Brown would be Matthew Robinson, and to the right of Mr. Brown would be Montez Brown.
Q. Do you know where this photograph was taken?

A. This photograph was taken in connection with the Prince Martin funeral services on August 14th of 2021.

Q. And I believe you said that Prince Martin was a YNT member; is that true?

A. Yes.

Q. And he had been killed?

A. Yes.

Q. Where had he been killed?

A. In Minneapolis.

Q. Do you know specifically where?

A. At the Winner Gas Station on West Broadway.

Q. I'll show you now what has been admitted as Government Exhibit A223. And beginning with page 1 here, this was sent from an account Odd Frenchies; is that right?

A. That is correct.

Q. And that was Mr. Brown's business; is that right?

A. Yes.

Q. And it was sent to Ramone Vercher; is that true?

A. Yes.

Q. And that was the person on the call we listened to earlier; is that correct?

A. That is correct.

Q. Do you know the date that this was sent?

A. October 12th, 20 -- 17th, 2022.

Q. And do you recognize Gregory Brown in the photograph?

A. Yes.
Q. Which one, which man is he in the photograph?
A. He's featured on the right side wearing glasses and a white shirt.
Q. And does he have anything on his body?
A. He appears to be wearing a cross-body styled bag and a watch.
Q. And I'll turn to page 2 of the exhibit. Also sent from Odd Frenchies to Mr. Vercher; is that true?
A. That is correct.
Q. And I'll zoom in. Who is the man who is standing next to Mr. Brown? Do you recognize him?
A. Yes.
Q. Who is that?
A. That is Calvin Marneze Wright.
Q. Calvin Wright?
A. Yes.
Q. Is that spelled C-A-L-V-I-N and then last name W-R-I-G-H-T?
A. That is correct.
Q. Now here we can get a better look at the bag that Mr. Brown is wearing; is that true?
A. Yes.
Q. And are you familiar with that brand?
A. Yes.

Q. What brand of bag is it?
A. Louis Vuitton.
Q. And do you know generally whether Louis Vuittons are considered expensive or not?
A. Yes, I would consider them to be an expensive brand.
Q. I'll turn to page 3. And this is another message from Odd Frenchies to Mr. Vercher; is that true?
A. Yes.
Q. What's the date?
A. October 17th, 2022.
Q. And can you tell what type of watch appears to be featured in this photograph?
A. A Rolex.
Q. And I'll ask you. Do you know if that is considered an expensive watch or not?
A. Yes, they are.
Q. Turning to page 4 of the exhibit. Another message from Odd Frenchies to Mr. Vercher; is that right?
A. Yes.
Q. What's the date?
A. October 17th, 2022.
Q. And I'll zoom in on this photograph. Does Mr. Brown appear in this photograph?
A. Yes, he does.
Q. Is he the man on the right?

A. Yes.
Q. Do you know the woman seated next to him?
A. Yes.
Q. Who is it?
A. Nubia Taylor.
Q. And is that spelled N-U-B-I-A, and then T-A-Y-L-O-R?
A. Yes.
Q. And I'm going to zoom in on Mr. Brown's wrist in this photograph. Can you tell what he's wearing on his wrist?
A. It is somewhat pixelated, but it appears to be the same watch.
Q. That Rolex that we just saw; is that true?
A. Yes.
Q. And I'll zoom in on the photograph again, and I'll ask you. The shoes that Mr. Brown and Ms. Taylor are wearing appear to have a red sole. Do you see that?
A. Yes.
Q. Are you familiar with a shoe with a red sole like that?
A. Yes.
Q. What type of shoe is that?
A. Louboutin.
Q. And do you know whether those are expensive shoes or not?
A. They are.
Q. And then I'll turn to page 5 of Government Exhibit A223,

another message from Odd Frenchies to Mr. Vercher?
A. Yes.
Q. Same date?
A. Yes.
Q. And Mr. Brown is in this photograph; fair to say?
A. Yes.
Q. Is that also Ms. Taylor?
A. Yes.
Q. I'll zoom in again on Mr. Brown's wrist. And are you able to tell what he's wearing on his wrist?
A. It appears to be that same Rolex.
Q. And I'll turn to page 6 now. Also from Odd Frenchies to Mr. Vercher on the same date?
A. Yes.
Q. And I'll zoom in here. Does this appear to be the same Rolex on the lower that we've been discussing?
A. Yes.
Q. There's another watch in this photograph as well; is that right?
A. That is correct.
Q. And let me zoom in on that one. Can you tell what type of watch this is?
A. It is a Rolex.
Q. Now, on this exhibit, it appears to be in a vehicle; is that right?

A. Yes.
Q. Are you able to see anything about the make or model of this vehicle?
A. Trackhawk which would be a Jeep.
Q. Thank you. That was my next question.
And are you familiar with that model of Jeep generally?
A. Yes.
Q. Is that a higher end Jeep, mid level, lower level?
A. That would be considered a high end model Jeep.
Q. I'll now publish what has been admitted as Government Exhibit A223a.
Let me flip this around and make it a little easier to read.
Sent from Odd Frenchies; is that true?
A. Yes.
Q. Who's the recipient in this message?
A. A Mr. Prince Jones.
Q. And can you tell us the date that it was sent?
A. October 27th, 2022.
Q. And I'll just ask you. Are you able to tell what type of vehicle this appears to be?
A. That is a white Jeep Grand Cherokee Trackhawk.
Q. And turning to page -- and then turning to page 5 of the exhibit, do you recognize the man in this photograph?

A. Yes.
Q. Who is that?
A. Gregory Brown.
Q. I'm concluding here, Investigator Voss.
My last series of questions has to do with whether it's possible to send videos by JPay.
A. It is.
Q. And have you reviewed a video sent or associated with Mr. Brown's JPay account?
A. With an account that he was using at the time, yes.
Q. Better said. Thank you.
And did you obtain the copy of that video that's been marked for identification as Government Exhibit A217?
A. Yes.
Q. And is Government Exhibit A217 a true and accurate copy of the video that you lawfully obtained?
A. Yes.
MR. CALHOUN-LOPEZ: Your Honor, at this point I move to admit what's been marked for identification as Government Exhibit A217.
THE COURT: Any objection?
MR. ADKINS: No, ma'am.
THE COURT: A217 is admitted.
BY MR. CALHOUN-LOPEZ:
Q. I will publish for the witness and for the jury.

You've reviewed -- before I begin I'll ask you. You've reviewed this video before, is that true, Investigator Voss?

A. Yes.

Q. Multiple times?

A. Yes.

Q. And have you paid close attention to the people in the video?

A. Yes.

Q. I will begin the exhibit.

(Video recording played)

Q. So I'm pausing here at 15, approximately 15 seconds, and I'm going to, I'm going to just move forward just a little bit.

(Video recording played)

Q. And I'm going to pause here at approximately 16 seconds in.

Do you recognize the man in black in the forefront of the video here?

A. Yes.

Q. Who is that?

A. That is Anthony Shannon also known as FA.

Q. The -- and we saw a reference to FA in Mr. Trevaun Robinson's message, true?

A. Correct.

Q. And what does FA stand for?
A. Fat Ass.
Q. And are you able to spell Mr. Shannon's name for the record, please?
A. A-N-T-H-O-N-Y S-H-A-N-N-O-N.
Q. Thank you. And you reviewed this video. What does Mr. Shannon appear to be doing with his right hand?
A. He is extending his pointer finger out and his pinky finger out, and his middle and ring finger are tucked in.
Q. Now do you recognize the man in -- before I ask you that, do you know where this video was taken?
A. This was taken on August 14th, 2021, in connection with the Prince Martin funeral services.
Q. So this was that same day that photograph we saw from Prince Martin's funeral was taken.
A. Yes.
Q. And do you recognize the man in white behind Mr. Shannon?
A. Yes.
Q. Who is that?
A. That is Josiah Taylor.
Q. The defendant in this case?
A. Yes.
Q. And what does Mr. Taylor appear to be doing with his left hand?

A. He appears to be using the same hand sign but with his left hand.
Q. Extending his index finger and his pinky finger?
A. Correct.
MR. CALHOUN-LOPEZ: May I have just a moment, Your Honor?
THE COURT: You may.
(Counsel confer)
MR. CALHOUN-LOPEZ: Thank you, Investigator Voss.
Your Honor, I have no further questions.
THE COURT: Thank you.
Cross-examination, Mr. Rivers.
MR. RIVERS: I don't have any questions, Your Honor.
THE COURT: Mr. Wold.
MR. WOLD: Thank you.

CROSS-EXAMINATION

BY MR. WOLD:
Q. Good morning, Investigator Voss. How are you doing?
A. I'm okay. Good morning.
Q. Thanks. So you're actually a case agent on this case? Did I understand that correctly?
A. Yes, sir.
Q. And if I refer to you as an investigator, is that the appropriate title?

A. Yes.
Q. And how long have you been an investigator?
A. 19 years.
Q. And on this case, you've dedicated your time since when?
A. Early 2023.
Q. Okay. And I'm showing you what you introduced --
Is this available to everyone to see right now?
MR. CALHOUN-LOPEZ: Yes.
BY MR. WOLD:
Q. I'm showing you Exhibit A207. And you introduced that. That's a picture of Josiah Taylor, correct?
A. Yes, it is.
Q. And we also recently saw the video, I believe that was A217, if I have my notes, right?
A. Yes.
Q. We just saw; is that correct?
A. Yes.
Q. Okay. And that's related to Prince Martin, and obviously there's a reference, I think on that gold chain Mr. Taylor's wearing according to your testimony, that said Boo and that's a reference to Prince Martin, too; is that right?
A. It is.
Q. Okay. And through your investigation, you learned or became aware that Prince Martin and Josiah Taylor were

childhood friends, I assume? Did you learn that?
A. Yes.
Q. Okay. And through that investigation, in this picture, I assume, you also learned the woman in that picture is Meko. The two of them share five children. Is that part of your investigation you learned that?
A. I believe that to be true, but I don't know all of the particulars of the family situation.
Q. Okay. And you see at the top of that photo, it's from Ruth Taylor. And through your investigation, did you come to learn Ruth Taylor is Josiah Taylor's mother?
A. Yes.
Q. Thank you.
THE COURT: Mr. Engh.

CROSS-EXAMINATION

BY MR. ENGH:
Q. Investigator Voss, good morning.
A. Good morning.
Q. I'm Paul Engh. I represent Mr. Robinson. I've got a couple questions for you.
A. Okay.
Q. You started your testimony with respect to him recalling what was in a report that you had reviewed; isn't that correct?
A. Yes.

Q. And the report indicated that Mr. Robinson had been interviewed by colleagues of yours; isn't that correct?
A. Yes.
Q. You yourself did not interview him?
A. Correct.
Q. Okay. All you did was review the reports that had been generated; fair enough?
A. Yes.
Q. Okay. And what it indicates is that there was a reference to YNT; isn't that correct?
A. Yes.
Q. Okay. That's Young N' Thuggin; is that correct?
A. Yes.
Q. Okay. My question for you then is, in any report that you have that is related to that disclosure, did Mr. Robinson ever mention an association with the Highs?
A. No.
Q. Then we saw a neck tattoo yesterday. Do you recall that?
A. Yes, I do.
Q. And then he had a 25 on his neck. I don't need to show it to you again. You remember what it is?
A. Yes.
Q. Okay. And that you indicated was related to the Young N' Thuggin because 25 is the letter Y in the alphabet;

is that fair enough?
A. Yes.
Q. That's the theory anyway, right? And in your work you keep track of all these tattoos, don't you?
A. Not every single tattoo, but, yes, a fair number.
Q. Well, they're a form of labeling, are they not?
A. I'm sorry?
Q. They're a form of labeling a person; is that correct?
A. They're a way of documenting scars, marks and tattoos on an individual.
Q. Right. Well, people have tattoos to memorialize whether they belong or don't belong; is that correct?
A. That would be fair.
Q. They have any number of reasons they have these things; isn't that right?
A. Yes.
Q. And for Mr. Robinson, he has a big one on his neck, needless to say; is that right?
A. Yes.
Q. Now my question for you is, where on his body is there a tattoo for Highs?
A. There isn't one. As of the date of these pictures, I should say.
Q. Well, do you have one ever that he has a tattoo for the Highs?

A. I don't know what tattoos he presently has, but of the ones that I'm aware of there isn't one that says Highs.
Q. Well, I assume during the course of the investigation you looked for any tattoos for Highs, did you not?
A. I was paying attention to any of the signifiers, yes.
Q. If you had found a tattoo for Highs, we certainly would have seen a picture of it yesterday, correct?
A. If I would have come across a picture of that, I would have, yeah, made note of that.
Q. Then we saw a group of JPay letters. Let me ask you some questions about that. Okay?
These JPay letters are a method of communication between people on the outside of a prison and those on the inside; is that fair?
A. Yes.
Q. I mean, that's the way you keep track of the communications; isn't that right?
A. Yes.
Q. I mean, the inmates inside are not given email accounts or cell phones; isn't that right?
A. Correct.
Q. So you use these JPay letters to document all communications so you know what they are; isn't that right?
A. Yes.
Q. And you in the course of your investigation have

reviewed thousands of these?
A. That's fair.
Q. And almost every day you review thousands of these? That's an exaggeration, but hundreds of these don't you?
A. Many.
Q. A big part of your job?
A. Yes.
Q. And what you found over time is that pictures are often sent to inmates in jail through this method; isn't that correct?
A. Yes.
Q. One of the things that you found over the course of your 19 years is that people in jail want to have contact with people out in the outside, and one of the ways to do it is to get a picture, correct?
A. Yes.
Q. And so that's what we have here is pictures of Mr. Robinson and his family and his brother and friends of his that he has sent to this young man; isn't that correct?
A. Yes.
Q. Not an uncommon occurrence at all.
A. No.
Q. In fact, a lot of these pictures came from his Facebook account; isn't that correct?
A. A fair number of them did, yes.

Q. Okay. And on this text, this one JPay email, if I may call it an email A21 -- or 210, he does mention Boo; isn't that correct?
A. Yes.
Q. Okay. And you've seen a lot of messages for Boo; is that correct?
A. Yes.
Q. And you would agree that the death of Boo was unbelievably tragic for everybody?
A. Yes.
Q. And what he's saying here is long live his memory.
A. Yes.
MR. ENGH: No further questions.
THE COURT: Ms. Turner, any questions?
MS. TURNER: No questions for this witness.
THE COURT: Mr. Adkins, any questions?
MR. ADKINS: Yes, ma'am.

CROSS-EXAMINATION

BY MR. ADKINS:
Q. Investigator Voss, good morning.
A. Good morning.
Q. I'm Dan Adkins, and I'm Mr. Brown's, Gregory Brown's, attorney. I'm just going to start by showing you. I'm holding my watch. This is by a company called Detroit Watch Company. You have no idea what this is worth, correct?

A. I do not.
Q. As you sit there today, you don't know the details this have watch?
A. No.
Q. More importantly, you have no idea if this is authentic, correct?
A. Correct.
Q. There's no way from a photograph to know specifically if a watch that may be encrusted with what could be jewels or not, you can't really tell from the photograph, correct?
A. Correct.
Q. There is a booming market in false products, correct?
A. So I have heard.
Q. Okay. And the higher the value, the higher the brand name, the more likely it's going to be counterfeited; is that fair?
A. That could be a fair assessment.
Q. And Louis Vuitton is one of the biggest targets of this sort of effort; isn't that correct?
A. I don't know to what extent, but that would be probably fair.
Q. A fair assumption to make?
A. Yeah.
Q. Okay. Taking you back. We talked -- one of the first things you heard about Gregory Brown today was a phone call

between two people talking about the dog business, at least in passing; is that correct?

A. Yes.

Q. The person you've identified as Gregory Brown said, I've got two dogs or a few dogs. It was transcribed as a few dogs. I think he said I have two dogs left; is that correct? Do you remember that?

A. From the transcript, yes.

Q. Okay. And that communication was about a specific period in time, correct?

A. Yes.

Q. Mr. Brown wasn't asked how the dog market is for the three-year window of this case, correct?

A. Correct.

Q. But at that moment in Houston, he had a few dogs left to sell, and he was struggling a little bit. And his friend said you might want to market better; is that a fair summary?

A. Yes.

Q. Okay. And that might be decent advice to any business person; is that correct?

A. Yes.

Q. And you are familiar with the exhibits in this case. You've looked those over relative to your testimony today; is that correct?

A. Yes.
Q. One of the those exhibits would be A220. This is where Gregory Brown asked the Secretary of State of Minnesota to confirm his business; is that correct?
A. I have not seen that document.
Q. But you know that Odd Frenchies is in fact a registered name right now with the State of Minnesota; is that correct?
A. Yes.
Q. Mr. Brown had a, an actual business; is that correct?
A. Yes.
Q. You know he was selling dogs; is that correct?
A. Purportedly, yes.
Q. And let's say that I was way off yesterday in my opening, and it turns out that puppies, two days ago in my opening, puppies can be sold for as much as $15,000 per dog; is that fair to say, if you know?
A. I don't know the price points that Mr. Brown was selling his puppies for.
Q. Okay. But it could very well be the case that a litter of ten could bring something like 50, 60 thousand dollars in revenue; fair to say?
MR. CALHOUN-LOPEZ: Objection, Your Honor. Foundation?
THE COURT: Sustained.

BY MR. ADKINS:
Q. But you are talking about the dog business here in this phone call, correct? You are analyzing that for the government; is that right?
A. I was reporting what was said in the call.
Q. Fair play. And in the call time, at that moment the sale of dogs was a little challenging for Mr. Brown; is that correct?
A. It appeared to be by his own assertions.
Q. But he confirmed that that's what he was doing; is that correct.
A. Yes.
Q. That was his business. And then you talked about and very freely opined that the watches that you saw, those two watches, would be very valuable; is that correct?
A. Yes.
Q. That would be the case if they were in fact authentic Rolexes, correct?
A. Correct.
Q. If they were knockoffs, they are not very expensive; is that correct?
A. I don't know the price points on those.
Q. Fair. Do you know enough about Rolex to know that there is always a sweep hand on an authentic Rolex that would time seconds? Do you know that?

A. I don't.
Q. Because on both watches there is no sweep hand, is that correct, from those photographs?
A. I wouldn't be able to tell from the photographs.
Q. Okay. Fair play. But if in fact those watches were not authentic, they would not be as valuable as Mr. Calhoun-Lopez was suggesting; is that correct?
A. Again, I wouldn't be able to talk about the price points of the watches.
Q. And you have no idea what the bag, that Louis Vuitton bag, would have cost; is that correct?
A. Generally, they're thousands of dollars.
Q. If they're authentic?
A. Correct.
Q. Okay. And with respect to the shoes, the red soled shoes, you said that stands out. That tells you it's Louis Vuitton, correct?
A. Louboutin.
Q. Okay. And those also could have been fake. They may not be authentic; is that fair to say?
A. I don't have any information to point that they are inauthentic.
Q. And I don't want you to be mischaracterized. You are not suggesting that people spending money is somehow itself illegal or inappropriate; is that correct?

A. No.
Q. If folks are making money, they can spend it any way they choose; is that correct?
A. That's correct.
Q. Perhaps unwisely on things that are very expensive and won't last very long, but that's their choice; is that correct?
A. Yes, it is.
MR. ADKINS: Oh, I have no further questions, Your Honor.
Thank you, Investigator.
THE COURT: Any redirect?
MR. CALHOUN-LOPEZ:

REDIRECT EXAMINATION

BY MR. CALHOUN-LOPEZ:
Q. Investigator Voss, I'd like to pick up where Mr. Adkins left off.
You've reviewed multiple of Mr. Brown's JPay messages; is that correct?
A. Yes.
Q. And has he discussed making purchases in messages?
A. I don't recall from the messages him discussing purchases, but from calls.
Q. Excuse me. Then you also reviewed calls where he's discussed making purchases?

A. Yes.
Q. And has he discussed specifically buying luxury items?
A. Yes.
Q. And in your review of all these calls and these photographs and these messages, do you have any indication that any of these are fakes?
A. No, I do not.
Q. I'd like to return to what you and Mr. Engh were discussing and specifically the YNT membership that Mr. Robinson indicated.
Based on your investigation, is there a relationship between the YNT and the Highs?
MR. ENGH: Objection. Invades the province of the jury.
THE COURT: Overruled.
THE WITNESS: Yes.
BY MR. CALHOUN-LOPEZ:
Q. What is that relationship?
A. That the YNT is one of the cliques or gangs encompassed under the larger umbrella of the Highs.
Q. And we talked about a man, that man. I believe his nickname was FA, and his real name was Mr. Shannon; is that right?
A. Yes.
Q. Is he associated with a particular clique?

A. Information over the case has indicated that, yes, he does have affiliation with YNT and/or Taliban.
Q. And is Taliban another Highs clique?
A. Yes.
Q. Thank you, Investigator Voss.
MR. CALHOUN-LOPEZ: Your Honor, I have no further questions.
THE COURT: Mr. Engh or Mr. Wold first.
MR. WOLD: Yes.
THE COURT: Go ahead.

RECROSS-EXAMINATION

BY MR. WOLD:
Q. Who created the umbrella?
A. I'm not sure what you are asking.
Q. Well, you just said the Highs is an umbrella over cliques. Who created this umbrella over these cliques?
A. Through the course of the investigation, in interviews with cooperators and other resources available.
Q. Do you know who created that umbrella?
A. No.
Q. Do you, did -- who's underneath the umbrella, do you know personally, persons? How does a person choose to be under this umbrella, or do they have a choice? You just said the YNTs are a group under this umbrella.
Do they have a choice about being under this

umbrella, do you know?

A. I would say anybody who is involved with any of the cliques has a choice on membership, and to the extent that the cliques associate with one another is also a choice.

Q. So there is a membership? Is there a membership in the Highs?

A. I would say yes.

Q. So can an individual say, I don't want to be a member, do you know? Is that part of the -- what you've learned?

A. I would say no one has the freedom of choice to belong to a group or not.

Q. That's what you say, but, I mean, do you know the rules of this umbrella? Are there any rules of this umbrella you refer to?

A. I'm not sure how to answer that question.

Q. Well, try. Are there any rules to this umbrella that you just said these groups are underneath? We're trying to figure it out. Can you help us?

A. Again, the cliques in aggregate and/or as an umbrella work with one another. I have learned that through the course of the investigation through talking with cooperators and reviewing other documentation.

Q. Cooperators that are here to get a deal to reduce their sentence. Those are the cooperators you are referring to right now, aren't they?

A. I'm referring to individuals that have to testify truthfully to their direct knowledge.
Q. They have to testify truthfully. And how do you know they're testifying truthfully? How do you personally know they are testifying truthfully? Are you able -- lie detector? I mean, are you able to tell us that these people are testifying truthfully?
A. I'm not allowed to sit in here and listen to other people's testimony, and I'm not aware of their testimony, because they have not testified yet.
Q. Okay. Okay. You said you saw no Highs symbols when you reviewed any of the pictures or JPays or things like that, true?
A. I said I had not seen a Highs tattoo, specifically a Highs tattoo.
Q. Okay. Okay. And the fingers like this, do you see the -- are you a sports fan? Do you watch the Timberwolves, by any chance?
A. Yes, I do.
Q. Okay. Do you see the picture of Anthony Edwards in the paper this morning raising his hands like this (indicating)? Did you see that?
A. I did not.
Q. The -- any colors for the Highs, gang colors, that you know of?

A. I haven't seen any that are particular to one group or another.
Q. Okay. And is there any specific Highs gang sign that you've ever seen?
A. Specifically for Highs, no.
Q. Well, that's what we're talking about specifically for Highs, aren't we?
A. Yep.
Q. Okay. Are there any, based on your investigation, are there anything that would disqualify an individual from being a High?
A. How do you mean?
Q. Tell me. I don't know. I'm asking. We don't know what a High is.
A. When talking with individuals connected to this case, would I be able to talk about what I've heard from them that could be a disqualifier?
Q. Let me ask you this: Could a woman be a High?
A. I don't see why they wouldn't be able to.
Q. Have you seen any or heard of any that are?
A. In my experience with who I've worked with, I have not, but that does not preclude the existence of anyone that could.
Q. How about a white boy? Could he be a High?
A. Sure.

Q. Have you seen any? Heard of any?
A. With the cliques or groups aligned with the Highs, yes.
Q. And who would that be?
A. Brent Buchan.
Q. Say that again?
A. Brent Buchan.
Q. Okay.
MR. WOLD: Thank you.
THE COURT: Mr. Engh.
MR. ENGH: Thank you, Your Honor.

RECROSS-EXAMINATION

BY MR. ENGH:
Q. Investigator Voss, it's true, is it not, that you are associating the Highs with a particular place in North Minneapolis; isn't that right?
A. The groups that comprise the Highs have many areas of congregation that are located in North Minneapolis.
Q. And one of the locations that you're claiming the Highs populate is Broadway and Lyndale; isn't that correct?
A. Yes.
Q. So if you are a black male and you hang out in the area of Broadway and Lyndale, is that one of the qualifying factors alone for being in the Highs? Yes or no.
A. I would not say so.
Q. Okay. But the fact of the matter is this is, this case

is about a number of black young men who live or are around a particular place; isn't that correct?

A. That would be a fair assessment.

Q. Pardon me?

A. That would be a fair assessment.

Q. And the place of the case here figures in large way in your analysis of the case; isn't that correct?

A. Yes.

Q. And do you ever have, in all the emails and all the JPays that you've looked at for Mr. Robinson, do you ever have him admit anywhere that he is a High?

A. No.

THE COURT: Any redirect? Oh, Mr. Adkins.

MR. ADKINS: One question, Your Honor.

RECROSS-EXAMINATION

BY MR. ADKINS:

Q. I have to say I'm fond of my colleagues, but I think there was something a little silly that was suggested. If you in fact bought a fake Louis Vuitton, Hermes, Cartier, Rolex product, you wouldn't send messages to your friends with a photo thereof saying it was fake.

The point is to deceive people; isn't that correct? The point is to make it look like you have a fancy watch which you got for a few dollars off the street.

A. I wouldn't be able to make that assessment either way.

Q. Why else would you have a fake watch?
A. I'm sorry?
Q. Why else would someone have a fake watch but to put on that you had those funds, I mean, when you didn't? You wouldn't send a message via JPay saying look at this cool fake watch I bought; is that fair to say?
A. I can't speak to his motivations.
Q. Okay. You spoke to enough. Thank you.
THE COURT: Mr. Calhoun-Lopez.

REDIRECT EXAMINATION

BY MR. CALHOUN-LOPEZ:
Q. I'd like to go back to what Mr. Wold was talking to you about, about the hand signs, and we've talked at length now about that index finger and pinky finger being extended; is that right? Is that true?
A. Yes.
Q. And we see that with the YNT you testified; is that true?
A. Yes.
Q. Have you seen it among other cliques that are associated with the Highs?
A. Yes, I have.
Q. So not just YNT can use it.
A. Correct.
Q. When you told Mr. Wold that you hadn't seen any

references to the Highs in Mr. Robinson's JPay or his tattoos, did you mean literally the word "Highs"?

A. Yes, I did.

Q. Thank you, Investigator Voss.

MR. CALHOUN-LOPEZ: No further questions, Your Honor.

THE COURT: Thank you. You may step down.

(End of requested excerpt)

* * *

I, Renee A. Rogge, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Certified by: /s/Renee A. Rogge
Renee A. Rogge, RMR-CRR