UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | | |
|---|---|---|
| United States of America, | ) | File No. 23-cr-160 (NEB/JFD) |
| Plaintiff, | ) | |
| v. | ) | |
| Tyreese Giles(6), Josiah Taylor(7), Trevaun Robinson(10), William Banks(19), Gregory Brown(26), | ) | Courtroom 13W Minneapolis, Minnesota Thursday, May 15, 2025 9:29 a.m. |
| Defendants. | ) | |

---

BEFORE THE HONORABLE NANCY E. BRASEL
UNITED STATES DISTRICT COURT DISTRICT JUDGE

**VOLUME IV - JURY TRIAL PROCEEDINGS**
**EXCERPT OF AVANTE NIX TESTIMONY**

Court Reporter: RENEE A. ROGGE, RMR-CRR
United States District Courthouse
300 South Fourth Street, Box 1005
Minneapolis, Minnesota 55415

* * *

Proceedings recorded by mechanical stenography; Transcript produced by computer.

* * *

APPEARANCES:

For the Plaintiff:
UNITED STATES ATTORNEY'S OFFICE
BY: THOMAS CALHOUN-LOPEZ
CARLA BAUMEL
300 South Fourth Street, #600
Minneapolis, Minnesota 55415

DEPARTMENT OF JUSTICE
ORGANIZED CRIME AND GANG SECTION
BY: BRIAN W. LYNCH
ALYSSA LEVEY-WEINSTEIN
1301 New York Avenue NW, #700
Washington, D.C. 20530

For the Defendant Tyreese Giles(6):
RIVERS LAW FIRM, P.A.
BY: BRUCE RIVERS
701 Fourth Avenue South, #300
Minneapolis, Minnesota 55415

For the Defendant Josiah Taylor(7):
WOLD LAW
BY: PETER B. WOLD
JOHN FEE
331 Second Avenue South, #705
Minneapolis, Minnesota 55401

For the Defendant Trevaun Robinson(10):
PAUL ENGH, ATTORNEY AT LAW
BY: PAUL C. ENGH
150 South Fifth Street, #2860
Minneapolis, Minnesota 55402

For the Defendant William Banks(19):
CATHERINE TURNER, ATTORNEY AT LAW
BY: CATHERINE L. TURNER
331 Second Avenue South, #705
Minneapolis, Minnesota 55401

For the Defendant Gregory Brown(26):
NORTH STAR LAW GROUP PLLC
BY: DANIEL S. ADKINS
1295 Bandana Boulevard North, #335
St. Paul, Minnesota 55108

* * *

# I N D E X


| | PAGE |
|---|---|
| **AVANTE NIX** | |
| Cross-Examination by Mr. Wold | 137 |
| Cross-Examination by Mr. Adkins | 158 |
| Redirect Examination by Mr. Lynch | 174 |
| Recross-Examination by Mr. Adkins | 187 |

| DEFENDANTS' EXHIBITS | REC'D |
|---|---|
| DD2 | 145 |


* * *

**9:29 A.M.**

**IN OPEN COURT**

**(JURY PRESENT)**

THE COURT: Good morning, everyone. You may be seated.

And, Mr. Wold, you may continue your inquiry.

AVANTE NIX,

called on behalf of the government, was previously duly sworn, was examined and testified as follows:

CROSS-EXAMINATION

BY MR. WOLD:

Q. A little high (indicating).

Good morning, sir.

A. Good morning.

Q. Sir, you told us yesterday presently you are being housed at the Washington County Jail; is that true?

A. Yeah.

Q. And let me ask you, are any of your colleagues or homies or other defendants from the block with you out there at the Washington County Jail?

A. Yeah.

Q. And who would they be?

A. Jovan, Doug, Bird. That's it.

Q. Okay. And you say Jovan, you mean is that Jovan Knight?

A. Yeah.

Q. JoJo?
A. Yeah.
Q. Okay. And prior to going to Washington County, were you ever at the Sherburne jail?
A. Yeah.
Q. And there was lots and lots of the colleagues from the block in Sherburne; is that true?
A. Yeah.
Q. Okay. And you would get to talk to them and see them every day, basically, true?
A. Yeah.
Q. And to now you see JoJo in Washington, true?
A. Yeah.
Q. Okay. I want to ask. You -- has your attorney given you or come out and seen you and reviewed the police reports and things she's received?
A. Yeah.
Q. Okay. Have you looked at those throughout the time you've been at either Sherburne or Washington?
A. Yeah.
Q. I mean, there's thousands, thousands and thousands and thousands of pages. Have you seen a lot of them?
A. Yeah.
Q. Okay. And she's come to you and talked about them, true?

A. Yeah.
Q. And talked about different things you'd need to be prepared for to testify about, I assume?
A. Yeah.
Q. Okay. And that includes a lot of the exhibits and things like that that you might need to talk about; is that correct?
A. Yeah.
Q. And, in fact, when you had these meetings with the U.S. Attorney's Office, as you prepared to testify here, they would go through many of the exhibits that they thought you might be asked about; is that fair?
A. Yeah.
Q. Okay. I want to ask you about a name. We've heard that there might have been a white young man that's white named Brent Buchan that was a member of one of the cliques up there.
Does that ring a bell with you?
A. No.
Q. Do you know any white guy that was a member up there?
A. When?
Q. At any time since you've been there. Any gang member that was a white guy?
A. At Washington?
Q. Pardon me?

A. At Washington County?
Q. I didn't understand what you.
A. I said, at Washington County?
Q. No, no, no. I mean on the street, on the block.
A. Oh, yeah.
Q. You do?
A. Yeah.
Q. Okay. And does that name Brent Buchan mean something to you?
A. Yeah, I know Brent, but I don't think, I don't know if that's his last name.
Q. Oh, okay. And Brent's a white guy?
A. Yeah.
Q. And is he one of the defendants in this case?
A. No.
Q. Okay. He's, is he a drug dealer up there too?
A. I don't know him like that.
Q. Okay. I want to go back, and I need to talk with you a little more. I think we finished yesterday, Mr. Nix, when I was talking to you about Montez Brown, and you did the undercover controlled purchase of fentanyl from him; is that right?
A. Yeah.
Q. And it sounds like Montez Brown was one of the suppliers of fentanyl to other people that were selling on the street;

is that correct?
A. Yeah.
Q. And you also were one of those people during the time that was bringing fentanyl back from Arizona and selling it to other members that were selling it to other people; is that right?
A. Yeah.
Q. So in fact Montez Brown was kind of a competitor of yours, fair?
A. You could say that.
Q. Okay. And that competitor you turned in to the cops, right?
A. Yeah.
Q. JoJo or Jovan Knight, you see him every day out there at Washington County?
A. I ain't seen him in like two months. He been in the hole.
Q. Okay. Did Jovan Knight know he was one of the people you turned in to Sergeant Schroeder?
A. I don't recall turning him in.
Q. Say that again?
A. I don't recall turning him in.
Q. Well, maybe I could help you if I showed you some of the paperwork from Sergeant Schroeder. Would that help refresh your recollection, sir?

A. Yeah.
Q. Okay.
MR. WOLD: If I can approach, Your Honor.
THE COURT: You may.
BY MR. WOLD:
Q. Sir, I'm handing you what's called a Minneapolis Police Department Money Voucher Evidence and Information, and I'll hand that to you, and you can take a look at it and just review that.
Does that help?
A. Yeah.
Q. Okay. And what was going on, sir, is Jovan Knight was being looked for by Sergeant Schroeder and other people. He was on the run. Do you remember that?
A. Yeah.
Q. And you told Sergeant Schroeder where he could find him, right?
A. Right.
Q. And they found him and arrested him. That was your friend, correct?
A. Yeah.
Q. Okay. You got 500 bucks for that?
A. I don't remember.
Q. Pardon me?
A. I said, I don't remember how much money I got.

Q. Okay. But you kept doing it. It was worth it, right?
A. Yeah.
Q. And your friend yesterday, you told us Keon Pruitt, KenKen, right?
A. Yeah.
Q. You remember snitching him out?
A. About what situation?
Q. Huh?
A. About what?
Q. He had a gun, right?
A. No, I don't remember that. I don't think that ever happened.
Q. Might it help to refresh your recollection if you looked at the money voucher evidence and information sheet about you?
A. I guess, yeah.
Q. Okay.

MR. WOLD: If I can approach, Your Honor.

THE COURT: You may.

THE WITNESS: I don't remember this.

BY MR. WOLD:
Q. You don't remember that?
A. No.
Q. Let me ask you this --

Your Honor, I'm going to mark this as DD2.

THE COURT: You may mark it.

BY MR. WOLD:

Q. Okay. Sir, I'm showing you what's been marked for identification purposes as Exhibit DD2. And I want you to take a look at this. It's a document of two pages. And take a look at that again.

Do you see a signature on that?

A. Yeah.

Q. And whose signature is it?

A. Mine's.

Q. And is that your signature, sir?

A. Yeah.

Q. And did you sign it?

A. Yeah.

Q. When did you sign it? Is there a date there?

A. 2/5/21.

Q. 2/5/21?

A. Yeah.

MR. WOLD: Your Honor, we would offer Defendants' DD2.

THE COURT: Any objection?

MR. LYNCH: Your Honor, I think it's appropriate to use that for refreshment purposes but not to admit as a substantive exhibit.

THE COURT: What's the objection?

MR. LYNCH: He's using it to impeach the witness. Mr. Nix said he couldn't remember, but he's not saying that he didn't do that.

THE COURT: I'm going to overrule the objection.

DD2 is admitted.

MR. WOLD: Thank you. Thank you.

THE COURT: Can you be by the microphone, please.

MR. WOLD: Can I show this on the ELMO?

THE COURT: You may publish it.

MR. WOLD: Thank you for that. There we go.

BY MR. WOLD:

Q. Okay. Showing this, it says 400 bucks, right? Keon Pruitt, $400, and that's 2/10/21. That you?

A. Yeah.

Q. Your signature? The back page describes what happened. Do you see that? Does that make sense?

A. Yeah.

Q. Maybe. Thanks.

So that's your friend KenKen?

A. Yeah.

Q. Does he know you snitched him out too?

A. No.

Q. He doesn't know that? Okay.

And Bibby, that's Robert Lesure, a friend of yours, right?

A. Yeah.
Q. Do you remember turning him in?
A. No.
Q. No?
A. What situation?
Q. Bibby with a gun?
A. I don't remember that.
Q. Pardon me?
A. I don't remember.
Q. Okay. If I showed you that one, might you remember?
A. Yeah.
Q. Okay. I'm going to come back to that when I have this lined up a little better.
Let me ask you this and see if we can skip some of these.
Do you remember now Demonta Mathis, turning him in for a gun?
A. Yeah.
Q. Okay. You got 300 bucks for that?
A. Yeah.
Q. He a High member too?
A. Yeah.
Q. Juwan Carroll, a homicide. Do you remember that now, sir?
A. No.

Q. Okay. You turned in several people to Sergeant Schroeder that you thought committed homicides. Do you remember that?
A. Yeah.
Q. Okay. Several people, right?
A. Yeah.
Q. Got lots of money for those, right?
A. Yeah.
Q. You got over 10,000 bucks turning in your colleagues and friends from Sergeant Schroeder, true?
A. Yeah.
Q. It was worth it, right, to you?
A. What?
Q. Was that worth it to you?
A. Yeah.
Q. Okay. And you kept doing it, and during at that time you were still making pretty good money and making more and more money selling drugs, right? Fentanyl?
A. Yeah.
Q. Okay. And during that time do you remember in April of 2022 getting arrested with a Glock 22?
A. No.
Q. You don't remember getting arrested at 7 Restaurant on 7th and Hennepin?
A. Oh, yeah. Yeah.

Q. You had a Glock 22. Do you remember that?
A. Yeah.
Q. Glock 22, .40 caliber, right?
A. Yeah.
Q. Had an extended magazine, right?
A. Yeah.
Q. And a switch, right?
A. Yeah.
Q. Made it into a machine handgun, right?
A. Yeah.
Q. Sir, did you shoot Harvey Williams?
A. No.
Q. You were selling about 50,000 fentanyl every two weeks in April of '22, correct?
A. Yes.
Q. And, you know, we saw your first trip to Arizona. I think it was in November of '21, right?
A. I don't remember when.
Q. Say that again?
A. I don't remember the date.
Q. Okay. But that, after that you kept going out there by yourself and picking up drugs too and bringing them back and distributing them, right?
A. Yeah.
Q. And you made the money.

A. Yeah.
Q. I want to talk to you about Josiah Taylor for just a couple minutes. Okay? Do you mind?
A. All right.
Q. And at some point your lawyer told you the questions they ask, they know the government wanted your help on the Harvey Williams murder deal, right?
A. Yeah.
Q. Okay. You talked about that with your lawyer?
A. Yeah.
Q. And you knew Josiah because he knew your father, right?
A. Yeah.
Q. Is that about right?
A. Yeah.
Q. But you, once you learned they wanted your help with Josiah Taylor, you told them, I can help you, right?
A. Yeah.
Q. But you told them he was more than just a friend of yours father's. You said he was a close friend of the family that you'd known for years, right?
A. Yeah, I told them he was like an uncle.
Q. You told them he was just like an uncle to you. And that made it sound like you could really help them with Josiah Taylor, right? Right?
A. That's not why I said it. It's the truth.

Q. Okay. Okay. Well, you know Josiah's mother?
A. No.
Q. Do you know her name?
A. No.
Q. Do you know any of Josiah's five children?
A. No.
Q. Know his sisters?
A. No.
Q. You do know that Josiah Taylor was one of the very few people in North Minneapolis that sold real Percocet, right?
A. Yeah.
Q. I know what you said, that Josiah found you somewhere and told you that, "I killed Harvey Williams," right?
A. Yeah.
Q. Okay. And where were you when that conversation took place, sir?
A. 21st and Washington.
Q. Where?
A. 21st and Washington.
Q. 21st and Washington. And -- 21st and Washington.
Could we put up that Highs map, please?
That's where Josiah Taylor sold his Percocet, true?
A. Yeah.
Q. Okay. Can I have that -- I'm sorry.

(Counsel confer)

MS. BAUMEL: Is that what you are looking for?

MR. WOLD: No. The Highs map, please.

(Counsel confer)

MR. WOLD: Yeah. Thank you.

BY MR. WOLD:

Q. And you, you know Washington's -- oh, that doesn't show -- is over here?

Can you see that red dot I put there?

A. Yeah.

Q. That's where Washington is?

A. Yeah.

Q. Okay. Over closer to the river on the other side of 94, right?

A. Yeah.

Q. And that's outside of the Highs territory as it's put there. Fair enough?

A. Yeah.

Q. And that's where Josiah Taylor sold Percocet, right?

A. Yeah.

Q. You didn't sell the Percocet to him, did you?

A. No.

Q. When you told -- do you remember telling some of these people that Josiah Taylor, when you told the story about him being the one that shot Harvey Williams, he was driving a

black Impala?
A. Yeah.
Q. Okay. And in fact, you went on to say you know he was driving a black Impala because shortly after that he sold it to your friend Baba, was it?
A. Yeah.
Q. And Baba, what's Baba's real name?
A. Anton Love.
Q. And are you saying you saw Josiah Taylor sell a black Impala to Baba?
A. Yeah, he sold it to him.
Q. Okay. And did he come over and sign a, a title of it and give it to Baba?
A. I don't know if he signed the title or not.
Q. Okay. Did he just give it to Baba?
A. Yeah, but Baba paid him back.
Q. Okay. So your story is that, that Josiah Taylor drove up beside Harvey Williams' car in a black Impala and shot him, right?
A. Yeah.
Q. Okay. That's what you told these people, right?
A. Yeah.
Q. Okay. When you had this conversation with Josiah Taylor, anybody else around, or is it just the two of you?
A. I don't really remember.

Q. You don't really remember?
A. No.
Q. Okay. Now were you walking, or were you driving when he told you this at 21st and Washington?
A. We was sitting in the car smoking.
Q. Say that again?
A. We was sitting in the car.
Q. You were sitting in the car?
A. Yeah.
Q. He just says, Mr. Nix, there is something I need to tell you; is that right?
A. I don't remember how the conversation came up.
Q. Okay. Just out of the blue? Yep? Is that right?
A. Yeah.
Q. Okay. You -- when you got --

Do you remember in February of 2023 you found out you'd been indicted in federal court in the Western District of Pennsylvania?
A. Yeah.
Q. Do you remember that?
A. Yeah.
Q. And they came here and you got arrested, right?
A. Yeah.
Q. You're in jail after that. Have you been in jail since then?

A. No.
Q. Okay. You got out for a while?
A. Huh?
Q. Did you get out for a while?
A. Yeah.
Q. Okay. Keep working a little bit?
A. Yeah.
Q. Okay. But at some point you got a lawyer, Karen Mohrlant, right?
A. Yeah.
Q. Okay. And you were then indicted in Minnesota, right?
A. Yeah.
Q. And somehow your friends that you were working with told the people in Pennsylvania you were cooperating here, and they dismissed the charges against you in Pennsylvania, right?
A. Yeah.
Q. Okay. You got out of that one, right?
A. Yeah.
Q. Okay. And then after you had this lawyer, she met with the prosecutors here, the U.S. Attorney's Office, and you agreed to cooperate with them and hopefully get their help in avoiding any time, right?
A. Yeah.
Q. Okay. And part of that deal was testifying against

Josiah Taylor and helping them convict him, right?
A. Yeah.
Q. Okay. And that's why you are here.
A. Yeah.
Q. Okay. And you knew before your lawyer struck this deal for you, you were looking at up to spending the rest of your life in prison, right?
A. I don't know if it would have been the rest of my life, but I would have spent some time in prison.
Q. Okay. Well, you read the plea agreement. It says that's the maximum penalty is life in prison, right?
A. Yeah.
Q. Okay. And with the benefit of that cooperation agreement, you understand the prosecutors and only the prosecutors can make a motion for you to get less time, right?
A. Yeah.
Q. But only if they agree that you have substantially assisted them, true?
A. Yeah.
Q. And that's what you are doing here today is trying to substantially assist them and accuse Josiah Taylor of murder.
A. Yeah.
Q. Okay. You talked to your old friend -- and let me --

You turned a lot of people in for murder to Sergeant Schroeder. Josiah Taylor was not one of them, was he?
A. No.
Q. Turned a lot of people into Sergeant Schroeder for carrying guns, even some of your best friends, right?
A. Yeah.
Q. Josiah Taylor wasn't one of them, was he?
A. No.
Q. Sergeant Schroeder called you about a month ago, right?
A. Yeah.
Q. And this was after you sat down with this group of people here to my left, right?
A. Yeah.
Q. Many times and others before them, correct?
A. Yeah, yeah.
Q. And with your lawyer with them, true?
A. Yeah.
Q. And based on all of those conversations and so forth, you told Sergeant Schroeder that you thought you would walk out of here and go home after you finished this case, right?
A. Yeah.
Q. Kind of need to get Josiah Taylor first, though, don't you?
A. What?

Q. I said you got to substantially assist them getting Josiah Taylor before you can walk out of here, though, true? Isn't that true?
A. Yeah.
Q. Yep.
MR. WOLD: If I can just have a minute, Your Honor.
THE COURT: You may.
BY MR. WOLD:
Q. Do you know how old Josiah is, sir?
A. No.
Q. He's ten years older than you, sir, about that?
A. Yeah.
Q. I mean, does that seem about right?
A. Yeah.
Q. Okay. Mr. Nix, thanks for talking to me this morning. We did a little better than we did yesterday, right?
A. Yeah.
Q. Okay. Thank you for that.
THE COURT: Thank you, counsel.
Mr. Rivers.
MR. RIVERS: I don't have any questions, Your Honor.
THE COURT: Mr. Engh.
MR. ENGH: No questions.

THE COURT: Ms. Turner.

MS. TURNER: No questions.

THE COURT: Mr. Adkins.

MR. ADKINS: If I could.

THE COURT: Yes.

CROSS-EXAMINATION

BY MR. ADKINS:

Q. Good morning, Mr. Nix.

A. Good morning.

Q. I have the privilege of representing Mr. Gregory Brown. I'm going to ask you some questions if that's okay.

A. All right.

Q. I will try not to make you upset. Okay?

A. All right.

Q. Okay. Now just picking up on what Mr. Wold was talking about, you actually took the oath here. You remember telling this judge, you told Her Honor, you said you would tell nothing but the truth; is that correct?

A. Yes.

Q. But the truth for you, you haven't been able to tell the truth since 2019; is that right? You've lived two lives; is that fair to say?

A. Yeah.

Q. Okay. You had to be very careful about what you communicated with folks; is that right?

A. Yeah.
Q. You couldn't tell your mom that you were cooperating; is that right?
A. Yeah.
Q. You certainly couldn't tell your friends in any gang in any clique that you were actually getting paid to roll them up; is that right?
A. Yeah.
Q. Okay. And those are lies; is that correct?
A. Yeah.
Q. So you've become very proficient at telling something other than the truth; is that correct?
A. I never told them I wasn't.
Q. Come on now. You didn't never have a conversation about whether or not you were snitching; is that right?
What you are telling me is, you never told anybody that you weren't snitching.
A. Yeah.
Q. Okay. You did a good job; isn't that right, Mr. Nix?
A. Yeah.
Q. To be valuable to Sergeant Schroeder and to these assistant U.S. attorneys, you have to have talent at lying, correct?
A. Yeah.
Q. Okay. And it does get easier with time; is that right?

A. Yeah.
Q. Okay. You first got arrested in 2019. That was a stolen car and some narcotics; is that right?
A. Yeah.
Q. Was it weed?
A. No.
Q. Do you remember what it was?
A. Crack cocaine.
Q. Okay. You had, was it powder cocaine?
A. No. Crack.
Q. You were 15 at that point; is that right?
A. Yeah.
Q. But you were driving?
A. Huh?
Q. You were driving that car?
A. Yeah.
Q. Okay. And you didn't feel like -- you got scared; is that fair to say?
A. Yeah.
Q. Okay. There's a lot of time coming even as a juvenile; is that right?
A. Yeah.
Q. So at that time you met Sergeant Schroeder; is that correct?
A. Yeah.

Q. Okay. That's not the case that put you in Red Wing; is that correct?
A. No.
Q. Okay. That case didn't get charged; is that correct?
A. Yeah.
Q. At that time did Sergeant Schroeder tell you that you needed to come up with three arrests at the level that you were at?
A. Yeah.
Q. That's kind of the trade; is that right?
A. Yeah.
Q. And you did that; is that correct?
A. Yeah.
Q. And at that point Sergeant Schroeder said, hey, this is productive. We can keep doing this; is that right?
A. Yeah.
Q. And you started getting paid for the work you did for him; is that correct?
A. Yeah.
Q. He's your boss; is that fair to say?
A. Yeah.
Q. Okay. Now there's receipts, you went over this with Mr. Wold, that are roughly $10,000 in money you received; is that correct?
A. Yeah.

Q. You got a lot more than that over time; is that correct?
A. Yeah.
Q. Okay. You never paid taxes on any of that money; is that fair to say?
A. Yeah.
Q. Okay. The receipts weren't, they're not 1099s. It's not like a W-2 where you are getting -- you have to account for that; is that correct?
A. Yeah.
Q. This is quiet money; is that correct?
A. Yeah.
Q. Nobody in Young N' Thuggin, nobody in Sayless, no FreeShotz could ever know that you were get that money; is that correct?
A. Yeah.
Q. None of them did; is that correct?
A. No.
Q. You were able to as late as 2023 after you got out of federal custody, you were still able to work; is that correct, I heard you say?
A. Yeah.
Q. Okay. Would you be working now if you weren't sitting on that stand?
A. Yeah.
Q. Okay. You need other people to serve the time that you

have earned; is that fair to say?
A. No.
Q. You give your time away, Mr. Nix.
A. No.
Q. You are looking to save multiple years; isn't that what you testified?
A. All I did was tell the truth.
Q. Okay. But you need that truth, as you characterize it as a professional liar, to shave that time off; is that what you have testified?
A. Yeah.
Q. You don't need that time; is that right?
A. Yeah.
Q. Now, you started Sayless, you said it was one other person that was starting that with you; is that correct?
A. Yeah.
Q. He came up with the name; is that right?
A. Yeah.
Q. Kind of ironic; isn't it fair?
A. Yeah.
Q. You were Sayless while you're talking to Schroeder.
A. Yeah.
Q. You were ready to be a gangster, but you knew silence was crucial for everybody around you; is that right?
A. Yeah.

Q. They need to lean on each other; is that right?
A. Yeah.
Q. And you never intended to be honorable with them; is that right?
A. Yeah.
Q. Okay. When you were left Red Wing, you were on supervised release; is that correct?
A. Yeah.
Q. And you've been on some form of conditions of supervised release pretty much the whole last six years, fair?
A. Yeah.
Q. And all that time you have not been prosecuted because of Sergeant Schroeder's intervention; is that correct?
A. Yeah.
Q. You've had other arrests since then; is that right?
A. Yeah.
Q. You testified to a Glock with a switch. Mr. Nix, you are a felon; is that correct?
A. Yeah.
Q. Okay. What is the mandatory minimum state sentence for getting caught with a Glock?
A. I don't know.
Q. What's the mandatory federal sentence for getting caught with an automatic weapon?
A. I don't know.

Q. If I told it you there's a ten-year mandatory minimum that can be radically increased based on the other facts of your case, would that sound right?
A. Yeah.
Q. Okay. Are you doing ten years for a Glock?
A. No.
Q. Okay. While you were under these agreements with Sergeant Schroeder, these agreements that had very specific language, you were committing crimes. You are now telling us that; is that correct?
A. Yes.
Q. Okay. When you met with the assistant U.S. attorneys, they told you early and repeatedly that it was vital that you use a certain word when you testified; is that correct?
A. Huh?
Q. They told you there's one word that you really have to keep hitting, and you started right away with your testimony. That word is "Highs"; is that correct?
A. No, they never told me that.
Q. They didn't tell you how important it was and that the defense would say there is no such thing as --
THE COURT: You have to slow down.
MR. ADKINS: Yes, ma'am.
BY MR. ADKINS:
Q. They never told you that the defense would say there's

no such thing as Highs.
A. Yeah. But they didn't tell me I had to keep saying it.
Q. Okay. I want to take you back. You heard some drill videos yesterday; is that correct?
A. Yeah.
Q. Some rap?
A. Yeah.
Q. Those are YouTube videos, correct?
A. Yeah.
Q. And you knew about those when they were being made; is that right?
A. Yeah.
Q. It was your friends, Mr. Nix; is that correct?
A. Yeah.
Q. They are not your friends anymore, are they?
A. No.
Q. Okay. In those videos you never heard the word "High"; is that correct?
A. No.
Q. And there was a caption across the bottom, the folks were helping us to understand the words. They never wrote out the word "Highs"; is that correct?
A. No.
Q. There is no symbol for Highs; is that correct?
A. No.

Q. You ain't got no Highs tattoos on you; is that right?
A. No.
Q. None of these men have a High tattoo, do they?
A. No.
Q. Okay. You have to work with and for these folks. They met with you, as we said, many times, and that substantial assistance means one thing, right? Convictions, right?
A. Yeah.
Q. If there are no convictions, if this jury finds you to not be credible, you don't get that discount; is that right?
A. Yeah.
MR. LYNCH: Objection. Mischaracterizing.
THE COURT: Sustained.
BY MR. ADKINS:
Q. You need for these items of testimony that you have offered today to be successful for the government's work; is that correct?
A. Yeah.
Q. Okay. So you motivated; is that fair to say?
A. Yeah.
Q. You are motivated for more than just that; is that correct?
A. Yeah.
Q. You told Sergeant Schroeder recently in a report we never saw that you were going home; is that right?

A. Yeah.
Q. Okay. What you meant was, the work is almost finished and you about to leave; is that fair to say?
A. Yeah.
Q. No more Stillwater jail, correct?
A. Yeah.
Q. No trips to Pennsylvania, correct?
A. Yeah.
Q. That entire matter has been dismissed; is that correct?
A. Yeah.
Q. That would have cost you close to life too; is that right?
A. Yeah.
Q. Okay. But you understand you can't ask Judge Brasel or any judge for a 5K discount. You can't say that you've substantially assisted. That has to come from someone else; is that right?
A. Yeah.
Q. That person needs to be someone from the government; is that right?
A. Yeah.
Q. Okay. So what did Sergeant Schroeder say when you told him you were going home? Did he disabuse you? Did he tell you that wasn't true?
A. No.

Q. Sergeant Schroeder didn't tell you to start Sayless, correct?
A. No.
Q. You said I think yesterday, he asked you to quit; is that right?
A. Yeah.
Q. But he never stopped paying you; is that correct?
A. Yeah.
Q. He never took you off the roll; is that correct?
A. Yeah.
Q. He didn't introduce you to Gregory Brown; is that right?
A. No.
Q. He didn't tell you to put Big Brother in your phone as his name; is that correct?
A. No.
Q. Okay. Lil' G was strong, correct?
A. Yes.
Q. He was a mentor to you; is that right?
A. Yeah.
Q. In life; is that right?
A. Yeah.
Q. Okay. He took you on vacation to Arizona now. That's correct?
A. Yeah.
Q. That trip was planned carefully with you and Bibby; is

that right?
A. Yeah.
Q. Mr. Bibby is Robert Lesure, L-E-S-U-R-E?
A. Yeah.
Q. Okay. You did have fun; is that right?
A. Yeah.
Q. I think we saw the video. It's kind of hard for a city kid to be an ATV star; is that fair to say?
A. Yeah.
Q. You understand it can be difficult for a city kid, never been on a farm, to get that ATV started, correct?
A. Yeah.
Q. And ATV is like a motorcycle with four wheels?
A. Yeah.
Q. But that was fun, wasn't it?
A. Yeah.
Q. Were there other events that you went to while you were out in Arizona?
A. Yeah.
Q. Stayed in fancy hotels?
A. Yeah.
Q. Had dinner with your friends.
A. Yeah.
Q. Went to a swimming pool.
A. We never went to no swimming pool.

Q. There was no pool, no lake?
A. No. We went to the club.
Q. Okay. Went to the club and saw lots of ladies; fair to say?
A. Yeah.
Q. And you had fun?
A. Yeah.
Q. That was a vacation; is that correct?
A. Yeah.
Q. Okay. At those moments you were getting paid by Sergeant Schroeder?
A. Yeah.
Q. You had been working for him for years at that point; is that correct?
A. Yeah.
Q. Mr. Wold asked but that August 9th document that you signed. That was your plea agreement with your lawyer's assistance; is that correct?
A. Yeah.
Q. Okay. I noticed something. Mr. Nix, you have raced to say Highs when you were answering questions from Mr. Wold, and then you stopped acing; is that correct?
A. What you say?
Q. Did you feel like you said the word "Highs" enough when you started with Mr. Wold? You got angry at him; is that

correct?
A. Yeah, I got angry.
Q. Okay. When you signed that agreement, that plea agreement, it was followed -- actually taking you back to an earlier document?

For the last four years you have been subject to an agreement with Sergeant Schroeder; is that correct?
A. Yeah.
Q. That agreement told you no crimes, correct?
A. Yeah.
Q. No guns to be handled, correct?
A. Yeah.
Q. The only time you could be around drugs was on a planned operation; is that correct?
A. Yeah.
Q. You broke every one of those rules; is that correct?
A. Yeah.
Q. Sergeant Schroeder never took you off the payroll.
A. No.
Q. Okay. There was a time when Mr. Brown asked you if you were ready to make a change; is that correct?
A. Yeah.
Q. He told you you could come with him and he would teach you to sell dogs --
A. Yeah.

Q. -- is that correct? You talked at length about that; is that correct?
A. Yeah.
Q. You said you weren't ready to leave the gang.
A. Yeah.
Q. Is that right? You didn't have time for what he was doing; is that correct?
A. Yeah.
Q. Because you knew he was making money from that; is that fair?
A. Yeah.
Q. You saw the dogs, correct?
A. Yeah.
Q. Did you get a dog?
A. No -- after.
Q. Okay. How expensive was the dog you got?
A. I paid 3500.
Q. 3500. That's a discount?
A. Yeah.
Q. Okay.
MR. ADKINS: Court's indulgence.
I have no further questions.
Thank you, Mr. Nix.
THE COURT: Redirect Mr. Lynch.
MR. LYNCH: Briefly, Your Honor.

REDIRECT EXAMINATION

BY MR. LYNCH:

Q. Mr. Nix, you testified on cross that Josiah Taylor was like an uncle to you?

A. Yeah.

Q. How do you feel about testifying here today?

A. Not good.

Q. And you testified that as part of your plea agreement you're required to provide substantial assistance; is that correct?

A. Yeah.

Q. And are you being truthful? Have you been truthful during your testimony?

A. Yes.

Q. All right. On cross-examination with Mr. Wold, you talked about the Pennsylvania indictment. Did that come down in about March of 2023?

A. Yeah.

Q. And you were charged with a drug conspiracy?

A. Yeah.

Q. And is it true that you were charged based on going to Arizona to get pills, and then you were going back to Minneapolis to sell the pills?

A. Yeah.

Q. Okay. And then you were indicted in this case with RICO

conspiracy and a drug conspiracy in November of 2023; is that correct?
A. Yeah.
Q. And the underlying conduct for this indictment, was that going to Arizona to get pills and then sell them in Minneapolis?
A. Yeah.
Q. So was your conduct in the, that was the basis of the Pennsylvania indictment and then the basis of the indictment here in Minnesota, was that the same conduct?
A. Yeah.
Q. And I'm going to show you page 1 of Exhibit B2a, what's been admitted as Exhibit B2a. And you testified before this is your plea agreement?
A. Yeah.
Q. And you testified on cross-examination that the maximum punishment you were facing in Pennsylvania was life imprisonment; is that correct?
A. Yeah.
Q. All right. On page 13 here, this is your plea agreement. So what you pled guilty to on the bottom here, can you tell me what your maximum punishment is?
A. Life.
Q. Okay. And that's what you currently pled guilty to; is that correct?

A. Yeah.
Q. You've testified on cross-examination about going on vacation to Arizona with Gregory Brown?
A. Yeah.
Q. And you testified on cross that you road ATVs and you were in fancy hotels; is that correct?
A. Yeah.
Q. Who paid for the ATVs and the hotels?
A. Lil' G did. I paid him back for the ATVs.
Q. Okay. Did you pay him back for the hotels?
A. No.
Q. Okay. And how did you have the money to pay him for the for the ATVs?
A. Selling drugs.
Q. And who were you working with to sell drugs at that time?
A. At that time I was working by myself when we went to Arizona and got pills.
Q. Afterwards, were you working with Gregory Brown?
A. Yeah.
Q. Prior to going to Arizona, were you getting pills from Gregory Brown?
A. Yeah.
Q. And you testified on cross-examination that in the music videos you never heard the term "Highs"; is that correct?

A. Yeah.
Q. Did you hear throwing up Es?
A. Yeah.
Q. And what's throwing up Es mean?
A. Throwing up EMB.
Q. And is that a clique of the Highs?
A. Yeah.
Q. And throwing up Ys?
A. Throwing up YNT.
Q. And you testified about the YNT hand sign. Is that sign used by members of all the cliques of the Highs?
A. Yeah.
Q. And in So Minneapolis you heard, "I've got FreeShotz. They slide for nothing."
What's that mean?
A. Just saying FreeShotz be sliding.
Q. And what's FreeShotz?
A. Another clique.
Q. A clique of what?
A. The Highs.
Q. And in the music videos So Minneapolis Traumatized Part II, did you see members from other cliques of the Highs?
A. Yeah.
Q. And what clique of the Highs is Gregory Brown from?
A. EMB.

Q. And in the music videos, was he throwing up a YNT hand sign?
A. Yeah.
Q. Was he dropping the L?
A. Yeah.
Q. All right. You testified on cross-examination that Josiah Taylor sold Percocets at 21st and Washington; is that correct?
A. Yeah.
Q. 21st and Washington, we'll pull it up here. I'm showing what's been admitted as Exhibit A91. We're going to be on page 1.
So you indicated before that 21st and Washington was, is that north or south of Broadway?
A. I think north.
Q. And when you said Josiah Taylor called -- or sold Percocets, what do you call those Percocets on the street?
A. Percs.
Q. Okay. And how are those different than the fentanyl pills?
A. They ain't got fentanyl.
Q. Do they look the same sometimes?
A. Yeah.
Q. And did Josiah Taylor, did he sell those pills on Broadway also?

A. He mainly was on 21st and Washington.
Q. Are you familiar with an individual named Randy?
A. Yeah.
Q. Did Josiah Taylor sell --
MR. WOLD: Objection. Leading.
THE COURT: Overruled.
BY MR. LYNCH:
Q. Did Josiah Taylor sell Percs with Randy?
A. Yeah.
Q. We're going to go to what's been admitted as Exhibit A92 to page 13.
And where is this photograph?
A. Broadway.
Q. Broadway. And where specifically on Broadway?
A. In the parking lot of Boost Mobile.
Q. Okay. And who is that?
A. Josiah.
Q. And the individual here in the white, who's that?
A. Randy.
Q. Okay. And Randy, do you know him?
A. Yeah.
Q. Is he in a gang?
A. He YNT.
Q. And you testified that he sold Percs with Josiah Taylor?
A. Yeah.

Q. And then who's this?
A. Will.
Q. And do you know Will?
A. Yeah.
Q. And how do you know him?
A. From the block.
Q. Okay. And do you see Will here in court?
A. Yeah.
Q. Can you please point to him and describe what he's wearing?
A. Wearing a gray suit with a black tie.

MR. LYNCH: Your Honor, the witness identified the defendant William Banks.

THE COURT: The record will so reflect.

BY MR. LYNCH:
Q. And you testified that you knew Will from the block?
A. Yeah.
Q. Do you know if he's in a gang?
A. I don't think so. I don't know.
Q. What do you mean that you knew him from the block?
A. I just seen him around.
Q. Okay. And what was he doing when you would see him around?
A. Selling weed.
Q. And you testified during direct that you have to be

associated with the Highs to sell on the block; is that true?
A. Yeah.
Q. Okay. All right. In the Traumatized Part II music video, Gregory Brown rapped, "Bail money. Lawyers' fees. I did it for the guys."
What does that mean?
A. Basically saying he bailed people out and pay lawyers' fees.
Q. And what are "the guys"?
A. Other people around, like Highs.
Q. And did you help Highs members out in that way?
A. Yeah.
Q. And did you help Highs members from multiple cliques in that way?
A. Yeah.
Q. And can you just give us some examples of that, like how you would do that?
A. Help bail them out, stuff like that. Help them get money, stuff like that.
Q. Okay. Did you ever buy guns?
A. Yeah.
Q. And did you ever share guns?
A. Yeah.
Q. And you testified on cross-examination that some Highs

members keep the money that they make selling drugs.
A. Yeah.
Q. And you testified that Gregory Brown, Montez Brown and Calvin Wright made money selling fentanyl pills; is that correct?
A. Yeah.
Q. And were they selling to other Highs distributors?
A. Yeah.
Q. And were those pills ultimately sold at Broadway and Lyndale?
A. Yeah.
Q. And were the Highs distributors that they would sell to, would they make money?
A. Yeah.
Q. And you testified that Gregory Brown gave you a drake. You also testified a drake is a firearm. Is that sometimes called a draco?
A. Yeah.
Q. And what type of firearm is that?
A. AK.
MR. ADKINS: Object, Your Honor. This is beyond the scope of cross.
THE COURT: Overruled.
BY MR. LYNCH:
Q. What type of firearm is that?

A. AK.
Q. And did you ever get firearms from Gregory Brown on any other occasions?
A. Yeah. We used to trade back and forth.
Q. Okay. And have you ever bought a gun?
A. Yeah.
Q. And where would you get the money to buy a gun?
A. From selling drugs.
Q. And did you ever loan a gun to a Highs member?
A. Yeah.
Q. And did you ever borrow a gun from a Highs member?
A. Yeah.
Q. Did you ever loan or borrow a gun from a Highs member who wasn't Sayless?
A. Yeah.
Q. And based on your time in the Highs, was it normal for members to share firearms?
A. Yeah.
Q. All right. And we're almost done here.
You testified on cross-examination to Mr. Wold that you turned in fellow Highs members; is that correct?
A. Yeah.
Q. And how did you have the information to be able to provide information to Sergeant Schroeder about Highs members?

A. From being around.
Q. And what do you mean by "being around"?
A. Being on the block, seeing guns, stuff like that.
Q. And back to guns. Is being a drug dealer dangerous?
A. Yeah.
Q. And what can you do to protect yourself when you are selling drugs?
A. Have a gun.
Q. And when you were at Broadway and Lyndale, did you often have a gun?
A. Yeah.
Q. Do you know if other members had guns?
A. Yeah.
Q. Would Broadway and Lyndale be a smart place for someone to try to rob a drug dealer?
A. No, not really.
Q. And why not?
A. People have guns always. Just ain't smart. It did happen, but it ain't smart.
Q. And you testified on cross-examination about conducting a controlled buy with Montez Brown that led to a large seizure of fentanyl pills; is that correct?
A. Yeah.
Q. And Montez Brown, do you know if he breeds dogs?
A. Yeah.

Q. Okay. What kind of dogs?
A. Bullies.
Q. And you wanted to get into breeding dogs also, right?
A. Yeah.
Q. And is that normal for drug dealers to want to do?
A. Yeah.
Q. And do you know after you conducted the controlled buy if Montez Brown was arrested?
A. No, I don't know.
Q. And what clique is Montez Brown in?
A. YNT.
Q. And how are you in a position to conduct a controlled buy from Montez Brown?
A. I was buying pills from him.
Q. All right. We talked about, a little bit about KenKen. I'm going to show you Exhibit A13, what's been admitted as Exhibit A13.
And we're on page 4 of Exhibit A13. Can you tell me what you see there?
A. KenKen.
Q. And how well do you know KenKen?
A. I know him a decent amount.
Q. Okay. And do you know if he's in a gang?
A. I don't know. I guess he YNT now.
Q. That's KenKen?

A. Yeah.
Q. Okay.
A. He was in it first.
Q. And how do you know he's YNT now?
A. He told me.
Q. And on cross-examination -- and where did he tell you that?
A. Sherburne.
Q. Okay. And on cross-examination, you were asked about rules of the Highs. Do the Highs have any rules about cooperating with law enforcement?
A. Yeah. Couldn't do it.
Q. And is there a reason that you didn't tell anyone that you were acting as a CI for Sergeant Schroeder?
A. Yeah. I just ain't want nobody to know.

(Reporter clarification)

THE WITNESS: I said yeah. I just ain't want nobody to know.

BY MR. LYNCH:
Q. And why wouldn't you want somebody to know?
A. Because it something that's not tolerated.
Q. And can you explain that?
A. Something you not supposed to do.
Q. And what can happen if you do that?
A. Anything. You could die, whatever.

MR. LYNCH: Nothing further. Thank you.

THE COURT: Any recross?

MR. WOLD: No. Thank you.

THE COURT: Mr. Adkins.

MR. ADKINS: Yes, Your Honor. Just a couple questions.

Brian, could you put A92, P13, again?

MR. LYNCH: Yeah.

MR. ADKINS: That photograph.

(Counsel confer)

RECROSS-EXAMINATION

BY MR. ADKINS:

Q. Mr. Nix, I'm sorry it took us a little bit of time.

You just talked about this photograph; is that correct?

A. Yeah.

Q. Now this photograph is from, you can tell at the top, it's a Facebook dump. I'm not asking you about the technology?

But if this picture came from Facebook, you see there are dates and time stamps on it; is that correct?

A. Yeah.

Q. And if you look down where it says Date Created, can you tell me what date that reads?

A. 4/18/2017.

Q. So this photograph is from 2017; is that right?
A. Yeah.
Q. You would have been 13 years old?
A. Yeah.
Q. You didn't know these men at that time; is that correct?
A. Probably not.
Q. Okay. What you are saying when you testify here is, you know them now by these names; is that correct?
A. Yeah.
Q. But you can't testify to their activities in 2017; is that fair?
A. No.
Q. Okay. I have one other question for you. You folks don't care much for the members of the Lows cliques, correct?
A. Yeah.
Q. But you do in fact buy clothes from their store; is that correct?
A. What store?
Q. The store is called Scams & Grams; isn't that correct?
A. Yeah.
Q. And that's a Lows location; is that right?
A. Yeah.
Q. But would you order from that store or go visit that store?

A. It's not a store. It's somebody that selling.
Q. Okay. So like a truck?
A. No. He, he just, you just call him and he will pull up with a jacket.
Q. He will bring it to you?
A. But he say he not the Lows.
Q. Okay. But it's associated with the Lows; is that correct?
A. Yeah.
Q. Okay. And you also sold to Lows members; is that correct?
A. Yeah, I did before.
Q. Okay. You did. And was that just you or other members of the Sayless that would sell to the Lows?
A. Just me, I believe.
Q. Okay. Fair play.

Nothing further. Thank you, Mr. Nix.

THE COURT: Mr. Lynch.

MR. LYNCH: Nothing further, Your Honor.

THE COURT: All right. We're going to take a break at this time.

All rise for the jury.

10:31 a.m.

**IN OPEN COURT**

**(JURY NOT PRESENT)**

THE COURT: All right. Mr. Nix, you may step down. Thank you, sir.

(End of requested excerpt)

* * *

I, Renee A. Rogge, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Certified by: /s/Renee A. Rogge
Renee A. Rogge, RMR-CRR