UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| United States of America, | ) | File No. 23-cr-160 (NEB/JFD) |
| Plaintiff, | ) | |
| v. | ) | |
| Tyreese Giles(6), Josiah Taylor(7), Trevaun Robinson(10), William Banks(19), Gregory Brown(26), | ) | Courtroom 13W Minneapolis, Minnesota Wednesday, May 21, 2025 10:09 a.m. |
| Defendants. | ) | |

BEFORE THE HONORABLE NANCY E. BRASEL
UNITED STATES DISTRICT COURT DISTRICT JUDGE

**VOLUME VI - JURY TRIAL PROCEEDINGS**
**EXCERPT OF JEFF TREVINO TESTIMONY**

Court Reporter: RENEE A. ROGGE, RMR-CRR
United States District Courthouse
300 South Fourth Street, Box 1005
Minneapolis, Minnesota 55415

* * *

Proceedings recorded by mechanical stenography;
Transcript produced by computer.

* * *

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | UNITED STATES ATTORNEY'S OFFICE<br>BY: THOMAS CALHOUN-LOPEZ<br>CARLA BAUMEL<br>300 South Fourth Street, #600<br>Minneapolis, Minnesota 55415 |
| | DEPARTMENT OF JUSTICE<br>ORGANIZED CRIME AND GANG SECTION<br>BY: BRIAN W. LYNCH<br>ALYSSA LEVEY-WEINSTEIN<br>1301 New York Avenue NW, #700<br>Washington, D.C. 20530 |
| For the Defendant Tyreese Giles(6): | RIVERS LAW FIRM, P.A.<br>BY: BRUCE RIVERS<br>701 Fourth Avenue South, #300<br>Minneapolis, Minnesota 55415 |
| For the Defendant Josiah Taylor(7): | WOLD LAW<br>BY: PETER B. WOLD<br>JOHN FEE<br>331 Second Avenue South, #705<br>Minneapolis, Minnesota 55401 |
| For the Defendant Trevaun Robinson(10): | PAUL ENGH, ATTORNEY AT LAW<br>BY: PAUL C. ENGH<br>150 South Fifth Street, #2860<br>Minneapolis, Minnesota 55402 |
| For the Defendant William Banks(19): | CATHERINE TURNER, ATTORNEY AT LAW<br>BY: CATHERINE L. TURNER<br>331 Second Avenue South, #705<br>Minneapolis, Minnesota 55401 |
| For the Defendant Gregory Brown(26): | NORTH STAR LAW GROUP PLLC<br>BY: DANIEL S. ADKINS<br>1295 Bandana Boulevard North, #335<br>St. Paul, Minnesota 55108 |

* * *

**10:09 A.M.**

**IN OPEN COURT**

**(JURY PRESENT)**

MR. CALHOUN-LOPEZ: Your Honor, you know, I'm sorry to accommodate a witness's scheduling needs, may we amend that and call Sergeant Jeff Trevino?

THE COURT: Yes.

JEFF TREVINO,

called on behalf of the government, was duly sworn, was examined and testified as follows:

THE WITNESS: Yes.

THE COURT: Thank you. You may be seated.

And when you are settled, please state and spell both your first and last name for the record.

THE WITNESS: Jeff Trevino, T-R-E-V, as in Victor, I-N-O.

THE COURT: And Jeff is J-E-F-F?

THE WITNESS: J-E-F-F, yes.

THE COURT: Thank you.

You may inquire.

MR. CALHOUN-LOPEZ: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. CALHOUN-LOPEZ:

Q. Good morning, sir.

A. Good morning.

Q. How are you employed?
A. I'm a sergeant with the Minneapolis/St. Paul International Airport Police Department.
Q. What are your duties as a Minneapolis, or excuse me, an airport police department sergeant?
A. I supervise the narcotics interdiction team at the airport.
Q. What is your training that you had to assume those duties?
A. I've had a lot of training over the years from the DEA basic school to numerous various narcotics interdiction and investigation training. I've been a police officer for 31 years.
Q. Is that all with the airport police department?
A. No.
Q. What other agencies?
A. So I worked for the Gary, Indiana, Police Department for a little over 20 years. I retired from there, and then I've been at the airport police department now for 11 years.
Q. And like me, you talk a little bit fast, so I'll ask you to just work on slowing down please.
Do you ever intercept drugs on inbound flights?
A. Yes.
Q. And are commercial flights used to transport drugs in your training?

A. Yes.
Q. What locations have you seen in your experience drugs come into Minnesota from?
A. So the primary is that we get most of our narcotics coming into Minnesota from is either California, Arizona. Phoenix area, Los Angeles are couple of main areas.
Q. Were you performing your duties with the narcotics interdiction team on the night of September 19th of 2022?
A. Yes.
Q. And on that night did you and your team intercept a bag of narcotics on an inbound flight to Minneapolis?
A. Yes.
Q. Let me step back just a little bit. What flight were you looking at that night?
A. We were looking at a flight coming from Phoenix, Arizona, on a Sun Country Airlines.
Q. Do you remember when it was set to arrive?
A. The exact time, sometime later that evening. I'm not sure of the exact time.
Q. A nighttime flight?
A. Yes.
Q. Why were you interested in that flight in particular?
A. So we received information from DEA of a possible narcotics courier coming in on that flight transporting pills in their carry-on luggage.

Q. Do you recall the person's name that the DEA gave you?
A. Yes. So it was Latoya Palmer.
Q. And is that spelled L-A-T-O-Y-A, last name P-A-L-M-E-R?
A. Correct.
Q. Did you check flight records associated with Ms. Palmer?
A. Yes. So we spoke with Sun Country personnel and confirmed that she was on that flight. We also, they were also able to confirm a separate male passenger flying on a different passenger name record, a reservation that they found connected to her.
Both had listed the same minor child on their reservations.
Q. So she appeared to be traveling with a male?
A. Yes, on a separate reservation.
Q. What was that man's name.
A. Ronnell Lockhart.
Q. And is that spelled R-O-N-N-E-L-L L-O-C-K-H-A-R-T?
A. Correct.
Q. And were Ms. Palmer and Mr. Lockhart and the -- you said there was a child in common there?
A. They were listed in common in the records, yes.
Q. And was Mr. Lockhart traveling with any other minors?
A. Yes, there was another minor child.
Q. So appears to be a party of four, two adults, two children?

A. Correct.
Q. Were they all seated close to each other?
A. Yes.
Q. And how did you go about intercepting Mr. Lockhart and Ms. Palmer?
A. Well, since the information received was that the narcotics was supposed to be transported in their carry-on luggage or on their person, we staged in the gate area, in the jet bridge area, of the arriving aircraft.
Q. And you said you staged. How many people were involved in this?
A. Probably approximately six or so investigators, maybe more, and two canines.
Q. And what was your role in the interdiction?
A. So I positioned myself with a canine handler at the bottom of the jet bridge, which the jet bridge is the ramp that people get off the plane and walk up into the gate area.
The bottom refers to the area where the aircraft hooked -- the jet bridge connects to the aircraft, and the passengers step off the aircraft onto the jet bridge.
Q. So let me see if I have this right. You're right where the people are actually stepping off the plane and into that kind of corridor that you take to get back into the airport?
A. Correct.

Q. And then you have another team who is at the gate where people leave that corridor and enter the actual airport?
A. In the actual gate area, correct, where the seats are and passengers wait to board.
Q. And you said that you were with a dog?
A. Correct.
Q. Was there a dog handler with you?
A. Yes.
Q. Who was that?
A. Detective Mark Altendorfer. He's a Ramsey County deputy assigned as a task force officer with DEA.
Q. Can you give us that first name again?
A. Mark.
Q. So is that M-A-R-K?
A. I believe so, yeah.
Q. And then A-L-T-E-N-D-O-R-F-E-R?
A. Sure.
Q. What is the dog's name, do you recall?
A. His dog is called Molly.
Q. So did you see Ms. Palmer and Mr. Lockhart come off?
A. Correct.
Q. Who came off the plane first?
A. Ms. Palmer I believe came off first, followed by Mr. Lockhart.
Q. Did you notice whether Ms. Palmer was carrying any

carry-on bags?
A. I believe she had some items in her hand, bags, and then there was also a small child, like an infant.
Q. And then was Mr. Palmer behind her -- excuse me -- Mr. Lockhart behind her?
A. Correct.
Q. What was the dog Molly -- what was Molly doing as the passengers walked past?
A. Detective Altendorfer had Molly doing open air sniffs of the passengers as they walked past.
Q. And what does the dog do when she smells narcotics?
A. When the dog recognizes an odor, it is trained in the dog's passive response canine. So it's trained to sit, instead of like bite or scratch at it.
Q. Did the dog react as Mr. Lockhart passed?
A. The dog I believe alerted on Mr. Lockhart, correct.
Q. And you said Ms. Palmer was carrying some carry-ons. Did she do anything with them as they walked down the jet bridge?
A. Yes.
Q. What did she do?
A. So after they passed myself, Mr. Lockhart retrieved a car seat that was positioned down at the bottom that the baggage handlers will generally bring those up and let the passengers collect them as they get off the aircraft.

Once he did that, they started walking up together the jet bridge towards the gate area.
Q. And at any point did she pass anything to him?
A. Yes. So at the top of the jet bridge just prior to entering the gate area, she handed a light colored bluish-gray bag that she was carrying off in her hands over to Mr. Lockhart.
Q. You saw that transfer happen?
A. Correct.
Q. Now, did they appear to note your presence when they did that?
A. Yes.
Q. What makes you say that?
A. While they were walking up the jet bridge after us standing down there with the dog sniffing them, they had looked back at me a couple times while they were having a conversation. I'm assuming it was about me, but I couldn't hear what they were saying.
THE COURT: I'm going to have you slow down.
BY MR. CALHOUN-LOPEZ:
Q. Hard to do.
What did Mr. Lockhart do when he took that bag from Ms. Palmer?
A. He took possession and then kind of tucked it under his left arm where there was a blanket hanging over his

shoulder.
Q. And you said there are other officers positioned at the gate area; is that right?
A. Correct.
Q. Was there a dog there?
A. Yes.
Q. What was that dog's name?
A. Zippo.
Q. And Zippo had a handler, I assume?
A. Yes.
Q. Where was Zippo stationed?
A. Zippo was stationed with his handler in the gate area directly in front of where the passengers would enter the gate area from the jet bridge.
Q. And did Mr. Lockhart walk past that dog?
A. Yes.
Q. Where did he go from there?
A. Immediately after that dog conducted a sniff on him, he separated from Ms. Palmer, and he started walking directly out of the gate area in the direction where the exit would be from the secured side to the unsecured side.
Q. He left Ms. Palmer behind him?
A. Yes, they separated.
Q. What about the kids? Did he leave them behind him?
A. The infant was with Ms. Palmer, and the small child that

was with him was following behind him a short distance.
Q. But he, was he moving faster than the child?
A. Yes.
Q. Did that strike you as odd?
A. Yes.
Q. Why?
A. Well, typically when we see people traveling together, they usually stay together, and they're usually aware where their children are at, and they kind of keep them with him.

He seemed more determined to get away from us than worrying about where his child was.
Q. And there are cameras at the Minneapolis/St. Paul airport; is that right?
A. Correct.
Q. Did they capture these events?
A. Yes.
Q. Have you reviewed video of this encounter marked for identification as Government Exhibits L1 and L2?
A. Yes.
Q. And are those videos true and accurate recordings of the events you just described?
A. Yes.

MR. CALHOUN-LOPEZ: Your Honor, at this point I move to admit what's been marked for identification as Government Exhibit L1 and L2, as well as still frames that

are marked as L1a and L2a.

THE COURT: Any objection?

You may.

Those are admitted. Thank you.

MR. CALHOUN-LOPEZ: And I'll publish for the witness and for the jury what has been admitted as Government Exhibit L1.

BY MR. CALHOUN-LOPEZ:

Q. Just at the beginning here, this is at the gate where the passengers disembark; is that right?

A. Yes. So this is hotel six at terminal two. And the open door at the top left of the screen is the top of the jet brim where the passengers will come off into the gate area.

Q. And I'll begin the exhibit now.

(Video recording played)

Q. Pausing about 16 seconds in. Do you recognize the people who are just in the upper left-hand corner of the frame here?

A. Yes. So the child that was traveling with Mr. Lockhart is in the beige hoodie with the hood up, carrying a black bag on his shoulder. And then in the jet bridge area partially in view in the red sweatpants is Mr. Lockhart, and then immediately to his left is Ms. Palmer.

Q. Resuming the exhibit.

(Video recording played)

Q. And pausing it at 19 seconds here. What just happened?

A. Ms. Palmer handed off the blue bag, which now is currently tucked under that towel under his left arm of Mr. Lockhart.

Q. Resuming the exhibit.

(Video recording played)

Q. And the exhibit is concluded.

Sergeant Trevino, are you in the final frame here at about 24 seconds?

A. Yes. I'm directly behind them in the red T-shirt.

Q. And I'll now publish what has been admitted as Government Exhibit L1a.

And going to the second frame. This is the transfer; is that right?

A. Correct.

Q. I'll publish now what has been admitted as Government Exhibit L2. This is another, another angle of that gate area; is that right?

A. Yes.

Q. And I think we see Zippo there in the center of the screen?

A. That is correct.

Q. I'll publish the exhibit.

(Video recording played)

Q. And pausing it about 19 seconds. There you just walked past the dog; is that right?
A. Yes.
Q. You said at this point he began to walk away and he left the boy behind him. Is that what happens at this points?
A. Yeah, at that point he starts heading towards, in the direction of the exit for the nonsecured side, which would be in the upper right corner.
Q. I'll resume the exhibit.

(Video recording played)

Q. And the exhibit is concluded.
Did you and other officers make contact with Mr. Lockhart?
A. Yes. Myself and DEA TFO Burton Crary.
Q. And did you ask for consent to look in his bag?
A. Yes.
Q. Did he give you consent?
A. Yes, he claimed it wasn't his bag.
Q. What did he -- whose bag did he say it was?
A. When questioned about the bag, he gave the indication that his son actually had picked up another passenger's bag on the aircraft and handed it to him at some point.
Q. And did you confront him with the fact that you had seen Ms. Palmer hand him the bag?
A. Yes.

Q. What did he say at that point?
A. He initially, he basically tried to distance himself like he wasn't traveling with her.
Q. And did you look inside the bag?
A. Yes.
Q. What was inside the bag?
A. A large quantity of pills.
Q. You've been an investigator for 31 years you said?
A. Yes.
Q. Have you had training in drug identification?
A. Yes.
Q. Have you encountered fentanyl before?
A. Yes, I've probably discovered or been around over a million pills.
Q. And so you are familiar with its shape, size, color and texture?
A. And markings, yes.
Q. And these appeared to be fentanyl pills?
A. Well, they were blue, round, pills with M on one side, 30 on the other, which are, if they were actually not counterfeit pills, they would be Oxycodone 30-milligram pills.

But in that quantity, when we find that quantity, it's almost always counterfeit fentanyl pills.

MR. CALHOUN-LOPEZ: I request permission to show

the witness only what has been marked for identification as Government Exhibit L4.

THE COURT: You may do so.

BY MR. CALHOUN-LOPEZ:

Q. Do you recognize this photograph, Sergeant Trevino?

A. Yes.

Q. Are these the fentanyl pills you found?

A. Yes.

Q. True and accurate capture of the pills?

A. Yes.

MR. CALHOUN-LOPEZ: Your Honor, at this point I move to admit what's been marked for identification as Government Exhibit L4.

THE COURT: Any objection?

L4 is admitted.

MR. CALHOUN-LOPEZ: Publishing the exhibit for the witness and for the jury.

BY MR. CALHOUN-LOPEZ:

Q. It appears there are four bags here; is that right?

A. Yes.

Q. A substantial amount of fentanyl?

A. Yes.

MR. CALHOUN-LOPEZ: And just as a final matter here, Your Honor, may I approach the witness one last time?

THE COURT: You may.

BY MR. CALHOUN-LOPEZ:
Q. Sergeant Trevino, I've just handed you what has been marked for identification as Government Exhibit L5. Do you recognize the contents of that bag?
A. Yes.
Q. How do you recognize them?
A. They appear to be the same pills from the picture that we recovered that night.
Q. Substantially the same condition as they were when you seized them from Mr. Lockhart?
A. Other than being repackaged in evidence tape, yeah.
MR. CALHOUN-LOPEZ: Your Honor, at this point I move to admit what's been marked for identification as Government Exhibit L5.
THE COURT: Any objection?
L5 is admitted.
BY MR. CALHOUN-LOPEZ:
Q. What did you do when you realized that Mr. Lockhart was carrying all those bags of fentanyl?
A. He was taken into custody.
Q. Thank you, Sergeant Trevino.
MR. CALHOUN-LOPEZ: Your Honor, I have no further questions.
THE COURT: Any cross-examination?
All right. Thank you, sir. You may step down.

(End of requested excerpt)

* * *

I, Renee A. Rogge, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Certified by: /s/Renee A. Rogge
Renee A. Rogge, RMR-CRR