UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| United States of America, | ) | File No. 23-cr-160 (NEB/JFD) |
| Plaintiff, | ) | |
| v. | ) | |
| Tyreese Giles(6), Josiah Taylor(7), Trevaun Robinson(10), William Banks(19), Gregory Brown(26), | ) | Courtroom 13W<br>Minneapolis, Minnesota<br>Thursday, May 29, 2025<br>2:05 p.m. |
| Defendants. | ) | |

BEFORE THE HONORABLE NANCY E. BRASEL
UNITED STATES DISTRICT COURT DISTRICT JUDGE

**VOLUME XI - JURY TRIAL PROCEEDINGS**
**EXCERPT OF CLOSING ARGUMENTS OF PETER WOLD AND PAUL ENGH**

Court Reporter: RENEE A. ROGGE, RMR-CRR
United States District Courthouse
300 South Fourth Street, Box 1005
Minneapolis, Minnesota 55415

* * *

Proceedings recorded by mechanical stenography; Transcript produced by computer.

* * *

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | UNITED STATES ATTORNEY'S OFFICE<br>BY: THOMAS CALHOUN-LOPEZ<br>CARLA BAUMEL<br>300 South Fourth Street, #600<br>Minneapolis, Minnesota 55415 |
| | DEPARTMENT OF JUSTICE<br>ORGANIZED CRIME AND GANG SECTION<br>BY: BRIAN W. LYNCH<br>ALYSSA LEVEY-WEINSTEIN<br>1301 New York Avenue NW, #700<br>Washington, D.C. 20530 |
| For the Defendant Tyreese Giles(6): | RIVERS LAW FIRM, P.A.<br>BY: BRUCE RIVERS<br>701 Fourth Avenue South, #300<br>Minneapolis, Minnesota 55415 |
| For the Defendant Josiah Taylor(7): | WOLD LAW<br>BY: PETER B. WOLD<br>JOHN FEE<br>331 Second Avenue South, #705<br>Minneapolis, Minnesota 55401 |
| For the Defendant Trevaun Robinson(10): | PAUL ENGH, ATTORNEY AT LAW<br>BY: PAUL C. ENGH<br>150 South Fifth Street, #2860<br>Minneapolis, Minnesota 55402 |
| For the Defendant William Banks(19): | CATHERINE TURNER, ATTORNEY AT LAW<br>BY: CATHERINE L. TURNER<br>331 Second Avenue South, #705<br>Minneapolis, Minnesota 55401 |
| For the Defendant Gregory Brown(26): | NORTH STAR LAW GROUP PLLC<br>BY: DANIEL S. ADKINS<br>1295 Bandana Boulevard North, #335<br>St. Paul, Minnesota 55108 |

* * *

**I N D E X**


| | PAGE |
|---|---|
| Defendant Taylor's closing remarks | 3 |
| Defendant Robinson's closing remarks | 28 |

2:05 P.M.

**IN OPEN COURT**

**(JURY PRESENT)**

MR. WOLD: Can we just have a couple minutes to get this hooked up?

THE COURT: Sure.

MR. WOLD: Josiah Taylor was a prescription drug dealer. That's a fact. Josiah Taylor sold prescription pills in northeast Minneapolis. He sold prescription Percocets. He conspired with absolutely no one to do so.

He didn't get his supplies of pills from any gang member on the north side or anywhere. He didn't share territory. He didn't sell on Broadway. He traveled alone to get his supply. When he came home, he wasn't met by some other gang member. He was met by his significant other and his children.

He didn't share his customers. He sold his pills by himself and kept the money for him and his family. And not once, not one time, did he sell fentanyl. Not once did he help anyone sell fentanyl. Not once. Never.

This case would have been resolved a long time ago if Josiah had been properly charged with possession and distribution of prescription meds in Hennepin County court, but that is light years away from what happened here.

Racketeering and murder. I have a bit to unpack

here. Josiah Taylor gets a separate trial, as each of these gentlemen do. You must compartmentalize the evidence and charges against each.

There is no such thing in our justice system as guilt by association. We have the constitutional right to associate. Judge Brasel will even remind you in her instructions of our constitutional right of freedom to associate, of speech, and freedom to go to a funeral of a childhood friend without being labeled a criminal.

The context of your job as judges of the facts is to do so through the lenses of our constitutional principles of the presumption of innocence and proof beyond a reasonable doubt as peers of Josiah Taylor.

It seems like a long time ago, but when I first had ten minutes to talk to you in our jury selection process, I talked to you about the presumption of innocence and the vital importance it has in our justice system.

I asked each of you honestly if you could look at Josiah Taylor and presume he was innocent, and that carries with him through the point and only the point you can find him guilty beyond a reasonable doubt of every element of an offense. And there's a reason for that. I think it is unnatural for us as citizens to presume innocence.

You know, I mentioned you see a 15-second spot on TV at night of someone in a jail outfit accused of a crime.

You just, of course he must have done it. That's what we think, but that's not here. And there is a reason for it.

Think of the name of this case. The United States of America versus Josiah Taylor. The United States and its resources, the FBI, the BCA, the DEA, their forensic scientists, their phone experts, their drug experts, their highway camera systems, versus Josiah Taylor and his court appointed lawyer.

It's the epitome of an underdog. That's the need of the presumption of innocence. And I asked you at the beginning to apply it to Josiah Taylor and apply the presumption of innocence to him as you would someone you cared about and presumed was innocent as they, as they are with you.

If an accusation was made against a member -- or a mentor or a family member or someone you trusted and loved, you would say, no, it's not true. You would say, no, it's not true, and you would hold that belief, unless that evidence was overwhelming to prove that otherwise, and that's the presumption of innocence. And if you don't give that to Josiah Taylor, you are ripping him off.

Proof beyond a reasonable doubt is the heavy burden the government must carry, and you've heard about that. I won't repeat it.

I will tell you now my argument will proceed in

three parts. First, the murder of Harvey Williams. Next, the myth that the Highs is a RICO enterprise, and lastly, I will address the three charges against Josiah Taylor.

Harvey Williams. The murder accusation and investigation should be an embarrassment to any law enforcement agency and any prosecutor.

First degree murder, it does not get any more serious than that. I am confident that each of you would agree that no one should be charged with that heinous crime without a thorough investigation.

You heard from Sergeant Jensen about his theory of the case, and we will go through his testimony and everything he ignored. He jumped to a conclusion and filled it in backwards.

Initially Sergeant Jensen testified that he heard this from an anonymous source, that Matt Robinson and Harvey Williams had some beef, and they were at a football practice together. And Matt Robinson wanted him offed. That's what he heard. That was the anonymous tip.

Yet, he did absolutely nothing to check that out. We know from Sergeant Jensen's testimony and from the evidence presented that both he and the Minneapolis Police Department failed to investigate Matt Robinson. They did not even talk to him.

They didn't check to see if he was even at that

football practice. They didn't see if he had a kid at that practice. They didn't even check what kind of car he drives and didn't care. You saw it here. They entered, you know, what, three or four clips from a 20-minute video to prove this case to you?

I showed him where Matt Robinson was in his vehicle. And you saw Harvey, a supposed rival gang member to Matt Robinson, hanging out next to Matt's car for minutes and minutes and minutes talking with him. You have the video. We introduced the whole thing, so you have it. They're talking. He's at one point handed a box of donuts. He's given a donut.

Did you see any body language or anything in this relationship of any animosity of a rivalry, of a beef? There was none. It didn't matter. They didn't even look at it.

Next, how about this supposed U-turn that they chose, not you, the finders of fact here, that it was even important enough to show you this, how they contend a Lincoln Navigator did a U-turn two blocks down the road in the dark and came back.

I introduced the full video to you. You can see that. We showed it to you. You saw the Lincoln Navigator take off out of the parking lot and continue straight. Watch the video carefully.

Ask yourself this: Why go two blocks if you are here to surveil this guy? Why go two blocks and make a U-turn and turn around and come back? Why not just turn and park in this hidden place in the parking lot apparently where Jensen thinks it happened.

And then his theory is, it's this Navigator flashing its lights. And what sense does that make? What message would that be signalling? And to whom?

Matt Robinson's car had just left minutes before with his son and Josiah's son. That's what Josiah came back to see, if his son was still there. You -- all these phone calls about -- well, we will get to that.

Harvey Williams left of his own accord. The Sergeant Jensen continued or contended that this vehicle pulled up out of sight and in his speculation just waited out of sight and then after Harvey Williams went by followed Harvey Williams. Can't see that. You can't see that. Speculation.

That's just his. For all we know, all you know, the Lincoln Navigator kept going down the road, or if it was the Lincoln Navigator that came back, you can never see it parked out of sight in a parking lot and follow Harvey Williams.

All you know is, it took a left and kept going. That's a conclusion you jump to, if you don't want to

investigate a case.

How does that make sense? You know, you could just walk down that street with the officers you have from the Minneapolis Police Department and see if there was anyone that had a camera on the houses going down there and see if that car made a U-turn or see if that Lincoln Navigator came back and parked in that hidden spot in the parking lot. Might that be helpful? Might that be a good investigation?

You, we know, after the Lincoln Navigator leaves that parking lot, it can never be identified again by video. No license plate. Never see a 24 in the windshield. Never see a silhouette of a heavyset, long-haired person in the vehicle. You are just asked to assume that that's a Lincoln Navigator.

You know, all due respect to Sergeant Jensen, all due respect, but in his report after the Navigator leaves the parking lot, Sergeant Jensen refers to the vehicle that he thinks is following the red Monte Carlo as a black SUV, but not when he's testifying yesterday. It's Navigator, Navigator, Navigator, Navigator. We're past this. Just repeating the word doesn't make it any more true.

His U-turn is a guess. A simple scapegoat, an easy answer born from an easy target. I will show you -- and then they had the phone expert come on. I'm sure you

waited at that point, and this is going to show the contact between Matt Robinson, who wanted to off this guy apparently, and Josiah Taylor.

And then we'll show the Navigator at the murder scene. That's what you might have anticipated. It never happened. What you saw were two calls, maybe, maybe that went through, brief calls, one at 7:43 and one at 7:48 between Matt Robinson and Josiah Taylor. That's it.

You will also see Meko Holbrook phone records, and her phone and Josiah were in constant communication throughout this whole process.

What -- and then that's on page 10. It's Exhibit GG18 of the government's exhibit that will show those, only those two calls. I mean, did you anticipate when you heard this story that, that Matt Robinson wanted to "off" Harvey Williams that there might have been a call after he got there and Harvey Williams was standing outside his car to say, Josiah, better get over here, I need your help.

Nothing. Not a call. Then, you know, it wasn't until football practice was about to end and he's calling Josiah about his son, that's the first call.

Interesting, you will see in that same exhibit, and I'll direct you to page 12. Between 8:00 p.m. and 8:12 p.m., there are four calls to Matt Robinson. None of

them from Josiah Taylor.

Do you think it might have been a good move by an investigator to check out those -- if you are not going to talk to Matt Robinson, maybe you could just run those numbers and see who's calling him right after a murder happened. Nope. Didn't need to do that.

You heard that Sergeant Jensen and all his resources and personnel of the Minneapolis Police Department couldn't bother to try to identify or question any of these guys standing next to Harvey out at the scene. Do you think that might have given some information?

They couldn't even bother checking this guy that the anonymous caller had said was there with Matt. He was identified as the anonymous tipster as a person called Midtown. We never heard that name before, and we never heard it again.

Do you think they might want to check who this guy is after the anonymous call? Didn't happen. The government skipped right past that.

That's the investigation in a nutshell, just pick a target, jump to the conclusion, stick with it, no real investigation, no follow-up, easy, thorough, police work at its very finest. Call it a day. Call it a day.

He's just a black boy from the hood. That's enough. That's enough for him. And how about Harvey

Williams? Do you think he deserves a little better investigation than that?

The reality is that the very last time the Navigator could be identified is when it enters and leaves the lot the second time. Watch the videos. Navigator leaves minutes after Matt's car has left with his son, which itself was a matter of minutes after the call between Matt and Josiah. The Navigator exits the lot and is out of sight. The U-turn is a fiction of convenience.

The vehicle that flashed its light and turns does look like a dark SUV. That's true. But you also saw all the dark SUVs in that parking lot. Given the nature and laxity of this investigation, it seems like a conclusion born of laziness, open and shut, no need to check out anything or anyone else, especially those, they are named by the anonymous tipster.

And keep in mind. Josiah Taylor was never mentioned by any anonymous tipster.

Next, you saw the Ring camera. You saw the Monte Carlo slow, which turned left at the intersection. Behind it a ways was the dark SUV. Can't identify that as a Navigator. A third vehicle got between the Monte Carlo after progressing through the intersection. Then the dark SUV turns left.

Can you identify it as a Navigator? Convinced

beyond a reasonable doubt that that's a Navigator? No way. Moreover, what is the very next car to follow through the intersection? Another dark SUV, an unidentifiable SUV.

Now on to 49th and out of sight and any camera -- and out of sight of any camera goes the Monte Carlo, then the sedan, then the first dark SUV and the second SUV. It's minutes before you see anything else to the next camera.

And you do see a dark SUV run the stop sign. It's a dark SUV. You saw the video of the intersection. It's a dark SUV.

Do you know the occupants of any car murdered Harvey Williams? In the five minutes before -- and we give you that tape too, or that video -- before the SUV and the Monte Carlo run the stop sign, you see no less than eight dark SUVs on the camera.

You also saw vehicles heading in the direction of the Monte Carlo from the west -- from the east just before the shooting. The sedan that was in between the Monte Carlo and the two SUVs seems to have turned off somewhere. Do you remember that one? I highly encourage you to review that.

At least one of the two dark SUVs is gone too. Seems to have turned off too. Where? When? Which one? Did another SUV turn in between? There's seven different streets between Humboldt and 94.

It was a dark SUV. We don't know where the

Navigator is now. Is an oncoming westbound shooter possible? At least I asked that question. We don't know. It didn't seem as though Sergeant Jensen, when I brought that up, had thought about the possibility I posed to him. He said, yes, it's possible, now that he thinks about it. Would that scenario be consistent with the bullet pattern?

And conversely, could a single person driving a big SUV fairly quickly shoot a switch, Glock? It's shooting 30, 40 rounds out a window and down, and hit a car? Is that -- you buying that? That's just what he said this morning. Please, please.

You heard when I asked the first person about shooting a gun like that, certainly the kickback is incredible. I wouldn't personally know, but I can imagine a .40 caliber shooting 30 rounds in a matter of seconds, it's going to be incredible.

You would think holding with two hands is what they recommended, but driving and taking -- (indicating), are you kidding me? That's proof beyond a reasonable doubt. Let's get him. Let's get him. That's enough for him. Got the black boy from the hood. That's enough, isn't it?

They didn't find any signs of shooting inside that vehicle, and you heard about it.

There was a guy, you saw him at 7:20, that got in the back of a Navigator. The tape had dropped off, but you

saw him get in the back of the Navigator. Did you ever see anyone in that car again?

I imagine the next part of the story is there must have been someone, some unidentified person in the back of the car, that will be the second story. But they have to prove that beyond a reasonable doubt too, if that's going to be a new story.

You heard that no shell casings were recovered from the Navigator, no gun smoke, no residue, nothing like that.

And, you know, they're asking you to guess that Josiah Taylor is guilty of first degree murder. And this was -- you might remember forensic scientist Joshua VonHaugg? Do you remember him? A young guy, he was at the scene that very night.

They walked through, and he found the bullet casings and brought them in. He talked about, about that's what they put him up there to do.

But what they omitted telling you was he also checked fingerprints. He also checked fingerprints, known fingerprints that they had, and they excluded Josiah Taylor.

Is that something that as a fact finder you would like to know? Do you think they should tell you that? They left it out. If I wouldn't have brought it up, you never would have known.

And let me just bring up one other point. The fifth witness in this trial was a woman named Renee Tremaine, I think. She was a forensic scientist from the very Minneapolis Police Department. I asked her one question on cross-examination: Can a shell casing be tested for DNA? Would a shell casing be able to demonstrate DNA? And she says, yes, it could.

So after Mr. VonHaugg answered my questions about the fingerprints that didn't match Josiah Taylor, I asked him about DNA on these shell casings. And he says, well -- I mean, this is the same, from the same office, I believe, as Ms. Tremaine. He says, well, we don't do that. That's what the BCA does.

So what did the BCA find? That's interesting. And I want to bring up why it's interesting, because you will remember Lieutenant Lepinski testified here, and he talked about the, I think it was June of 2022 when Josiah and his friend Matt Robinson were sitting in his vehicle at 21st and Washington.

And Lieutenant Lepinski came up, and that's where they knew they'd find Josiah because that's where he sat and sold his prescription Percocet. And there he was. He took off. It wasn't a high-speed chase. He went about ten yards I think and got caught between the light pole and the building.

And in the back compartment they find this gun. And what the prosecution wanted to tell you was, this partial print on the extended magazine that was in that gun matched, they think, the left thumb of Josiah Taylor. That's what they wanted you to know. That's all they told you, right? Do you remember that?

If I wouldn't have asked Lieutenant Lepinski, there was DNA testing done on that gun, wasn't there? Yeah. And that DNA testing excluded Josiah Taylor, didn't it? Yeah, it did. And that DNA testing showed Matt Robinson's DNA was all over that gun? Yes, it did.

Do you think as fact finders that would be something you would expect the prosecution to tell you when they're trying to convict this black guy from the hood? Do you think?

So that's, that's what, that's what happened. And let me remind you of one thing, and maybe you haven't noticed this. That was the only gun associated in any way with Josiah Taylor, found in that vehicle of his in June. And we'll get there, but what happened. Remember in that car, Matt Robinson comes out through the back. He comes out through the back of that car and then through the red car to get out.

Matt Robinson lifted that thing up there and put his gun in there, and that's how it was found. That was his

gun. That was his DNA. That's the only gun that you've ever seen close to Josiah Taylor in this case. There is no photograph of Josiah Taylor holding a gun.

There has been not one witness that has said they've seen Josiah Taylor with a gun. But somehow in this murder that was so well investigated, Josiah Taylor somehow shows up with a machine gun Glock to carry out a murder.

So, you know, this homicide, this murder was turned over to this group when they started in 2023. And they indicted Josiah Taylor, and that's the first time he hears he's involved in a murder.

And as anyone should see, this is far from an investigation. This is far from a murder investigation. This is far from proof. So they need help. So what do they do, they begin auditioning snitches to find somebody that can help them with this case. That's what they did.

And sure enough Avante Nix learned that the government needed help with a murder case against Josiah, so he knows the drill. He auditions. And remember. Remember. He testifies here in front of you that, yeah, he knew Josiah Taylor because he thinks he had a relationship with his father.

That's what he told you. That's not what he told the government when he's auditioning to be their snitch, to be their cooperator, to reduce his sentence. And as he told

Andrew Schroeder, his handler, he expected he'd walk after this case, after his cooperation.

But he told them, he told them he could help them with Josiah Taylor because their families were close, their families hung out together. In fact, he called Josiah Taylor uncle. That's what he told them when he's auditioning for this job.

Interesting. You heard me ask him. Do you know Josiah's mother Ruth? No. Could you name any of his five kids? No. Do you know where he lives? No. But you got his foot in the door. They hired him as a cooperator. And they can believe whoever they want, but so can you. So can you.

So Avante Nix comes in and says, yeah, he just, Josiah just told me out of the blue that he killed Harvey Williams. The rest of the story he hadn't quite got it put together, really, because you remember. He said, yeah, he was driving a black Impala when he did this shooting and in fact he sold it to my friend Bubba, right? Do you remember him telling you that?

Well, did you hear from -- Josiah Taylor's never had a black Impala. You will never see a black Impala in any of these videos you watched about this murder, but that's what Avante Nix said. The government didn't bring that out when they had him on the stand that that's what he

told them.

I mean, you -- all lawyers like to win their cases, but can we be honest about it?

You heard enough about Avante Nix. Obviously he doesn't care much for me, and that's fine. But that's what they added to this murder charge to prove beyond a reasonable doubt that Josiah Taylor is a first degree murderer.

If that's proof beyond a reasonable doubt, you know, God help us all. That's, that's all I can, that's all I can say.

I am, I am moving on. I'm going to talk now. It's -- I have notes here I'm using, because I can't miss anything here. This is, this is very, very important.

I'm going to talk about RICO now. Josiah grew up in North Minneapolis. He grew up on the North side. It's a unique part of this city. Poverty, poor schools, neglected infrastructure, but still a real community.

Young boys sought support and structure often when it wasn't available in their homes. They associated in neighborhood groups. Some became known as gangs. Some became violent. Josiah's boyhood friends were associated with the YNTs, and he was, he became associated with them too. Young N' Thuggin. Just associated. They were his friends.

Randy Tate, Prince Martin, Matt Robinson. None of them were violent as Josiah hung out with them. It was their community. It was their neighborhood. They remained his friends. Those are the names of people you have seen and heard him sharing time with. They were friends, but they were all individuals, responsibile for their own lives.

Across the neighbors, there were many other cliques of friends. Some were quiet. Some were not. Some were violent. Some were not. Some shared their space and their friendships, and some didn't.

But there was never an affiliation, as the government claims, of a notorious criminal enterprise that's an umbrella overall of them.

In my opening statement, I said the Highs or high end was a term of convenience created by the Minneapolis Police Department. And there have been in this case over 30 Minneapolis police officers that have testified here, and including Hennepin County Sheriff's deputies.

And not one of them has disputed that characterization that I made at that time. In fact, you heard Mr. Engh ask Lieutenant Lepinski that directly. He noted to Lieutenant Lepinski, quote: "I wrote down a sentence that you mentioned at the start of your testimony. You said, 'We called them the Highs.'"

And Lieutenant Lepinski says, "Yes, that's true.

That's what we called that neighborhood. It's a term we use."

You may remember Investigator Erin Voss, who was the eighth witness here. She is a case agent with the rest of this group. She testified that the Highs was an umbrella over all the north side gangs. I asked her who invented this umbrella, who came up with this umbrella over all north side gangs.

I asked her who started this, who conjoined this, who can withdraw. And she seemed confounded by all of those questions.

So what does the government do to prove the existence of this super umbrella gang? They call two cooperators: Avante Nix, Jovan Knight. Interesting choices. Interesting choices.

They had several answers that were the same. First, both of them conceded prior to meeting with the government in 2022 or 2023, while auditioning to be cooperating witness, that they had never used the term "Highs" before as a group they belonged to. They were proud members of Sayless and proud members of FreeShotz. They had bragged about the association with these gangs, but never once mentioned a mega gang called the Highs.

And then I asked, you might remember, obviously, I irritated young Mr. Nix by asking him about this

association, but I asked him, how did you get in? And he just said, well, we're in because we're there.

I say, Can you get out? And they said, You can't really get out. Kind of like the Twilight Zone, it seems. It's interesting.

And don't forget Mr. Knight said that the FreeShotz and the YNTs don't really get along at all. They would rob and shoot each other. He told Sergeant Schroeder that FreeShotz don't have shit to do with the YNT, that they weren't homies, that they didn't get shit from them and don't really sound like working together.

That doesn't sound like working together. That doesn't sound like a group effort. That doesn't sound like an umbrella of friends that work together.

Let me make a point here. There are plenty of ex-gang members out there, ones that have been busted and did their time and then gone straight and reintegrated in society.

Did we hear from one of those that's not getting paid to testify? Did you hear from one of those that's not working to get out of jail? Did you hear from one of those to say, yeah, the Highs is a real umbrella organization? No, not one. Not one.

You only heard from a couple of desperate young men that are bargaining for their substantial assistance.

The Highs just is not an enterprise, and Josiah Taylor absolutely never worked for the Highs or anyone but himself.

Josiah sold prescription Percocet in northeast Minneapolis by himself for himself. Not one time did he buy pills from another person on the north side, whether they are in a gang or a clique. Not once did he share his small profits with anyone but his family.

Not once did you hear or see Mr. Taylor selling his Percocets in High territory. Avante Nix told you where he would find him selling his pills, 21st and Washington. 21st and Washington. You may remember him testifying to that.

I asked him is that where Josiah Taylor sold his pills, and he said, yes, that's where he did. And Mr. Lynch then asked him on redirect, yeah, but, but, but he sold them on Broadway too, right? Negative. Negative. They need to get him over in Highs territory to be a part of the group.

You see? You see? That's the point of the question. That was a bad answer for them that Josiah Taylor doesn't work the block, because he doesn't. He's not working for any organization.

Let me just attempt, and maybe I'm going too long here, but this is so important to me to help this young man.

I grew up. I grew up -- this is an analogy. I grew up in a small torn in northern North Dakota. Bottineau

is the name. It was my home, my neighborhood. I loved it my boyhood friends were all there, many still are. I still see them. They still are my friends. We were loyal to a point.

Our main rivals were five miles away in other town called Rugby, the Rugby Panthers. We were the Bottineau Braves. We had great disrespect for each other. And like many young folks, we displayed that disdain for each other. But there was nothing I did for the good or the bad that was in the name of my community.

Everything I did for better or worse was for my personal agenda, my personal responsibility, and the very same is true of Josiah Taylor. He associated with YNT, but his life was his own, his actions were his own responsibility.

I thank you. I want to just look, if I can, at the charges against Josiah Taylor, and I'm going to show you the verdict form as it relates to Josiah Taylor.

His Count 1 is this RICO conspiracy. And you see it there. The question you will face is, is Josiah Taylor guilty or not guilty of racketeering, being a member of the Highs gang. The answer is, no, he's not a member of the Highs gang.

Josiah Taylor gave the same YNT group sign that he's a member of. That's all. Josiah Taylor never did

anything for the Highs ever, ever. That's just a no.

And you go down, and I'm not even going to do it, because he's not a High and never was. He's not guilty of being involved in a racketeering enterprise. And you see the questions after that.

If you go after that, did he intentionally distribute fentanyl? Well, you know that never ever happened. There was never even a suggestion that Josiah Taylor sold fentanyl to anyone. And the same is true of the next question.

And then you get to (C), and that is, is he guilty of first degree murder, and that would be a tragic mistake, tragic mistake if you made that choice. That's Count 1. You just go past it.

Count 3 is the next charge he's faced with, and that's a conspiracy to distribute controlled substances, and I've talked about that. Josiah Taylor sold pills by himself. He conspired with no one. And you know they went through this, Mr. Lynch did, and the four people they're charged with conspiring sell fentanyl, that's not Josiah Taylor.

Josiah Taylor never ever did. Josiah Taylor sold pills by himself. And if there was a crime charged like this, they can charge him in Hennepin County tomorrow with that offense, and we'll take care of it, because he did it.

But he conspired with no one to distribute controlled substances.

You can just -- I mean, look at the rest of the questions. If you find him guilty, then look at these. Did he sell more than 400 grams of particular amount of fentanyl or, or less than 400 grams, more than 40?

Yeah. He just didn't do it. That's not Josiah Taylor.

And then here, here's Count 7 is the last charge, and that's the June, whenever it was, 2022 summer deal when he was caught, and his buddy Matt Robinson was in his car, and Matt had his gun that he stashed in the door before he got out.

That was Matt Robinson's gun. His DNA was on it. And there's no DNA of Josiah Taylor on that gun. He can't possibly be guilty of that last charge.

It's hard not to get emotionally involved in these cases when you work closely with a decent young man like Josiah Taylor. And he is just not -- he's not a perfect young man, not perfect in many respects, but he is not guilty of the charges that were brought here.

And I very respectfully ask you to find him not guilty of these charges, because he's just not guilty.

Thank you.

THE COURT: Thank you, counsel. We'll take a

15-minute break, and we'll come back at 3:25.

All rise for the jury.

3:10 p.m.

**IN OPEN COURT**

**(JURY NOT PRESENT)**

THE COURT: We're in recess until 3:25.

(Recess taken at 3:10 p.m. till 3:30 p.m.)

3:30 p.m.

**IN OPEN COURT**

**(JURY PRESENT)**

THE COURT: Thank you. You may all be seated.

And Mr. Engh.

MR. ENGH: May it please the court. Counsel for the government. Counsel for the defense. Mr. Robinson.

Ladies and gentlemen of the jury, this is about a place that you will never be at. It's an, it's an intersection of life that undoubtedly feels strange to you. It's a place where horrible things have happened, and it is a place that is nonetheless familiar to Mr. Robinson.

The case is sort of a dialectic in a way because how you evaluate happened at this place will dictate your verdict. There's a lens that you look at at this place without any help from the law; and just as a visceral response to it, it's a place of open air drug dealing and murder and car accidents and shootings, killing stations,

liquor stores. And people are there.

And without a filter or a lens to look at it, you can kind of assume that it is also horrible, that anybody there is horrible. But that's not how the law works, though. The dialectic I am talking about is a lens you have to look at the case as dictated by the court, and it's a lens that is framed, as you will, by a presumption of innocence.

And if you look at the case from the presumption of innocence, and look at Mr. Robinson, for all his imperfections from that presumption alone, the view of that intersection and place changes quite a bit.

So if you presume him innocent, he's there. He's found with some drugs. If you view him as innocent, you say there's no scale. He's not a dealer. If you view him as guilty, you say there's no scale, therefore he's guilty. If you are like Agent Flanagan, if you say he has no money, he's guilty. If you view him as presumptive innocent person, he has no money. He's not a dealer.

If you presume him innocent because there are no customers, that means he's not a dealer at all. If you presume him guilty because there's no customers, ala Agent Flanagan, he's guilty because no one is around at 4:00. There is no supplier. There are no sales. There is no delivery.

If you presume him innocent, you look at all the facts in the case. There is no Arizona. There's no proof that the dope that he had, the 95 pills, came from anybody in this case. There are no flights. He wasn't involved in the Wells murder. He's not involved in the Berry murder. He's not involved in the Williams murder. He's just there living his life.

And if you look at him as an individual in the context of a social network here and signs consistent with the First Amendment rights that he has, the image or the lens tells you that the case is much different for him. It really is.

Before I get too far, I want to put a structure to what I'll going to talk to you about too. I want you to know where I'm going to go here, so you can follow me along. And, you know, the name that comes to mind initially is John Ruskin. He was an English philosopher, and he was a rock star in England about 100 years ago.

There were a lot of PhDs theses written about him. He was considered the key philosopher in England. And he's largely forgotten today, but he did come up with a sentence or a phrase that I'd like to share with you that gives us a way to frame our own case.

And the sentence was, the composition -- a composition is the arrangement of unequal things. It is up

to the composer to decide what must stay and what must be, what must be cast aside in life's unfurling passage.

I will repeat that again. The composition is the arrangement of unequal things. It's up to the composer to decide what must stay and what must be discarded in life's unfurling passage.

So what is he saying? He's saying that the composer, the painter he's talking about back then, but the composer, the arrangement, the way of viewing things is to decide what is important and what is not. And that's what you've got to do too: What's important here and what's not.

In law, the composition that we arrange is formed by questions. When we enter law school, there's this case law method, and the cases are all started with the same way. The issue in this case is whether we're not such and such, and the facts are discussed, and the court then decides the issue in the context of the facts.

So the issues frame a legal case. If you've ever read or want to read a Supreme Court decision, which are interesting if it's the topic that is relevant to you, the first paragraph is always, This case comes before the court on an issue that's unresolved. The question we must ask or answer is this as follows. And then they proceed for 90 pages, and then they answer the question.

So our task, my task for you is to frame the case

with questions. And how you resolve those questions will be how you resolve the case.

So the first question is whether or not this is about a place or an enterprise. And does the criteria for enterprise basically describe the place we're dealing with. That's the first question.

The second question is whether this case is really about familiarity as a touchstone of acceptance and whether or not his conduct is premised on familiarity rather than criminality. That's the second question.

The third question in the case is what about those four instances that they've had here where he's been arrested. I want to talk about each one of those and tell you why that doesn't prove the RICO enterprise.

So there are three questions.

Then before we get to those, I want to touch briefly on the presumption of innocence as well, the burden of proof beyond a reasonable doubt, and go over what the language is in specific and also talk about your duties and obligations here as a jury. I'll end with an anecdote, and we'll be ready to go.

It's every -- I've been married a long time. My wife loves these crime shows, and I always ask her why she's watching them. And she says, well, the actors are handsome and the actresses are beautiful and the story always ends

well.

And, you know, I feel like it's an encapsulated whole, it kind of all works. And I said, that's not reality. And she says, well, I don't care. This is, this is something enjoyable for me. And so we got used to watching these crime shows for that purpose, because it all works out.

Well, you know, I remind her that the law is different, and she goes back to her crime shows, but the point is that we're not actors here. It's one thing to be in a show. It's quite another to stand before you, as I do right now, and argue for someone's life.

And so I want you to stay with me now. This is going to take about a half hour. So let's start with the presumption of innocence, proof beyond a reasonable doubt, function of the jury. I'll not repeat what my friends have said, and we'll go to the three questions. And I've got an anecdote to end.

Well, Mr. Rivers talked about it briefly, but when we were starting our country here in Philadelphia, the question for the founding fathers was how to make sure that people are treated fairly in this country, because the standard or the reasons we exist is whether we treat people fairly in the United States. And so the struggle they had back then was how to do it.

And Independence Hall is smaller than this. The best part of Philadelphia is the Thomas Graff House where everything was written. And if you are a friend of -- a fan of the Monroe, Jefferson, all those people, you skip the Independence Hall, and you go sit at the desk where Jefferson wrote this stuff.

And it's about the size of your jury room right there. There's a window, and it's hot. If you are there in July, you sweat it out in Philadelphia.

It's quite enthralling really to be there, but the idea they came up with was that no matter who you are, what you've done, your economic class, your race, where you live, you get the presumption of innocence. It starts for you.

And it's important to think about what that means, though. Mr. Wold talked about someone that you know who might be in trouble.

The best story, though, I thought of a case in Kentucky. It's the Billy Taylor. He was a kind of a near-do-well in the rural Kentucky area. He was a burglary constant, breaking into houses. He'd been in court, in and out for six felonies.

And one day entered one of his friend's house and took some money, and his defense was that he had consent to go in. And, of course, entering a house and taking something out is a burglary.

And the, he decided to go to trial on that defense. The judge knew who he was. And at the conclusion of the case, they had to present their testimony. They were discussing jury instructions, just as we've done.

So you are probably thinking what are we doing back there while you are waiting, and what we're doing is trying to get the language right for you so you can get the right context so we instruct you correctly. It takes some time when you see how complicated instructions are.

But in Kentucky, Billy Taylor, who had been through the system, noticed that the instructions had omitted the presumption of innocence. And he said, you know, I would like to have the presumption of innocence given. And the judge said, you know, Billy, I've seen you six times. This is just ridiculous.

But it's given, though. And he was convicted, of course. Went up to the Kentucky Supreme Court, and the ruling was, well, you didn't get the presumption, but it was harmless because you are guilty anyway.

And they petition the Supreme Court, and there was a decision that came down, *Taylor versus Kentucky*. And the decision was, well, Billy Taylor, you get the presumption. You may be the guiltiest guy in the world; but if you don't have the presumption, you don't have a fair trial.

So what's the story mean for you, though? You

will go back into the room probably tomorrow now. Select someone to lead you. And the first thing you should say to each other is, I will presume Trevaun innocent.

And you know once after your verdict comes back, no one is going to call you. And I can promise you that no one, I'm not going to call you. Whenever decision you make is your decision. We've met for thee weeks, and that's it.

No one is going to ever ask you if you presumed him innocent. The rules of the court, the deliberations are private anyway.

But unless you engage in that presumption, which is so important here for him, you haven't done justice. You haven't done this right.

And it's difficult because these individuals are so foreign to you. They live in a foreign place. It's difficult because of the violence of this case and the drugs that do that, but you've got to do it, and this is the first step in your deliberations.

The second step is the burden of proof. We're trying to figure out way back in the constitutional days how to treat someone fairly, and they decided the burden of proof should be very high. They decided it should be beyond a reasonable doubt.

And the evolution of that proof or the language of the proof has changed over 250 years. What's so great about

the trial here is that all this is very traditional. All the language is traditional. It's changed. The vernacular has changed.

In Minnesota it used to be proof beyond a reasonable doubt was proof to a moral certainty. They got rid of that because what was moral for someone might not be moral for someone else.

In the south, they often don't define it at all. They call it a tautology. Proof beyond a reasonable doubt must be proof beyond a reasonable doubt, and they let the jury try to figure it out.

But here we have a definition. I don't want to be pedantic and read to you, but I want to make sure I get the language right so I can explain it to you. The court I anticipate will give you this instruction. If I have read it incorrectly, obviously rely on the court.

But proof beyond a reasonable doubt is proof of such convincing, such a convincing character that a reasonable person after careful consideration would not hesitate to rely and act upon that proof in life's most important decisions. If after careful consideration, you would not hesitate to rely on and act upon that proof in life's most important decisions.

So what you've got to do to apply that standard is figure out what the life's important decisions have been for

you and then find out what evidence you needed to make those decisions.

So I would submit to you that the most important thing in your life is who you love, whether it's a partner, whether it's your children, whether it's a brother or sister. You don't have to be married for this, but it is the most important thing that you can do.

And what you have to decide here or remember as you kind of figure out what the standard is, is what evidence you needed beyond a reasonable doubt to love that person, and recall the courtship days where you would date somebody. It's a little different with all these cell phones now, but you are asked out and spend a lot of time with that person.

And if it wasn't working out, your emotional clicker would say cancel, but it is, you keep going. You progress. And you, you get to the point where you have no doubt. It's beyond reasonable doubt.

And when you get to that point, you utter these words, you say I want you. I want to be with you for the rest of my days. And at that point you don't have a, you don't have any doubt.

It may not work out. A lot of marriages don't work out, but as an emotional reaction, every major decision in life is an emotional decision. We're not in the AI. We

don't do calculus here. You don't go back and make numbers in the jury room.

This magnitude of the case, and this is a heavy, this is a heavy weighted case as you could possibly get, first degree murder. So you have to remember what kind of evidence did I need.

If you have hesitation, you have what is called cognitive dissonance. It was a favorite phrase in college. You have this eery, oozy thing that you can't go on. If you have cognitive dissonance about the case, if you have hesitation, then you have doubt.

Is there a reason to hesitate here, and there are abundant reasons, which I'm going to get to in a second, and those are all within those questions I'm going to tell you about and answer for you. But that's what proof beyond a reasonable doubt is.

You know, it recalls the old Samuel Beckett line, you know. I wait. I don't want to wait. I wait. I go on. I go on and on and on. It's that kind of French existentialism.

And eventually you go on if you resolve your doubts; and if you don't resolve your doubts, you wait. The whole play is about this. But he was talking about something that -- resolving doubt. That's what he was famous for.

So that's, that's how you look at that. What's the most important affair of my life, and it may not be someone you love. Maybe a surgery. Maybe something else, but you got to think about what's important, what's the most important, and how you decided it. And why you had hesitation and how you resolve the hesitation.

The last piece of this is the jury itself. The founding fathers we're ingenious. They decided that not only should people be summoned in to decide a case, but they should be allowed, if the evidence wasn't proven, to reject the government. They should be obligated to reject the government. They should be given no choice.

So the system is, if you presume innocence and you find the burden has not been overcome, that presumption has not been overcome by proof beyond a reasonable doubt, you have no choice. You must say no.

So this isn't about, what we're doing here is not about setting standards of conduct. It's not about what you would have done had you been raised in North Minneapolis. It's not about the fact that you may not have had anything to do with fentanyl. It's not about the fact that you were addicted maybe by genetics or by lack of exposure.

It's not about setting context. It's not about convicting someone because you think it's going to do society some good. It's not about any of that. It's quite

simple in a way. Presume innocence. If you have a doubt based upon reason, acquit.

You know, we all have to do things for the government. We all have to pay our traffic tickets, our license tabs, our taxes, which you already did last month or two months ago. But this is the one chance you have in your life to say no to the government. It's the one chance you have that you are obligated to do it.

You are at the cusp of life. You have -- as Nietzsche would say, as the cold increases, the responsibility increases, and you have to make an everlasting decision about it. Individually in making that decision, you have a right to say no to the government.

You have enormous power for maybe one of the first times in your life, enormous power over a human being, in somewhat as sacred an endeavor that we are all engaged in now.

All right. Let's go to the Ruskin questions. The first question is, is this about a place or is this about an enterprise.

Well, if you, if you listen to the testimony of Jovan Knight, it's certainly about a place. It's people go to the North side. He came from Chicago. Mr. Robinson was born there. They tend to stay there. Why do they do that? It's a black community. It's where they were raised, where

they went to school and where they made their friends.

And according to Mr. Knight, he's going to go back whenever he gets out of prison, if he does, and he will because he's selling himself. But it is, it's the nature of a place, you see, and this intersection is a part of that place.

And the problem here in the case is the description of an enterprise is the same description of this place. The judge will give you some instructions on how to define enterprise.

I want to go through those right now with you and apply those to the place and ask you to decide whether this is really about a place or something else.

You're going to get like 50 pages of these, but the enterprise is defined in many ways. Again the judge is the arbitrator of law. If I miss a sentence, please rely on her.

But, excuse me, an enterprise need not have an hierarchy or a change of command. This place of Broadway and Lyndale in North Minneapolis, north of it, has no hierarchy, does it? There is no chain of command at this place. So that defines it as well.

Decisions can be made or may be made on an ad hoc basis by any number of methods, whatever that means, including by consensus or a show of strength. So what

happens at this intersection is ad hoc. People come and go.

If you believe Jovan Knight, everybody is kind of doing their own thing. No one bothers anybody else. They have their own business. People come and go. They can use Winners without permission. They can go to Merwin's without permission. Someone from the neighborhood can go here.

Then the other definition as we go along what an enterprise is, members of the group need not have a fixed, have fixed roles. Well, there are no fixed roles in a place like that. You've heard nothing like that.

Different members may perform different roles at the same time. Well, there are no members here. You can perform the role of going to Merwin's if you like. You can perform the role of selling some dope if you like at different times, different places. This is still, this is a place.

The group need not have a name or regular meetings that describes the place. There are no meetings here. There are no group meetings. There are no dues at this time. There are no established rules and regulations at this place.

There are no disciplinary procedures. There are no induction or initiation ceremonies. All these are factors describing an enterprise, but they are the place we are talking about.

And what can happen to this place that there would be, quote, unquote, spurts of activities punctuated by periods of inactivity. Welcome to the intersection. The enterprise or place is not limited to whose crimes are sophisticated, diverse, complex or unique. That describes what happens here.

So this idea of an enterprise really describes a location for our case, but what is it about this place here? What, what more can we say about it. There's something that is quite concerning that we learned about in this case, and that is from Mr. Nix and his relationship to this place.

And that is that he was paid, as Mr. Rivers said, $50,000 to be an informant to snitch on all his friends, but really what is terribly troubling here is that Sergeant Schroeder paid him knowing that he was dealing on the side.

And so Nix, if you recall his testimony, and check your notes on this, basically said, well, Sergeant Schroeder knew what I was doing. I gave some tips, but I kept dealing on the sides. So he goes to Arizona. He keeps selling dope. And the police know about it. And the dope he's selling, says the government, goes right into this place.

So what we have here is rather awful. It's a complicity with the Minneapolis Police Department in this place or this enterprise that they say, where they know that their informant is dirty and contributing to the crisis in

Minneapolis.

And they turn around and say, these people are terrible. These are awful. Trevaun, you know, he's a doper, but, you know, what's going on here?

You know one of the reasons you can doubt the government's case is that one. I mean, we have Sergeant Schroeder, who is almost like a Waldo figure. My kids were young, maybe you remember that. Where's Waldo? You read the book to the kids, a picture book, and you'd find little Waldo. It's really quite entertaining.

Well, Schroeder is our Waldo. He's everywhere. He's ordering this arrest. He's ordering that arrest. He must have been on ten arrests. He's got this snitch named Nix, knowing that he's trafficking.

And he's making this great exchange of money, give him a thousand dollars $500 here and there, so that he can help Nix stay out of jail and help Nix pollute the North Minneapolis neighborhood.

It's outrageous what happened here. You should feel outraged that the police are involved.

The second part of the case is that they know that this is an open air market because Jovan Knight said so. He said, well, I sell all the time here. Well, aren't the police involved with you? No. They just walk right by.

All you're seeing here is a couple of arrests over

the ten-year period of time. You see one bust, and that was with Mr. Banks, and his lawyer will handle that and what that means. That's all you saw in ten years.

You saw a couple of arrests for Mr. Robinson, of course, because that's where he lives. That's his neighborhood. That's his hood. But it's an open air market. They know about it and didn't stop it.

And then this Agent Flanagan, you know, I asked him about that. He said, well, you know, we can't stop everything. I mean, the guy's sort of a bearded braggadocio punk is what he was. And he wouldn't answer any of my questions.

And he answered all their questions in this nice smiling narrative, and when I wanted to ask him questions, of course, he couldn't do it. But he says, well, you know, we can't stop everything. It's just too bad. But wait a second. Schroeder knows this is going on. They are complicit in this.

So do you have a basis to doubt alone on the fact that the police are complicit here in the alleged crime? Does that give you hesitation to doubt what their descriptions are and what the descriptions of this High is? Does that give you a sense of queasiness? I hope it does. This is just sordid stuff. This is rather awful.

So it's really about a place. It's not about an

enterprise. There are no Highs. There are no Highs signs. There's no, no -- there's no effort here to say you belong to the Highs. There's nothing like that.

What this is in this place are different gangs who are competing with each other in the same neighborhood and doing whatever they want to. If you believe Jovan Knight, he's just going to do whatever he wants to.

Did you shoot somebody because someone told you to do it? No, I just shot anybody I wanted to. Did anyone tell you to shoot somebody? No, I just shot somebody. You hate these other gangs? He more or less said that.

I mean, that's kind of what's happening here. The problem in the case is there is no Highs, but there are other -- there are other conspiracies here.

And you are going to get an instruction called multiple conspiracy instruction in this place. And what it says is that -- it acknowledges that there are two conspiracies charged here: Conspiracy to commit RICO and conspiracy to distribute controlled substance.

And the government must prove beyond a reasonable doubt each defendant was a member of the particular conspiracy charged, which is the Highs. That's what's charged here.

If the government fails to prove this to the defendant, you must find the defendant not guilty of the

particular conspiracy, which is the Highs, even if you find that he was a member of some other conspiracy.

Proof the defendant was a member of some other conspiracy not charged in the particular conspiracy, then that count is not enough to convict on that count. So the gravamen on the case is this Highs umbrella includes other gang, but the Highs is what you have to belong to.

What you should find here and relative to this place is that he was involved in the YNTs and has nothing to do with the Highs. The gravamen offense is this tragic killing of Mr. Wells.

We saw the planning of YNT members. It had nothing to do with the Highs. They met. Remember the Porsche and the Dodge Charger and the tragic death of Prince Martin. And these guys get together, and on a day later, they go to this Skyline Market and shoot Mr. Wells.

Well, it had nothing to do with the Highs. It had to do with Prince Martin being a YNT. It wasn't a part of the Highs whatsoever. There was no meeting of anybody outside of the YNTs to do that. There was no confluence of the FreeShotz, the EMBs. I mean the EMBs I think they are, EMGs. There's nothing like that.

It was a money group that did this. I mean, there's no Highs. It's absurd. Nothing like it. And for the other events, I mean, there's no evidence as to the

other homicides that they were related to the Highs at all.

There's no one to testify they could say that really. And then the only people they had was Nix, who was a, he's a liar. You can't rely on the most important affairs on him. I mean, if a guy like him came to see your daughter a asked for a date, you would say, get out of here. I can't trust you.

I mean, and then Jovan Knight, I mean, you can't really trust that guy either. They are both trying to avoid life sentences. And if you don't consider that, we've missed the boat here. They will say whatever they have to say, and they know what they have to say is the Highs exist and they don't care.

There's a certain narcissism in Mr. Knight. He will just shoot anybody he wants to. He will do whatever he has to do. He writes a letter to his father saying I'll do whatever I have to do.

And this narcissistic drivel of his, if you ever dealt with a narcissist, it doesn't resonate after a while. All they think about is themselves. He's selfish. He just wants to avoid prison. You can't rely on a guy like that. That's the only proof they have.

You would be entitled to say I have a reasonable doubt about Knight, and I have a reasonable doubt about Nix and call it a day. You can start right there.

The second question that Ruskin has asked us to ask you is what about, is this about familiarity? Is this case about a gang, or is it about familiarity?

And here we have an interesting and very important instruction for you. I'm almost done with my instructions too.

Familiarity is the touchstone. We do gravitate to people in our life, as I mentioned to you, and one of the, one of the great features of making friends is that you have a right to do it. You have a right to associate. The First Amendment lets you do that.

You have a right to assemble. You have a right to write things. You have a right to show things. You have a right to have videos, and you are going to get an Instruction Number 27 in this trial, the evidence has been introduced of the defendants engaging in expressive activities such as rap videos or threats and associative activities, such as attending memorials.

Such activities without more do not themselves constitute criminal racketeering activity. So what this is saying is that these guys have rights too. You just don't live in North Minneapolis and give up your right to make friends. You don't give up your right to associate.

So what the case is all about, we have this almost Instagram rat-a-tat-tat, every minute, every image, there's

no narrative here, of course. It's just image after image after image. And they say, okay, here they are together. Of course, they're together. This is what they know. They have a right to be together.

If you presume innocence, which you must, you can look at these pictures and say, okay, fine, what does that show? It shows they're exercising a constitutional right to hang out with each other. And then the question is what about dropping the Y. They have a right to do that. The instructions say they do.

You can engage in expressive activities. You can make signs. You can swear. You can criticize people. That's what he's doing. I mean, what he's supposed to do? Huddle in a puddle in a basement? Not be with his friends, and you say, I don't like your friends. I don't like your choices.

Well, that doesn't matter here. But he's engaging in the conduct of life. So when you see these things, you say I'm going to engage in a dialectic. I'm not going to presume guilt because he's in these pictures. I'm going to be presuming innocence because he has a constitutional right to hang out with his friends. That's what you got to do.

So you got all these rat-a-tat images. It is really fatiguing after a while. There is no narrative. No one says what's happening. There's just one image after

another. That's all protected.

And I suppose the counterclaim is, oh, they are getting together to plan something. Well, there is no evidence of that. No evidence whatsoever. So this is about something larger than just the facts. This is about exercising the right to associate even with people that you may not associate with yourself.

So we move on to the last question. If you answer at that question though, are these picture consistent with the right to associate, right to go to funerals, right to mourn your friends, is that evidence of a gang life? No, it's not. It's not.

So what about these four instances? What do they show us? If I may take each one in sequence. I may be out of sequence in terms of the time and sequence of the case and what they mean here.

The first one was the arrest at the 4th Street Saloon. He's in a Monte Carlo. Hannah Whitfield is driving. And they take him out of the car and they -- you know, he has some pills, as I told you in opening, in his hand and those drop to the ground.

They find a gun near the driver's seat console on the driver's side, not his side. They take some prints of the gun with their latex gloves, and there's no evidence that there's a match to him whatsoever, although they check

every gun.

So what does that show? Government contends, well, these pills have to have come from the same conspiracy, but there's no proof that have whatsoever. As I mentioned to you earlier, there's no proof he's a dealer. There's no customers. There's no video.

There's no supply. There's no effort to link up the drugs from Arizona. We know drugs come from California, New Mexico. We know the people who have the different supplies of drugs, I suppose.

And then the defense here is what Jovan Knight said is, you know, people have drugs kind of to disguise their own addiction and to feed their own addiction. And he admitted he did. And then he kind of, then he realized what he admitted, and then he added some more things because he had to keep cooperating.

You recall that exchange. Yeah, I had drugs. I had 87 pills. I didn't know -- I didn't want anyone to know I was addicted, but he was.

So we've introduced, the Exhibit DD6 is his medical records and you can look at those. It's 65 pages. He's addicted. Trevaun is, he's trying to get some treatment at HCMC. You know, he's got warts and all in these records. He's kind of vulnerable by showing them to you.

But he's trying to get Suboxone. He's got Narcan issues. He's got Percocet issues, but he's addicted.

So if you presume him innocent, is there a way for you to look at those 95 pills and say, well, wait a second. It's a masking of the addiction, and yeah, because this witness said that that is what happened.

And you have no other evidence that that gun was used to facilitate a drug transaction or to protect those drugs or anything other than it is clear that guns are around all the time, but that's the first instance here.

And there was a little bit of confusion on when Hannah Whitfield was arrested or not, but the gun was found on her side, and there were no prints that match him. And if you presume innocence, then he didn't touch the gun. You presume guilt, of course he touched the gun and didn't find a print. That's kind of the mechanism here.

So he's arrested. And again, there's just no claim whatsoever that those pills came from any conspiracy in this case. None. No proof.

The second instance is this General-Thomas name, this young kid that videotapes himself driving. He's in a car, and he got some guns. And then Trevaun Robinson is driving, and he broadcasts these images, and the police find them, and then they find the car and arrest him an hour later.

So what does that show us? Well, the guns are found on the driver's -- or excuse me -- the passenger's seat, below the passenger seat where General-Thomas was. That suggests to you that those guns are his. Obviously they're his guns because he's showing them off on the video.

Now, marijuana is emanating from the car, from the passenger seat, according to Officer Grout, and General-Thomas is arrested. Everyone is arrested, of course, and that's the end of the case. The guns, of course, are seized with latex gloves, and you have heard nothing about DNA or fingerprints matching Trevaun Robinson to that gun. None.

There's some marijuana in the car. It would appear from looking at the testimony that marijuana is an endemic issue on the north side in the black community, but there's no proof that Mr. Robinson ever sold marijuana. There is no proof that that's his.

And so that's the end of that one. So there are guns. It wasn't his. How you look at that is how you presume him innocent.

And the next one, the next two are of course more concerning. The next one is a Mayo Clinic shooting. The claim is that there was a funeral for Boosie that afternoon, and therefore the anger spilled out to Hennepin Avenue, and at 1:30 there was a shooting that was caused by the gang.

What is the proof, though? We have the video. We know who the shooter was, Deandrae Whitfield-Smart. We know that Trevaun Robinson was near him and separated himself at the time the gun went off. We know that Sergeant Schroeder appears again, our Waldo, and identifies people on Hennepin Avenue.

What's missing, though, is who else was there. If the police are so good at identifying these people, why is it that there was no testimony as to who was there? Is this, is this a shot fired at the Lows? Is it a shot fired at someone who offended Deandrae Whitfield-Smart?

Who is this person? You don't know. It would be wrong, consistent with the presumption of innocence, to assume that this is a Low member, or it would be wrong for you to assume this had anything to do with that funeral of Boosie. Y22 is the exhibit. We've seen it a few times. There is no connection there.

And it is kind of offensive to have Sergeant Metcalf just interpret the evidence when she can't hear anything. He must have said this. He must have said that. He must have been whispering in his ear. He must have told him to shoot. There's no evidence of that.

You can't assume there is evidence when there isn't. It's this bias that some of the police officers had. Flanagan was the same way. It's this bias to try to convict

these guys. Just tell us what the facts are.

What she should have said is, I couldn't hear what was said. This is what I saw. You make your own conclusion. But, no, that's not what she did. He, he told Whitfield to fire, but there's no evidence of that. No evidence of that.

And, of course, it's dangerous. Of course, it's downtown. And, of course, Ms. Gomez-Aguilar [sic] is entirely sympathetic, and it's tragic that she even had to be here. Of course. But what are the facts? What's the evidence?

The final instance is this one on videotape that is concerning I'm sure for everyone, including you. That's the one where he goes into the Winners and buys some things in the red sweatshirt. Drives off. Goes to Merwin's. There's a collision, and they showed you the video today, and then the shots were fired into the window.

The question for you is whether or not this is consistent with a place or an enterprise. And the problem the government has is that the person who was shot, regrettably so, had nothing to do with the gang. There's no evidence that that person was involved in the Lows, the Ipsa [sic] Dipset, Mindset, or whatever the gangs are in the low end. There's no evidence of that whatever.

There was no evidence that he was acting at the

behest of anybody. There's no evidence that someone told him to shoot anybody. There's no evidence that someone's guiding him. It's entirely regrettable. But is it, is it gang related, or is it something entirely different?

If you presume him innocent, it is something entirely different because this individual he shot he did not know. The whole theory of the government is that these guys are at war, they knew each, and they're going to shoot each other to death.

That's the theory of the case. They are at war. This has nothing to do with that. It's antithetical to their theory. It doesn't work.

So the poor guy is shot three times in the thigh. They show you the photographs, and they're awful. That's true. But is it related to the gangs, or is it related to the place? It has nothing to do with it.

It has nothing to do with dope. It has nothing to do with anything except a temper, a hot head, and a regrettable instance. But he's not charged. There's no count on that that you have to decide. You have to decide whether it's a part of the enterprise. The enterprise doesn't exist, by the way. There's no proof this enterprise existed. The only people that say it did are these two witnesses I mentioned to you.

And that's the end of the case. I mean, he

shouldn't have shot into the window. It shouldn't have happened, but it's not consistent with their theory.

So you have to say, well, even though this is rather awful stuff, it's inexcusable, but what does it really mean in the context of what they're trying to prove? You have to be somewhat dispassionate about that.

You can't have a visceral dislike of Mr. Robinson because of what you saw, and what you have to do is say I'm going to presume you innocent and see if it fits into the government's theory. That's what you got to do. And it simply doesn't.

Well, I've said my piece. I want to give you an anecdote and send you on your way.

And this is a, you know, this is -- the life I experience is so much different than this one. I mean, I look at all these pictures in the case, and I'm looking for -- I'm looking for people with gray hair. In all those pictures I'm looking for fathers. I'm looking for mothers. And, you know, we don't see any, do we?

But what we see is a family of young men who are familiar with each other and communicating with each other.

But I look back on my own life, and I was quite fortunate. When I was 14 I was somewhat acting out and rebellious. My dad was an ex-marine, World War II, and those guys that came back from World War II were hard-nosed.

They were so happy they survived the Pacific and Europe that they had no time for teenage angst, at least that was my experience. And I wasn't being as nice as I should have been. And he goes -- he wasn't a very expressive guy. Never talked about the war. He was in some of the big slaughters at the time.

And he said, well, you know, you're not doing too well. I want you to see a friend of mine. You are not behaving well. Your school scores are dipping, and you could be nicer to your mother. Your brothers, you know, are not being valued by you. So I want you to go visit my friend.

And I said who's that. And he said, well, it's a friend of mine from the war. So we got in the station wagon. It was a large Impala. It was kind of a boat. Back then they made these huge cars with eight cylinders. They got eight miles a gallon, if you remember, although I date myself, you know.

And I got in the front seat, and he drove for what seemed forever to Mr. Olson's house and said, get out and I'll wait for you at the front door.

And so I rang the doorbell. This gigantic guy, and I was 14 and growing, but he was, he seemed gigantic to me. His hands were huge. He's like six, five, which was big back then. He had this flock of gray hair that was back

and a puffy face and warm brown eyes and said come with me.

So we sat in his den. And it was one of these dens where the seats in front of the desk -- he worked out of the home sometimes -- were lower, and the desk owner's chair was higher, so he looked down on you. You maybe experienced that.

And so he said, how you doing? I said, I'm fine. He said, well, I hear you are not doing well. And, yeah. He says, is that so? I said, yeah. He said, well, I'm not going to spend a lot of time with you, but I do have three pieces of advice for you. And I said well, what would those be.

Well, he said, the first piece of advice would be to be a good person and engage in acts of virtue. It's Aristotle's advice to you that the virtuous life is formed by small acts of virtue. And I said, who is Aristotle. And he said, you should know. Start reading. I said, I understand that one.

And he said, the second piece of advice is that you need to select your friends, if you can, because they do form your life, and you are running into a little bit of trouble. So you got to be careful about selecting your friends, of course, which is apropos here, I suppose.

And I said, do you have a third piece of advice? It was terribly uncomfortable. He's looking down on me

leaning over his desk. I was kind of shirking away.

And he said, the last piece of advice to you is this. Don't you ever be cynical about your life. And I said, what do you mean by that. He said, well, don't you ever ascribe to people things that they didn't do or don't make judgments about them that you don't know about. Don't you ever think bad thoughts about somebody without knowing what they did.

And I said, well, that's okay. He said, now you are done. He stood up and I went back, and my dad was waiting in his white Impala station wagon. We drove home. Never said a thing about it. Never said a thing about it the rest of our lives.

But I have remembered that day and that evening, especially the last piece of advice, which is never be cynical. And, of course, that translates to the law as well. And if you are never cynical, you are presuming people innocent at the same time.

So the lesson for the 14-year-old boy is that the law says much the same thing and that we give people the benefit of the doubt whether we want to or not.

And despite everything in the case and all of violence and sordidness of North Minneapolis, you still have to do that for him. You really do.

So may the angel of truth, however you perceive or

believe that incandescent feeling of rightness or justice, that sense of fairness that is represented, it's almost angelical, almost spiritual. May the angel of truth come into the courtroom and at the conclusion of your verdict, and let the angel of truth tap Mr. Robinson on the shoulder and may she say on to him the jury has spoken and found you not guilty.

THE COURT: Thank you, counsel.

(End of requested excerpt)

* * *

I, Renee A. Rogge, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Certified by: /s/Renee A. Rogge
Renee A. Rogge, RMR-CRR